IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Southern Division)

| | |
|---|---|
| CHARGEPOINT, INC., | |
| *Plaintiff*, | |
| 254 East Hacienda Avenue,<br>Campbell, CA 95008 | **Civil Action No.:** |
| v. | **DEMAND FOR JURY TRIAL** |
| SEMACONNECT, INC., | |
| *Defendant*. | |
| 4961 Tesla Drive,<br>Bowie, MD 20715<br>County of Residence: Prince George's | |

## COMPLAINT

Plaintiff ChargePoint, Inc. files this Complaint for Patent Infringement against Defendant SemaConnect, Inc., and alleges as follows:

### I.      INTRODUCTION

1.      ChargePoint is the market leader in electric vehicle ("EV") charging infrastructure.  It pioneered the networked EV charging market and holds patents covering its innovative and proprietary technology.  As can be expected in any new industry, new competitors have emerged, in many instances copying ChargePoint's product offerings.  Despite these challenges, ChargePoint currently supplies more than a majority of the EV charging infrastructure market by virtue of its superior technology and intellectual property.

2.      One of the competitors to emerge in the electric vehicle charging space is SemaConnect, Inc.  SemaConnect has always been a minor player in the market.  However, it

recently announced that it is in the process of entering into contracts over the next 90 days to deploy, *for free*, at least $16 million in competing EV charging infrastructure—using technology that will indisputably infringe ChargePoint's patents. **Exhibit E**. Participants in the program will receive up to $100,000 in free electric vehicle charging stations and related services (for a period of 8 years) in exchange for a commitment to keep the charging stations in place for a minimum period. On information and belief, the program will consume a majority of the available market during that time.

3.      ChargePoint will not be able to compete with the SemaConnect program and will, for all practical purposes, permanently lose those customers who accept the SemaConnect offer. Funding for the SemaConnect offer comes from Electrify America, a wholly-owned subsidiary of Volkswagen Group of America, and is being spent in connection with the $2 billion zero-emission vehicle infrastructure and technology build-out penalty imposed on Volkswagen as a consequence of its emissions-rigging scandal in 2015. After the initial 90-day, $16 million contract cycle is complete, SemaConnect will roll out additional free goods (again subsidized by Electrify America) to parking lots, apartment complexes, and commercial buildings nationwide. In the meantime, ChargePoint—the party that invented the industry and holds valuable patents asserted in this litigation—is left with virtually no ability to compete for this business.

4.      By reason of SemaConnect's infringement, ChargePoint will be irreparably harmed if this "free goods" scheme were allowed to go forward. Once the infringing stations are installed, it will be almost impossible to convince their owners to replace them, especially because payment for the stations themselves, as well as the continued subsidies from Electrify America, are almost certainly dependent on the infringing charging stations remaining *in situ*. Thus, SemaConnect's patent infringement will effectively shut ChargePoint out of these

opportunities—because it cannot meaningfully compete with "free" goods and services—and ChargePoint will be deprived of revenues for its patented inventions for nearly a decade. Absent an immediate injunction, SemaConnect will build an entire infringing ecosystem that will be impervious to challenge for most of the life of ChargePoint's patents. Mere money damages will not restore ChargePoint's access to this enormous swath of the EV charging market.

## II.    BACKGROUND

5.      Founded in 2007 as Coulomb Technologies, ChargePoint is a pioneer in the electric vehicle charging infrastructure industry. ChargePoint has invested millions of dollars in research, development, design, manufacture, sale, and maintenance of electric vehicle charging stations and related technology. Its worldwide electric vehicle charging network includes tens of thousands of stations that have been used more than 16 million times.

6.      ChargePoint was the first company to propose *networked* EV charging infrastructure, in the face of widespread industry skepticism, and the first to patent networked EV charging technology.

7.      ChargePoint has received numerous accolades including a 2016 Edison Award in the Electric Energy & Propulsion Systems category. ChargePoint has been a Global Cleantech winner six years in a row and has been recognized and praised by the United Nations, the World Economic Forum, Time Magazine, CNBC, and Businessweek, amongst many others.

8.      ChargePoint invests substantial resources in research and development of EV charging stations and related technologies in order to continually improve its product offerings for its customers and consumers. As part of its R&D efforts, ChargePoint has obtained dozens of patents and applications that relate to hardware, software, management, networking of EV charging stations, and communications with electric vehicles and electric vehicle drivers. It has

invested resources in obtaining its patents so that it can, when needed, use those patents to advance its business objectives and protect its inventions.  ChargePoint's patents include US Patent Nos. 7,956,570 (the "'570 patent"); 8,138,715 (the "'715 patent"); 8,432,131 (the "'131 patent"); and 8,450,967 (the "'967 patent") (collectively, the "Asserted Patents").

9.      Together, the Asserted Patents describe a paradigm-shifting concept of how to charge electric vehicles in a dynamic, networked environment—a dramatic departure from the gas station-centric ideas that prevailed before ChargePoint's innovations.  Each of the patents claims new and useful features in the field of network-controlled charging stations.

10.     On information and belief, SemaConnect was founded in 2008.  SemaConnect is a manufacturer of electric vehicle charging stations and related software.  SemaConnect also provides maintenance services for EV charging stations.  On information and belief, the charging stations developed by SemaConnect include ChargePro community electric vehicle charging stations, personal electric vehicle charging stations, and their supporting software, network, and system (the "Accused Products"), each of which infringes one or more claims of the Asserted Patents.

11.     On information and belief, In November or early December 2017, SemaConnect became the exclusive provider of networked "level 2" electric vehicle charging stations for Electrify America's Zero-Emission Vehicle ("ZEV") Investment Plan.  The ZEV Investment Plan requires Electrify America to invest $2 billion nationwide over the next 10 years in ZEV infrastructure and in the promotion of ZEVs.

12.     On information and belief, as part of the ZEV Investment Plan, Electrify America will pay the fees associated with the installation of infringing SemaConnect charging station as well as maintenance services related to the Accused Products to ChargePoint's customers and

prospective customers—*e.g.*, electric vehicle charging station site hosts, such as businesses

and/or apartment communities.  One such publicly announced arrangement (with CBRE, a

nationwide real estate holding company) calls for free service and maintenance till 2026.

**Exhibit E**.

13.      In effect, this means that ChargePoint's customers and prospective customers will

be able to acquire the Accused Products (and hence practice ChargePoint's patents) *for free* and

likewise obtain related services free of charge for many years.  During that service window—for

as long as 8-10 years—ChargePoint will be shut out of these parking locations and deprived of

the revenues those locations would generate were ChargePoint to install its products (instead of

the Accused Products) there.  Such downstream revenues are an important component of

ChargePoint's business model.  These installations, moreover, require significant labor and

construction, and constitute fixtures that are not easily removed.  Allowing SemaConnect to

install $16 million of them in the next 3 months alone will permanently alter the marketplace and

will shut ChargePoint out of these locations for most of the life of its Asserted Patents.  It will

also enable—indeed, *require*—SemaConnect's customers to infringe ChargePoint's patents for

the life of SemaConnect's installations.

14.      SemaConnect's infringement, particularly in view of the ZEV Investment Plan,

poses a dire threat to ChargePoint's business.  On information and belief, SemaConnect's annual

revenue currently is around $1 million; the very first Electrify America ZEV Investment Plan

deal with CBRE will inject SemaConnect with $16 million *in the next 90 days.*  Supercharging

ChargePoint's competitor is one thing; enabling it to sell infringing goods and services on a

massive scale is another.  Under the ZEV Investment Plan, Electrify America will make a

substantial investment in SemaConnect and the Accused Products, an investment that will

substantially and unfairly erode ChargePoint's position in the market for electric vehicle charging stations and related services.

15.     ChargePoint welcomes competition in the market, when the competition is fair. But having to compete against products and services that infringe ChargePoint's valuable intellectual property rights—particularly when offered for free—is not fair competition.  As such, SemaConnect's infringement is anticipated to irreparably harm ChargePoint's hard-earned position in the marketplace and good reputation, among other ways.  As a result, ChargePoint is forced to file this lawsuit to protect its patented innovations and its reputation as the leader in the electric vehicle charging station industry.

16.     The significant harm that SemaConnect's infringement will inflict on ChargePoint is imminent.  On information and belief, Electrify America is investing at least $85 million on community charging stations that include level-2 electric vehicle charging stations during the first cycle of the ZEV Investment Plan, which started less than a month ago, in November 2017. This is a substantial investment that risks allowing SemaConnect to capture a large portion of the market for electric vehicle charging stations and related services for years to come with the Accused Products.

17.     ChargePoint's estimate of the projected market for electric vehicle charging stations and related services for the upcoming fiscal year 2018 is $118 million, consisting of about $96 million for workplace and commercial sites and $22 million for multifamily sites. This translates into about $29.5 million per quarter—and, under the ZEV Investment Plan's proposed SemaConnect installation program, Electrify America will spend $16 million *at CBRE locations alone* in the next quarter.  Some of this money will be spent on infrastructure improvements.  Some of it will be spent on charging stations themselves.  All of it will be spent

to enable a permanently affixed infringing charging station network in lieu of ChargePoint's patented goods and services.

18.     On information and belief, SemaConnect has already begun offering the Accused Products to potential site hosts for free, and is in the process of selecting site hosts.  On information and belief, SemaConnect will enter into contracts and then commence installation in the first quarter of 2018.  **Exhibit E**.

19.     Under the ZEV Investment Plan's first installation cycle, after SemaConnect installs its infringing EV charging stations, it will then service and support them at Electrify America's sole expense until 2026.  ChargePoint will lose substantial revenue not only by losing out on installing its patented charging stations at those locations but also on at least 8 years of ancillary services directly associated with ChargePoint's patented charging system.  Thus, SemaConnect's infringement directly affects the market related to EV charging stations and related ancillary services.  Thus, if not enjoined, the threatened installations will cause irreparable harm to ChargePoint until at least 2026.

### III.     NATURE OF THE ACTION

20.     This is an action for patent infringement under the patent laws of the United States, Title 35, United States Code, seeking monetary damages, injunctive relief, and other relief against SemaConnect due to its infringement of ChargePoint's '570, '715,'131, and '967 patents.

### IV.     THE PARTIES

21.     ChargePoint is a company organized under the laws of the State of Delaware with a principal place of business at 254 East Hacienda Avenue, Campbell, California 95008.

22.     On information and belief, SemaConnect is a company organized under the laws of the State of Maryland with a principal place of business at 4961 Tesla Drive, Bowie, Maryland 20715.

## V.      JURISDICTION AND VENUE

23.     The Court has subject matter jurisdiction over this dispute pursuant to 28 U.S.C. §§ 1331 and 1338(a).

24.     On information and belief, SemaConnect is subject to personal jurisdiction in the District of Maryland because it is incorporated and has its principal place of business here.

25.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1400(b) because SemaConnect has committed acts of patent infringement and has a regular and established place of business in this District.

## VI.      THE ASSERTED PATENTS

26.     The '570 patent (**Exhibit A**) claims a network-controlled charge transfer system for electric vehicles comprising: a server; a data control unit connected to a wide area network for access to said server; and a charge transfer device, remote from said server and said data control unit, comprising: an electrical receptacle configured to receive an electrical connector for recharging an electric vehicle; an electric power line connecting said receptacle to a local power grid; a control device on said electric power line, for switching said receptacle on and off; a current measuring device on said electric power line, for measuring current flowing through said receptacle; a controller configured to operate said control device and to monitor the output from said current measuring device; a local area network transceiver connected to said controller, said local area network transceiver being configured to connect said controller to said data control unit; and a communication device connected to said controller, said communication device being

configured to connect said controller to a mobile wireless communication device, for communication between the operator of said electric vehicle and said controller.

27.     The '715 patent (**Exhibit B**) claims an apparatus, comprising: a control device to turn electric supply on and off to enable and disable charge transfer for electric vehicles; a transceiver to communicate requests for charge transfer with a remote server and receive communications from the remote server via a data control unit that is connected to the remote server through a wide area network; and a controller, coupled with the control device and the transceiver, to cause the control device to turn the electric supply on based on communication from the remote server.

28.     The '131 patent (**Exhibit C**) claims an apparatus, comprising: a control device to control application of charge transfer for an electric vehicle; a transceiver to communicate with a remote server via a data control unit that is connected to the remote server through a wide area network and receive communications from the remote server, wherein the received communications include communications as part of a demand response system; and a controller, coupled with the control device and the transceiver, to cause the control device to modify the application of charge transfer based on the communications received as part of the demand response system.

29.     The '967 patent (**Exhibit D**) claims a method in a server of a network-controlled charging system for electric vehicles, the method comprising: receiving a request for charge transfer for an electric vehicle at a network-controlled charge transfer device; determining whether to enable charge transfer; responsive to determining to enable charge transfer, transmitting a communication for the network-controlled charge transfer device that indicates to the network-controlled charge transfer device to enable charge transfer; and transmitting a

communication for the network-controlled charge transfer device to modify application of charge transfer as part of a demand response system.

## VII.   ACCUSED PRODUCTS

30.     On information and belief, SemaConnect manufactures, offers to sell, and sells the Accused Products nationwide.

31.     On information and belief, SemaConnect also uses the Accused Products in numerous charging station sites nationwide, including charging station sites maintained by SemaConnect itself.

32.     SemaConnect's sales and use of the Accused Products has and will continue to damage ChargePoint's hard-earned position in the marketplace and good reputation.

33.     SemaConnect's actions, especially in connection with the ZEV Investment Plan, have caused ChargePoint harm, and will cause further irreparable harm to ChargePoint if they continue.  In addition, SemaConnect's knowing acts of infringement will frustrate ChargePoint's ongoing strong business relationships, contracts, and potential contracts, with resulting lost sales and profits, and otherwise are or will cause substantial harm to ChargePoint's business.

## COUNT I

### (INFRINGEMENT OF US PATENT NO. 7,956,570)

34.     ChargePoint incorporates paragraphs 1-26 and 30-33 by reference.

35.     On June 7, 2011, the USPTO duly and legally issued the '570 patent, entitled "Network-controlled charging system for electric vehicles," to inventors Richard Lowenthal, Dave Baxter, Harjinder Bhade, and Praveen Mandal.

36.     ChargePoint is the owner, by assignment, of all rights, title and interest in the '570 patent, including the right to recover damages for past infringement.

37.     Each of the claims of the '570 patent is presumed valid.

38.     SemaConnect has infringed and continues to infringe the '570 patent in this District and throughout the United States by making, using, importing, offering for sale and/or selling the Accused Products.  For example, based on ChargePoint's current investigation, the Accused Products infringe at least claim 31 of the '570 patent as follows:

| Claim Element | Accused Products |
|---|---|
| A network-controlled charge transfer system for electric vehicles comprising: | The Accused Products are charge transfer systems for electric vehicles. *See, e.g.,* SemaConnect, *ESVE Basics*, available at https://www.semaconnect.com/charging-station-basics/ (Charging Stations "provide the electricity that is needed to recharge your vehicle"); SemaConnect, *About*, available at https://www.semaconnect.com/about-2/ (hereinafter "*About SemaConnect*") ("Our ChargePro Charging Stations [] offer advanced features such as smart-grid integration."). <br><br> The Accused Products are network-controlled.  *See, e.g., About SemaConnect* ("Our ChargePro Charging Stations utilize CDMA and Zigbee Wireless technology [].").  |
| a server; | The Accused Products include a server.  *See, e.g., https://www.semaconnect.com/the-network/* |

The difference with the ChargePro
**is its communication capabilities.**

| | Additionally, the Accused Products use "smart grid integration [] for easy energy metering and demand response."  *See, e.g.,* SemaConnect, *SemaConnect Partners with Mobile NOW to Permit EV Charging Payment by Cell phone with the ChargePro*, available at https://www.semaconnect.com/semaconnect-partners-with-mobile-now-to-permit-ev-charging-payment-by-cell-phone-with-the-chargepro/ (hereinafter "*SemaConnect-Mobile NOW Announcement*").  Upon information and belief, the Accused Products use a server at least with respect to implementing demand response using smart grid integration. |
|---|---|
| a data control unit connected to a wide area network for access to said server; and | The Accused Products include wireless capabilities and a data control unit for accessing the server.  *See, e.g.*, SemaConnect, *Series 6 Smart EV Charging Stations*, available at https://www.semaconnect.com/wp-content/uploads/2017/11/2017_Series_6_EV_Charging_Station.pdf (hereinafter "*SemaConnect Product Brochure*") ("the Station communicates with the software and produces real-time data). |
| a charge transfer device, remote from said server and said data control unit, comprising: | The Accused Products include charge transfer devices that are remote from the server. *See, e.g.,* Electric Vehicle Charging Station. |

| | |
|---|---|
| an electrical receptacle configured to receive an electrical connector for recharging an electric vehicle; | 

Reproduced from SemaConnect, *Commercial v. Personal EV Charging*, available at https://www.semaconnect.com/personal-2/ (hereinafter "SemaConnect Product Features")

The Accused Products include an electrical receptacle, *e.g.*, electrical receptacles A and B depicted above.  The electrical receptacles are configured to receive an electrical connector, *e.g.*, electrical connector C received by electrical receptacle A and electrical connector D received by electrical receptacle B, for recharging an electric vehicle. |
| an electric power line connecting said receptacle to a local power grid; | 

Reproduced from SemaConnect Product Features

The Accused Products include an electric power line, *e.g.*, electric power lines E and F, that connects the receptacles to an electric power grid G. |
| a control device on said electric power line, for switching said receptacle on and off; | A receptacle in the Accused Products can be on (*i.e.*, a state in which it transfers electric charge) or off (*i.e.*, a state in which it does not transfer electric charge).  Upon information and belief, the Accused Products have a control device on the electrical power line for switching between the two states. |
| a current measuring device on said electric power line, for | The Accused Products "give utilities new demand response options that would enable greater use of renewables while minimizing peak demand."  *See* SemaConnect, *SemaConnect Congratulates* |

| | |
|---|---|
| measuring current flowing through said receptacle; | *California Utilities for Planned Build-Out of Electric Vehicle Charging Networks, Urges Regulatory Support*, available at https://www.semaconnect.com/press-release/semaconnect-congratulates-california-utilities-for-planned-build-out-of-electric-vehicle-charging-networks-urges-regulatory-support/ (hereinafter "*SemaConnect Press Release*").  Upon information and belief, the Accused Products include a current measuring device on the power line for measuring current flowing through the receptacles, *e.g.*, for measuring current during peak hours and offering demand response options. |
| a controller configured to operate said control device and to monitor the output from said current measuring device; | Upon information and belief, the Accused Products include a controller configured to operate the control device and to monitor the output from the current measuring device, *e.g.*, with respect to instructing the control device to change the state of the receptacle and/or implement demand response options. |
| a local area network transceiver connected to said controller, said local area network transceiver being configured to connect said controller to said data control unit; and | The Accused Products include smart grid integration capabilities by "send[ing] and receiv[ing] important energy usage information and allow[ing] for chargers to operate with more solar and wind energy as it comes onto the grid." *SemaConnect Press Release*.  The Accused Products include a transceiver to at least perform these functions. *SemaConnect Product Brochure* (the charging stations include "wireless technology [that] The Station communicates with the software and produces real-time data.").<br><br>The SemaConnect Series 6 EV Charging Station is advertised as using "wireless technology" and advertises that "[t]he Network" is "what makes the ChargePro smart."<br><br> |



The ChargePro Charging Station Technical Specification confirm that each ChargePro is LAN-enabled and that up to 128 ChargePro Accused Devices can be networked together in a single LAN:

| Network Specs | |
|---|---|
| | UL2594; NEC Article 625 Compliant |
| Wide Area Network | Commercial CDMA or GPRS cellular network |
| Network Communication Protocol | TCP/IP |
| Network Security | HTTPS; 128-bit AES Encryption |
| Maximum Charging Stations per LAN | 128 |
| Smart Card Reader | ISO 15693 compliant |

Thus, on information and belief, the Accused Products enable smart grid integration capabilities at least in part by communicating with the grid via a LAN, using the transceiver connected to the controller and being configured to connect the controller to the data control unit to facilitate communications between the controller and the data control unit.

| | |
|---|---|
| a communication device connected to said controller, said communication device being configured to connect said controller to a mobile wireless communication device, for communication between the operator of said electric vehicle and said controller. | The Accused Products enable connection between a charging station and the mobile wireless communication device of an operator of an electric vehicle being charged.  SemaConnect and Telit, *SemaConnect Plugs Telit CC864-DUAL and GC864-QUAD V2 Cellular Modules into ChargePro EV Charging Station*, available at https://www.telit.com/press-release/telit-and-semaconnect-lead-the-charge-in-powering-electric-vehicles/ ("Users can receive real-time emails and text messages regarding the charging status of their vehicle, enhancing consumer experience.").   The Accused Products include a communication device.  *SemaConnect Product Brochure* (the charging stations include "wireless technology [that] The Station communicates with the software and produces real-time data.").  Upon information and belief, the communication device is connected to the controller and is used for communication between the operator and the controller. |

39.     SemaConnect also infringes at least Claim 32, which specifies that "the wide area network" identified in Claim 31 "is the Internet."

40.     SemaConnect has also induced and/or is inducing the infringement of the '570 patent by making, using, importing, offering for sale and/or selling one or more of the Accused Products. These products, as provided by SemaConnect to its customers and used as intended and instructed, infringe the '570 patent, and SemaConnect has known of this infringement since at least the filing of this Complaint and/or the date this Complaint was served upon SemaConnect.  SemaConnect sold and/or offered for sale these products, and is continuing to do so, to site hosts, specifically intending to actively encourage them to use the infringing devices for use in the United States in a manner that SemaConnect knows to be infringing.

41.     SemaConnect has also contributed to and/or is contributing to the infringement of the '570 patent by making, using, importing, offering for sale and/or selling one or more of the Accused Products.  SemaConnect has made and/or sold these products with knowledge that these products are especially designed for use as a component of a patented system, apparatus and kit, and/or an apparatus for use in a patented process, and are not staple articles of commerce suitable for substantial noninfringing use.  For example, among other things, SemaConnect actively and knowingly sells these products and provides the manuals and other documentation for these products to customers and others for use as a component of a patented system, apparatus and kit and/or an apparatus for use in a patented process.  These products are especially designed for use as a component of a patented system, apparatus and kit and/or an apparatus for use in a patented process, constitute a material part of the invention, are sold by SemaConnect for the designed use, and are not a staple article of commerce suitable for substantial noninfringing use.  On

information and belief, SemaConnect's customers and consumers have used these products in the United States in this manner and infringed the '570 patent.

42.     As a result of SemaConnect's infringement of the '570 patent, ChargePoint has suffered and will continue to suffer irreparable harm and damages.  ChargePoint is entitled to seek relief from the continuing irreparable harm.  ChargePoint is entitled to recover from SemaConnect the damages adequate to compensate for such infringement in an amount to be determined at trial.

43.     On information and belied, SemaConnect's acts of infringement of the '570 patent herein have been committed and are being committed with full knowledge of ChargePoint's rights in the patent.  SemaConnect has acted and is continuing to act despite an objectively high likelihood that their actions constituted direct and/or indirect infringement of a valid patent, and knew or should have known of that objectively high risk since at least the filing of this Complaint and/or the date this Complaint was served upon SemaConnect.  SemaConnect's acts, since at least the filing of this Complaint and/or the date this Complaint was served upon SemaConnect, constitute willful and deliberate infringement, entitling ChargePoint to enhanced damages under 35 U.S.C. § 284 and reasonable attorneys' fees and costs.

44.     SemaConnect's acts of infringement have caused and will continue to cause irreparable harm to ChargePoint, for which there is no adequate remedy at law, entitling ChargePoint to injunctive relief.

## COUNT II

## (INFRINGEMENT OF US PATENT NO. 8,138,715)

45.     ChargePoint incorporates paragraphs 1-25, 27, and 30-33 by reference.

46.     On March 20, 2012, the USPTO duly and legally issued the '715 patent, entitled

"Network-controlled charging system for electric vehicles," to inventors Richard Lowenthal,

Dave Baxter, Harjinder Bhade, and Praveen Mandal.

47.     ChargePoint is the owner, by assignment, of all rights, title and interest in the

'715 patent, including the right to recover damages for past infringement.

48.     Each of the claims of the '715 patent is presumed valid.

49.     SemaConnect has infringed and continues to infringe the '715 patent in this

District and throughout the United States by making, using, importing, offering for sale and/or

selling the Accused Products.  For example, based on ChargePoint's current investigation, the

Accused Products infringe at least claim 1 of the '715 patent as follows:

| Claim Element | The Accused Products |
| --- | --- |
| An apparatus, comprising: | The Accused Products include charging stations that are apparatuses. |
| a control device to turn electric supply on and off to enable and disable charge transfer for electric vehicles; | A charging station in the Accused Products can be on (*i.e.*, a state in which it transfers electric charge) or off (*i.e.*, a state in which it does not transfer electric charge).  Upon information and belief, a charging station in the Accused Products has a control device on the electrical power line for switching between the two states. |
| a transceiver to communicate requests for charge transfer with a remote server and receive communications from the remote server via a data control unit that is connected to the remote server through a wide area network; and | The Accused Products include smart grid integration capabilities by "send[ing] and receiv[ing] important energy usage information and allow[ing] for chargers to operate with more solar and wind energy as it comes onto the grid." *SemaConnect Press Release*.  A charging station in the Accused Products include a transceiver to at least perform these functions.  *SemaConnect Product Brochure* (the charging stations include "wireless technology [that] The Station communicates with the software and produces real-time data.").  Upon information and belief, the Accused Products enable smart grid integration capabilities by communicating with the grid, using the transceiver to facilitate communications between a data control unit that is network connected to a remote server. |
| a controller, coupled with the control device and the transceiver, to cause the control device to turn the electric | Upon information and belief, a charging station in the Accused Products includes a controller coupled with the control device and transceiver to cause the control device to turn the electric supply on based on communication from the remote server.  For example, the Accused Products enable "smart grid integration [] for easy energy |

| supply on based on communication from the remote server. | metering and demand response."  *See, e.g., SemaConnect-Mobile NOW Announcement*. |

50.    SemaConnect also infringes at least claim 2, which adds to the apparatus in claim 1 "an electrical coupler to make a connection with an electric vehicle, wherein the control device is to turn electric supply on and off by switching the electric coupler on and off."

51.    SemaConnect has also induced and/or is inducing the infringement of the '715 patent by making, using, importing, offering for sale and/or selling one or more of the Accused Products.  These products, as provided by SemaConnect to its customers and used as intended and instructed, infringe the '715 patent and SemaConnect has known of this infringement since at least since at least the filing of this Complaint and/or the date this Complaint was served upon SemaConnect.  SemaConnect sold and/or offered for sale these products, and is continuing to do so, to site hosts, specifically intending to actively encourage them to use the infringing devices for use in the United States in a manner that SemaConnect knows to be infringing.

52.    SemaConnect has also contributed to and/or is contributing to the infringement of the '715 patent by making, using, importing, offering for sale and/or selling one or more of the Accused Products.  SemaConnect has made and/or sold these products with knowledge that these products are especially designed for use as a component of a patented system, apparatus and kit, and/or an apparatus for use in a patented process, and are not staple articles of commerce suitable for substantial noninfringing use.  For example, among other things, SemaConnect actively and knowingly sells these products and provides the manuals and other documentation for these products to customers and others for use as a component of a patented system, apparatus and kit and/or an apparatus for use in a patented process.  These products are especially designed for use as a component of a patented system, apparatus and kit and/or an apparatus for use in a patented

process, constitute a material part of the invention, are sold by SemaConnect for the designed use, and are not a staple article of commerce suitable for substantial noninfringing use.  On information and belief, SemaConnect's customers and consumers have used these products in the United States in this manner and infringed the '715 patent.

53.     ChargePoint has suffered and will continue to suffer irreparable harm and damages.  ChargePoint is entitled to seek relief from the continuing irreparable harm. ChargePoint is entitled to recover from SemaConnect the damages adequate to compensate for such infringement in an amount to be determined at trial.

54.     On information and belief, SemaConnect has acted and is continuing to act despite an objectively high likelihood that their actions constituted direct and/or indirect infringement of a valid patent, and knew or should have known of that objectively high risk since at least the filing of this Complaint and/or the date this Complaint was served upon SemaConnect.  SemaConnect's acts, since at least the filing of this Complaint and/or the date this Complaint was served upon SemaConnect, constitute willful and deliberate infringement, entitling ChargePoint to enhanced damages under 35 U.S.C. § 284 and reasonable attorneys' fees and costs.

55.     SemaConnect's acts of infringement have caused and will continue to cause irreparable harm to ChargePoint, for which there is no adequate remedy at law, entitling ChargePoint to injunctive relief.

## COUNT III

### (INFRINGEMENT OF US PATENT NO. 8,432,131)

56.     ChargePoint incorporates paragraphs 1-25, 28, and 30-33 by reference.

57.     On April 30, 2013, the USPTO duly and legally issued the '131 patent, entitled "Network-controlled charging system for electric vehicles," to inventors Richard Lowenthal, Dave Baxter, Harjinder Bhade, and Praveen Mandal.

58.     ChargePoint is the owner, by assignment, of all rights, title and interest in the '131 patent, including the right to recover damages for past infringement.

59.     Each of the claims of the '131 patent is presumed valid.

60.     SemaConnect has infringed and continues to infringe the '131 patent in this District and throughout the United States by making, using, importing, offering for sale and/or selling the Accused Products. For example, based on ChargePoint's current investigation, the Accused Products infringe at least claim 1 of the '131 patent as follows:

| Claim Element | The Accused Products |
|---|---|
| An apparatus, comprising: | The Accused Products include charging stations that are apparatuses. |
| a control device to turn electric supply on and off to enable and disable charge transfer for electric vehicles; | A charging station in the Accused Products can be on (*i.e.*, a state in which it transfers electric charge) or off (*i.e.*, a state in which it does not transfer electric charge). Upon information and belief, a charging station in the Accused Products has a control device on the electrical power line for switching between the two states. |
| a transceiver to communicate with a remote server via a data control unit that is connected to the remote server through a wide area network and receive communications from the remote server, wherein the received communications include communications as part of a demand response system; and | The Accused Products include smart grid integration capabilities by "send[ing] and receiv[ing] important energy usage information and allow[ing] for chargers to operate with more solar and wind energy as it comes onto the grid." *SemaConnect Press Release*. A charging station in the Accused Products includes a transceiver to at least perform these functions. *SemaConnect Product Brochure* (the charging stations include "wireless technology [that] The Station communicates with the software and produces real-time data."). Upon information and belief, a charging station in the Accused Products enables smart grid integration capabilities by communicating with the grid, using the transceiver to facilitate communications between a data control unit that is network connected to a remote server. |
| a controller, coupled with the control device and the transceiver, to | Upon information and belief, a charging station in the Accused Products includes a controller coupled with the control device and transceiver to cause the control device to modify the electric supply |

| cause the control device to modify the application of charge transfer based on the communications received as part of the demand response system. | based on received communications that are part of a demand response system. For example, the Accused Products enable "smart grid integration [] for easy energy metering and demand response." *See, e.g., SemaConnect-Mobile NOW Announcement.* |
|---|---|

61.     SemaConnect also infringes at least claim 8, a dependent claim that specifies that "the communications received as part of the demand response system" described in claim 1 "include power grid load data, and wherein the controller is further to manage charge transfer based on the received power grid load data." *SemaConnect Press Release* ("send and receive important energy usage information and allow for chargers to operate with more solar and wind energy as it comes onto the grid").

62.     SemaConnect has also induced and/or is inducing the infringement of the '131 patent by making, using, importing, offering for sale and/or selling one or more of the Accused Products.  These products, as provided by SemaConnect to its customers and used as intended and instructed, infringe the '131 patent and SemaConnect has known of this infringement since at least since at least the filing of this Complaint and/or the date this Complaint was served upon SemaConnect.  SemaConnect sold and/or offered for sale these products, and is continuing to do so, to site hosts, specifically intending to actively encourage them to sell the infringing devices for use in the United States in a manner that SemaConnect knows to be infringing.

63.     SemaConnect has also contributed to and/or is contributing to the infringement of the '131 patent by making, using, importing, offering for sale and/or selling one or more of the Accused Products. SemaConnect has made and/or sold these products with knowledge that these products are especially designed for use as a component of a patented system, apparatus and kit, and/or an apparatus for use in a patented process, and are not staple articles of commerce suitable

for substantial noninfringing use.  For example, among other things, SemaConnect actively and knowingly sells these products and provides the manuals and other documentation for these products to customers and others for use as a component of a patented system, apparatus and kit and/or an apparatus for use in a patented process.  These products are especially designed for use as a component of a patented system, apparatus and kit and/or an apparatus for use in a patented process, constitute a material part of the invention, are sold by SemaConnect for the designed use, and are not a staple article of commerce suitable for substantial noninfringing use.  On information and belief, SemaConnect's customers and consumers have used these products in the United States in this manner and infringed the '131 patent.

64.     As a result of SemaConnect's infringement of the '131 patent, ChargePoint has suffered and will continue to suffer irreparable harm and damages.  ChargePoint is entitled to seek relief from the continuing irreparable harm.  ChargePoint is entitled to recover from SemaConnect the damages adequate to compensate for such infringement in an amount to be determined at trial.

65.     On information and belief, SemaConnect has acted and is continuing to act despite an objectively high likelihood that their actions constituted direct and/or indirect infringement of a valid patent, and knew or should have known of that objectively high risk since at least the filing of this Complaint and/or the date this Complaint was served upon SemaConnect.  SemaConnect's acts, since at least the filing of this Complaint and/or the date this Complaint was served upon SemaConnect, constitute willful and deliberate infringement, entitling ChargePoint to enhanced damages under 35 U.S.C. § 284 and reasonable attorneys' fees and costs.

66.     SemaConnect's acts of infringement have caused and will continue to cause irreparable harm to ChargePoint, for which there is no adequate remedy at law, entitling ChargePoint to injunctive relief.

## COUNT IV

### (INFRINGEMENT OF US PATENT NO. 8,450,967)

67.     ChargePoint incorporates paragraphs 1-25 and 29-33 by reference.

68.     On May 28, 2013, the USPTO duly and legally issued the '967 patent, entitled "Network-controlled charging system for electric vehicles," to inventors Richard Lowenthal, Dave Baxter, Harjinder Bhade, and Praveen Mandal.

69.     ChargePoint is the owner, by assignment, of all rights, title and interest in the '967 patent, including the right to recover damages for past infringement.

70.     Each of the claims of the '967 patent is presumed valid.

71.     SemaConnect has infringed and continues to infringe the '967 patent in this District and throughout the United States by making, using, importing, offering for sale and/or selling the Accused Products.  For example, based on ChargePoint's current investigation, the Accused Products infringe at least claim 1 of the '967 patent as follows:

| Claim Element | Accused Products |
|---|---|
| A method in a server of a network-controlled charging system for electric vehicles, the method comprising: | The Accused Products are charge transfer systems for electric vehicles. *See, e.g.,* SemaConnect, *ESVE Basics*, available at https://www.semaconnect.com/charging-station-basics/ (Charging Stations "provide the electricity that is needed to recharge your vehicle"); *About SemaConnect* ("Our ChargePro Charging Stations [] offer advanced features such as smart-grid integration."). The Accused Products include electric vehicle charging stations that are network-controlled.  *See, e.g., About SemaConnect* ("Our ChargePro Charging Stations utilize CDMA and Zigbee Wireless technology []."). |

The Accused Products include a server. *See, e.g.,*
*https://www.semaconnect.com/the-network/*



Additionally, the Accused Products use "smart grid integration []
for easy energy metering and demand response." *See, e.g.,*
*SemaConnect-Mobile NOW Announcement*. Upon information and
belief, the Accused Products use a server at least with respect to
implementing demand response using smart grid integration.

Moreover, the Accused Products allow a user to pay for charge
transfer using a "SemaConnect Account," which is a "debit
system" for payment. SemaConnect, *FAQ*, available at
https://www.semaconnect.com/faq/. On information and belief, the
Accused Products uses a server at least with respect to enabling
payment using a SemaConnect Account.

| | |
|---|---|
| receiving a request for charge transfer for an electric vehicle at a network-controlled charge transfer device; | Upon information and belief, the Accused Products enable demand response using smart grid integration, through receiving a request for charge transfer for an electric vehicle at a network controlled charge transfer device, *e.g.*, an electric vehicle charging station.<br><br>Additionally, upon information and belief, the Accused Products enable payment using a SemaConnect Account, through receiving a request for charge transfer for an electric vehicle at a network controlled charge transfer device, *e.g.*, an electric vehicle charging station. |

| | |
|---|---|
| determining whether to enable charge transfer; | Upon information and belief, the Accused Products enable demand response using smart grid integration, through determining whether to enable a charge transfer.  For example, a charge transfer may be enabled when a grid is active, but not enabled when the grid is not active.<br><br>Additionally, upon information and belief, the Accused Products enable payment using a SemaConnect Account, through determining whether to enable charge transfer.  For example, a charge transfer may be enabled when the user has a sufficient balance in its SemaConnect Account. |
| responsive to determining to enable charge transfer, transmitting a communication for the network-controlled charge transfer device that indicates to the network-controlled charge transfer device to enable charge transfer; and | Upon information and belief, the Accused Products enable demand response using smart grid integration, through transmitting a communication, responsive to determining whether to enable a charge transfer, to the networked controlled charge transfer device, where the communication indicates to the network-controlled charge transfer device to enable electric charge.<br><br>Additionally, upon information and belief, the Accused Products enable payment using a SemaConnect Account, through transmitting a communication, responsive to determining whether to enable a charge transfer, to the networked controlled charge transfer device, where the communication indicates to the network-controlled charge transfer device to enable electric charge. |
| transmitting a communication for the network-controlled charge transfer device to modify application of charge transfer as part of a demand response system. | Upon information and belief, the Accused Products enable demand response using smart grid integration, through transmitting a communication for the network-controlled charge transfer device to modify application of charge transfer as part of a demand response system.  For example, when the server determines that the demand response system requires a voltage change, a communication is transmitted for the network-controlled charge transfer device to modify the charge transfer.<br><br>Additionally, upon information and belief, the Accused Products enable payment using a SemaConnect Account, through transmitting a communication for the network-controlled charge transfer device to modify application of charge transfer as part of a demand response.  For example, when the server determines that the balance in a user's SemaConnect Account has fallen below a sufficient amount and the server is unable to automatically recharge the SemaConnect Account, a communication is transmitted for the network-controlled charge transfer device to terminate the charge transfer.  The communication is part of a demand response system that determines the price of charge transfer and the available debit balance in a SemaConnect Account. |

72.     SemaConnect also infringes at least claim 2, which calls for the SemaConnect Account "debit system" to "determin[e] whether to enable charge transfer" by "validating a payment source for the charge transfer."

73.     SemaConnect has also induced and/or is inducing the infringement of the '967 patent by making, using, importing, offering for sale and/or selling one or more of the Accused Products.  These products, as provided by SemaConnect to its customers and used as intended and instructed, infringe the '967 patent and SemaConnect has known of this infringement since at least since at least the filing of this Complaint and/or the date this Complaint was served upon SemaConnect.  SemaConnect sold and/or offered for sale these products, and is continuing to do so, to site hosts, specifically intending to actively encourage them to sell the infringing devices for use in the United States in a manner that SemaConnect knows to be infringing.

74.     SemaConnect has also contributed to and/or is contributing to the infringement of the '967 patent by making, using, importing, offering for sale and/or selling one or more of the Accused Products. SemaConnect has made and/or sold these products with knowledge that these products are especially designed for use as a component of a patented system, apparatus and kit, and/or an apparatus for use in a patented process, and are not staple articles of commerce suitable for substantial noninfringing use.  For example, among other things, SemaConnect actively and knowingly sells these products and provides the manuals and other documentation for these products to customers and others for use as a component of a patented system, apparatus and kit and/or an apparatus for use in a patented process.  These products are especially designed for use as a component of a patented system, apparatus and kit and/or an apparatus for use in a patented process, constitute a material part of the invention, are sold by SemaConnect for the designed use, and are not a staple article of commerce suitable for substantial noninfringing use.  On

information and belief, SemaConnect's customers and consumers have used these products in the United States in this manner and infringed the '967 patent.

75.      As a result of SemaConnect's infringement of the '967 patent, ChargePoint has suffered and will continue to suffer irreparable harm and damages.  ChargePoint is entitled to seek relief from the continuing irreparable harm.  ChargePoint is entitled to recover from SemaConnect the damages adequate to compensate for such infringement in an amount to be determined at trial.

76.      On information and belief, SemaConnect has acted and is continuing to act despite an objectively high likelihood that their actions constituted direct and/or indirect infringement of a valid patent, and knew or should have known of that objectively high risk since at least the filing of this Complaint and/or the date this Complaint was served upon SemaConnect.  SemaConnect's acts, since at least the filing of this Complaint and/or the date this Complaint was served upon SemaConnect, constitute willful and deliberate infringement, entitling ChargePoint to enhanced damages under 35 U.S.C. § 284 and reasonable attorneys' fees and costs.

77.      SemaConnect's acts of infringement have caused and will continue to cause irreparable harm to ChargePoint, for which there is no adequate remedy at law, entitling ChargePoint to injunctive relief.

## VIII.   PRAYER FOR RELIEF

WHEREFORE, ChargePoint prays that this Court enters judgment and provides relief as follows:

A.      That SemaConnect has infringed and is infringing the Asserted Patents in violation of 35 U.S.C. § 271;

B.      That SemaConnect has induced, and is inducing, infringement of the Asserted

Patents in violation of 35 U.S.C. § 271;

C.      That SemaConnect has contributed to, and is contributing to, infringement of the

Asserted Patents in violation of 35 U.S.C. § 271;

D.      That SemaConnect's infringement of the Asserted Patents has been willful under

35 U.S.C. § 284;

E.      That the Asserted Patents are valid and enforceable;

F.      That SemaConnect, its officers, agents, and employees, and those persons in

active concert of participation with it, and its successors and assigns be

preliminarily and permanently enjoined, pursuant to 35 U.S.C. § 271, from

infringing the Asserted Patents, including but not limited to an injunction against

making, using, offering to sell, and selling within the United States, and

importing, and importing into the United States, and products covered by the

Asserted Patents;

G.      For an accounting for any infringing sales not presented at trial and an award by

the Court of additional damages for any such infringing sales;

H.      That SemaConnect be ordered to account for and pay to ChargePoint the damages

resulting from SemaConnect's infringement of the Asserted Patents, including

lost profits, together with interest and costs, and all other damages permitted by

35 U.S.C. § 284, including enhanced damages up to three times the amount of

damages found or measured, but in any event no less than a reasonable royalty;

I.      That this action be adjudged an exceptional case and ChargePoint be awarded its

attorneys' fees, expenses and costs in this action pursuant to 35 U.S.C. § 285; and

J.      That ChargePoint be awarded such other equitable or legal relief as this Court

deems just and proper under the circumstances.

## IX.      JURY DEMAND

ChargePoint hereby demands a trial by jury on all issues so triable.

Dated:  December 15, 2017                                   Respectfully Submitted,


                                                             */s/ Charles Klein*
                                                            Charles Klein (Fed. Bar No. 14504)
                                                            Zachary Cohen (Fed. Bar No. 20159)
                                                            Winston & Strawn LLP
                                                            1700 K St., N.W.
                                                            Washington, DC 20006
                                                            (202) 282-5000
                                                            cklein@winston.com
                                                            zcohen@winston.com


                                                            *Pro hac vice applications forthcoming*

                                                            David S. Bloch
                                                            Michael Rueckheim
                                                            James Lin
                                                            Winston & Strawn LLP
                                                            275 Middlefield Road, Suite 205
                                                            Menlo Park, CA 94025-4004
                                                            (650) 858-6500
                                                            dbloch@winston.com
                                                            mrueckheim@winston.com
                                                            jalin@winston.com

                                                            *Counsel for Plaintiff*