**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Southern Division)**

| | |
|---|---|
| CHARGEPOINT, INC., | |
| *Plaintiff,* | |
| v. | Civil Action No: 17-cv-3717 |
| SEMACONNECT, INC., | |
| *Defendant.* | |

**[CORRECTED][1] PLAINTIFF'S MEMORANDUM IN SUPPORT OF MOTION FOR
EMERGENCY INJUNCTIVE RELIEF**

---

[1] Substantively unchanged from initial filing (ECF 2-1), but corrected to refer to the proper declarant, date of incorporation, and to add further identification of the dependent claims at issue.

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ........................................................................................... 1

II.     FACTUAL BACKGROUND ......................................................................... 5

      A.     ChargePoint's history of innovation in the EV charging station industry ............. 5

      B.     ChargePoint's patented inventions ........................................................ 6

      C.     The infringing SemaConnect EV charging infrastructure ...................................... 9

      D.     SemaConnect's involvement in the ZEV Investment Plan.................................... 9

      E.     The significant threat of the ZEV Investment Plan to ChargePoint .................... 10

III.    LEGAL STANDARD.................................................................................... 11

IV.    ARGUMENT................................................................................................. 12

      A.     ChargePoint is likely to succeed on the merits .................................................... 12

             1.      The accused products infringe at least Claims 31-32 of the '570 Patent............................................................................................. 13

             2.      The accused products infringe at least Claims 1-2 of the '715 Patent............................................................................................. 16

             3.      The accused products infringe at least Claims 1 and 8 of the '131 Patent............................................................................................. 17

             4.      The accused products infringe at least Claim 1 of the '967 Patent........... 18

             5.      There are no substantial questions about the validity or enforceability of the Asserted Patents........................................................ 19

      B.     ChargePoint will suffer irreparable harm from SemaConnect's infringement..... 21

      C.     The equities weigh heavily in favor of an injunction ........................................... 24

      D.     The public interest weighs heavily in favor of an injunction................................ 26

V.      CONCLUSION............................................................................................. 27

# TABLE OF AUTHORITIES

**Cases**                                                                                                    **Page(s)**

*Abbott Labs. v. Andrx Pharms., Inc.*,
    452 F.3d 1331 (Fed. Cir. 2006)...............................................................26

*Abbott Labs. v. Sandoz, Inc.*,
    544 F.3d 1341 (Fed. Cir. 2008)...............................................................11

*Apple Inc. v. Samsung Elecs. Co.*,
    809 F.3d 633 (Fed. Cir. 2015)............................................................22, 24

*AstraZeneca LP v. Apotex, Inc.*,
    633 F.3d 1042 (Fed. Cir. 2010)..........................................................12, 13

*BioTechnology Gen. Corp. v. Genentech, Inc.*,
    80 F.3d 1553 (Fed. Cir. 1996)................................................................23

*Black & Decker Inc. v. Robert Bosch Tool Corp.*,
    No. 04 C 7955, 2006 WL 3446144 (N.D. Ill. Nov. 29, 2006)................24

*Canon Comput. Sys. v. Nu-Kote Int'l, Inc.*,
    134 F.3d 1085 (Fed. Cir. 1998)..............................................................20

*Celsis In Vitro, Inc. v. CellzDirect, Inc.*,
    664 F.3d 922 (Fed. Cir. 2012)................................................................22

*Douglas Dynamics, LLC v. Buyers Prods. Co.*,
    717 F.3d 1336 (Fed. Cir. 2013)..............................................................24

*eBay Inc. v. MercExchange, L.L.C.*,
    547 U.S. 388 (2006)................................................................................12

*Georgetown Rail Equip. Co. v. Holland L.P.*,
    867 F.3d 1229 (Fed. Cir. 2017)..............................................................11

*H.H. Robertson, Co. v. United Steel Deck, Inc.*,
    820 F.2d 384 (Fed. Cir. 1987)................................................................13

*i4i Ltd. P'ship v. Microsoft Corp.*,
    598 F.3d 831 (Fed. Cir. 2010), aff'd, 564 U.S. 91 (2011).....................26

*Impax Labs., Inc. v. Aventis Pharms., Inc.*,
    468 F.3d 1366 (Fed. Cir. 2006)..............................................................13

*John Fluke Mfg. v. North America Soar*,
    5 U.S.P.Q.2d 1657 (D. N.J. 1987) .........................................................25

*Kewanee Oil Co. v. Bicron Corp.*,
    416 U.S. 470 (1974).........................................................................26

*L.A. Gear, Inc. v. Thom McAn Show Co.*,
    988 F.2d 1117 (Fed. Cir. 1993).........................................................20

*Litton Sys., Inc. v. Sundstrand Corp.*,
    750 F.2d 952 (Fed. Cir. 1984).........................................................25

*MGM Well Servs., Inc. v. Mega Lift Sys., LLC*,
    H-05-1634, 2005 WL 1693152 (S.D. Tex. July 19, 2005), *aff'd*, 264 Fed.
    App'x 900 (Fed. Cir. 2008).........................................................24, 26

*Mintz v. Dietz & Watson, Inc.*,
    679 F.3d 1372 (Fed. Cir. 2012).........................................................20

*Montgomery v. Hous. Auth. of Baltimore Cty*,
    731 F. Supp. 2d 439 (D. Md. 2010) .........................................................11

*Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*,
    22 F.3d 546 (4th Cir. 1994) .........................................................21

*Occupational Health Centers of the Sw., P.A. v. Toney*,
    ELH-17-0975, 2017 WL 1546430 (D. Md. Apr. 28, 2017).........................23

*Pfizer, Inc. v. Teva Pharm., USA, Inc.*,
    429 F.3d 1364 (Fed. Cir. 2005).........................................................14

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005).........................................................14

*Planet Bingo, LLC v. GameTech Int'l, Inc.*,
    472 F.3d 1338 (Fed. Cir. 2006).........................................................13

*Polymer Technologies, Inc.* v. *Bridwell*,
    103 F.3d 970 (Fed. Cir. 1996).........................................................24

*Port-a-Pour, Inc. v. Peak Innovations, Inc.*,
    49 F. Supp. 3d 841 (D. Colo. 2014).........................................................14

*Ralston Purina Co. v. Far-Mar-Co.*, Inc.,
    772 F.2d 1570, 1573 (Fed. Cir. 1985).........................................................13

*Real Truth About Obama, Inc. v. Fed. Election Comm'n*,
    575 F.3d 342 (4th Cir. 2009) .........................................................12

*Robert Bosch LLC v. Pylon Mfg. Corp.*,
   659 F.3d 1142 (Fed. Cir. 2011)........................................................................22, 26

*Technology Licensing Corp. v. Videotek, Inc.*,
   545 F.3d 1316 (Fed. Cir. 2008)..................................................................................20

*Techtronic Indus. Co., Ltd., v. Chevron Holdings, Ltd.*,
   395 F. Supp. 2d 720 (N.D. Ill. 2005) .......................................................................20

*Titan Tire Corp. v. Case New Holland, Inc.*,
   566 F.3d 1372 (Fed. Cir. 2009)..........................................................................13, 20

*Trebro Mfg., Inc. v. Firefly Equip.*,
   LLC, 748 F.3d 1159 (Fed. Cir. 2014) .....................................................................12

*Tuf-Tite, Inc. v. Fed. Package Networks, Inc.*,
   No. 14-CV-2060, 2014 WL 6613116 (N.D. Ill. Nov. 21, 2014) ............................25

*Univ. of Tex. v. Camenisch*,
   451 U.S. 390 (1981) ....................................................................................................12

*Warner-Lambert Co. v. Teva Pharms. USA, Inc.*,
   418 F.3d 1326 (Fed. Cir. 2005)..................................................................................13

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) ........................................................................................................12

## Statutes

35 U.S.C. § 271........................................................................................................................26

35 U.S.C. § 282.................................................................................................................13, 19

## Other Authorities

Fed. R. Civ. P. 65(a)-(b) ...........................................................................................................1

Fed. R. Civ. P. 65(b) ..............................................................................................................11

Fed. R. Civ. P. 65(b)(1)............................................................................................................1

## I.    INTRODUCTION

ChargePoint, Inc. moves for a temporary restraining order and preliminary injunction barring SemaConnect, Inc. from infringing claims 31 and 32 of U.S. Patent No. 7,956,570 (the "'570 patent"); claims 1 and 2 of U.S. Patent No. 8,138,715 (the "'715 patent"); claims 1 and 8 of U.S. Patent No. 8,432,131 (the "'131 patent"); and claim 1 of U.S. Patent No. 8,450,967 (the "'967 patent") (collectively, the "Asserted Patents").  Fed. R. Civ. P. 65(a)-(b).[2]

Since its founding more than a decade ago, ChargePoint has invested substantial resources toward developing an innovative electric vehicle ("EV") charging infrastructure, which include charging equipment for plug-in electric vehicles, their supporting software, network, and system.  ChargePoint has advanced the EV charging infrastructure industry by developing a network-controlled EV charging infrastructure.  The network-controlled EV charging infrastructure invented by ChargePoint enables more efficient implementation of various important functionalities associated with an EV charging system, such as managing the load imposed on electric grids, allowing for access control and pricing control and informing drivers of important events occurring during charging, including interruption of a charging session or a change in price.  ChargePoint has, to date, obtained 32 patents on its innovations, almost all related to EV charging infrastructure, has created hundreds of jobs in the United States, and has worked to ensure energy sustainability and efficiency in the American economy.

Today, ChargePoint offers the world's largest and most open electric vehicle charging station network and is responsible for a large majority of the EV charging infrastructure market by

---

[2] ChargePoint does not know who SemaConnect's counsel is and did not reach out to SemaConnect before filing this motion. Fed. R. Civ. P. 65(b)(1).  But it served its Complaint and this motion simultaneously and is open to an arrangement that would provide for a temporary pause in SemaConnect's activities while the parties brief ChargePoint's request for a preliminary injunction on an expedited basis.

virtue of its superior technology and intellectual property. To better advance the adoption of cleaner, electric vehicles by consumers, ChargePoint has had a long history of bringing products that practice its patents to market and into the hands of consumers, including at least eight models of smart EV charging stations.

SemaConnect is in the process of entering into contracts, to be completed within the next 90 days, to deploy at least $16 million in competing EV charging stations to customers free of charge, and provide services related to those stations free of charge for the next eight years. ChargePoint believes that the size of that free offer is equal to more than half of the total available market for those charging stations during the offer period. Participants in the offer will receive free charging stations, as well as free network services and support for a period of 8 years. SemaConnect is able to do this because Volkswagen Group of America (through its subsidiary, Electrify America) is subsidizing SemaConnect's offerings as part of Volkswagen's commitment to spend $2 billion on zero-emission vehicle ("ZEV") infrastructure and technology under settlement terms Volkswagen agreed to in the aftermath of an emissions-rigging scandal in 2015. Importantly, SemaConnect's EV charging systems are attractive to Electrify America because of the functionalities they provide. Unfortunately, many of those functionalities infringe the Asserted Patents.

Charging stations are *fixtures*, usually installed in parking structures or at storefronts. Installing a charging station is not a trivial process. So once a customer chooses a particular charging station to install, it is almost impossible to persuade that customer to move to a different vendor. Under the SemaConnect program, it will be even harder. Not only will participants receive free (infringing) charging stations (installed free of charge) along with free network and support services until 2026, they will also have to commit to *keeping* the charging stations for a

minimum period of time—presumably equal to the 8 free years of network services and support. In other words, once ChargePoint loses a customer to the SemaConnect free station offer, that customer will remain lost to ChargePoint for virtually the entire remaining life of ChargePoint's patents. This deprives ChargePoint both of the revenues associated with an initial installation and the equally important downstream revenues generated by existing customers—a very sizeable part of ChargePoint's overall revenue stream. No royalty can compensate ChargePoint for the customers who install infringing SemaConnect charging stations and network services. As such, ChargePoint will suffer irreparable harm as a result of SemaConnect's infringement and, given the 90 day period of the offer, that harm is imminent.

SemaConnect's infringing activities must be enjoined immediately because all four factors governing the issuance of emergency injunctive relief are met.

1. *ChargePoint is likely to succeed on the merits.* ChargePoint's patents have been fully vetted by the Patent & Trademark Office and are presumed valid. As explained more fully in the Declaration of David Baxter, submitted herewith, SemaConnect's products infringe all four patents.

2. *ChargePoint will suffer irreparable harm in the absence of an injunction.* SemaConnect announced its free-goods program in November and will start installing the first of its infringing charging stations by the first quarter of 2018—just a few short weeks from now. It will be almost impossible for ChargePoint to win back customers who participate in the SemaConnect free charging scheme once SemaConnect's infringing charging stations are installed. And thus, during the 8-10 years that these customers utilize SemaConnect's free goods, ChargePoint will be shut out of these parking locations and deprived of the revenues those locations would generate were ChargePoint to install its products (instead of the Accused Products)

there.  Such downstream revenues are an important component of ChargePoint's business model.  These installations, moreover, require significant labor and construction, and constitute fixtures that are not easily removed.  Allowing SemaConnect to install $16 million of them in the next 3 months alone will permanently alter the marketplace and will shut ChargePoint out of these locations for most of the life of its Asserted Patents.  It will also enable—indeed, *require*—SemaConnect's customers to infringe ChargePoint's patents for the life of SemaConnect's installations.  As discussed in more detail in the Declaration of David Adams, submitted herewith, ChargePoint will suffer irreparable harm if SemaConnect is permitted to swamp the market with infringing free goods.

      *3.*      *The balance of equities tips in ChargePoint's favor.*  Installations of infringing goods are imminent, but as far as ChargePoint knows nothing has happened yet.  So SemaConnect will suffer no harm as this Court protects ChargePoint's intellectual property.  As SemaConnect's website explains, it is currently at Step 1 of the Program Schedule, where there is "[n]o commitment at this point."[3]  On the other hand, in the absence of emergency injunctive relief, ChargePoint will forever lose customers who participate in the SemaConnect free-charging scheme.  ChargePoint currently is responsible for as much as 70% of the EV charging infrastructure market by virtue of its superior technology and intellectual property.  Without an injunction, ChargePoint will suffer permanently lost sales and customers, potentially more than half of the available market, *in just the next 90 days*.

      *4.*      *An injunction is in the public interest.*  The public interest always favors the enforcement of legitimate intellectual property rights.  But here, its interests are even more acute.

---

[3] Declaration of David S. Bloch (Bloch Dec.) ¶ 2, Exhibit A: https://www.semaconnect.com/ea-cbre-2/ (last accessed on December 14, 2017).

Once construction begins, the interests and rights of third parties will be impacted. And once construction is complete, those third parties will be very reluctant to have SemaConnect's charging stations removed from their parking lots. Thus, an injunction also protects the interests of third parties (such as CBRE, a nationwide real estate holding company) who might otherwise decide to accept SemaConnect's free-goods offer only to be left with infringing installations they cannot use and cannot, except at great expense, replace with ChargePoint's legitimate goods and services.

For all of these reasons, ChargePoint respectfully asks this Court to grant emergency injunctive relief to block SemaConnect's infringing behavior before any further infringing products are installed.

## II.     FACTUAL BACKGROUND

### A.     ChargePoint's history of innovation in the EV charging station industry

ChargePoint (formerly Coulomb) was founded in 2007 with the goal of revolutionizing EV charging infrastructures. Then, as now, an EV charging infrastructure typically transferred electric charge from local electricity grids to EVs. A major challenge facing the industry concerned managing the load imposed on electricity grids during times of peak electricity demand. At the same time, the prevailing view was that EV charging was analogous to refueling internal combustion vehicles—like gas stations, charging stations would dot the highways and there would be no need for them to communicate with each other or with prospective users.

Through its research and development efforts, however, ChargePoint developed an entirely new paradigm for EV charging. It succeeded in developing a network-controlled electric vehicle charging infrastructure that performed a whole host of new functions, including demand response and vehicle-to-grid charge transfer, to tackle the problem of managing local grid load and address queuing and remote payment for EV charging. These developments marked a major breakthrough in EV charging infrastructure industry—a dramatic departure from the gas station-centric ideas

that prevailed before ChargePoint's innovations—and was praised by observers at the time: "Those at Coulomb Technologies envision a subscription model that would charge a premium for tapping into the grid during peak demand times. They also tout utility grid management technology. The company would provide charging stations with wireless communications, managing a mesh network to authenticate users, and manage energy flow and metering. Users, hosts, and utilities would access GPS-linked data online."[4]

Today, ChargePoint designs, manufactures, and sells its innovative EV charging infrastructure, including at least eight models of smart charging stations. ChargePoint's EV charging infrastructure offerings also include related software and services. ChargePoint operates the world's largest and most open EV charging network, with more than 43,200 EV charging sites that provide real time availability status for charging stations. It is responsible for more than half of the U.S. EV charging infrastructure market by virtue of its superior technology and intellectual property. In addition, ChargePoint has received numerous accolades, including a 2016 Edison Award in the Electric Energy & Propulsion Systems category. Baxter Dec. ¶ 6. ChargePoint has been a Global Cleantech winner six years in a row and has been recognized and praised by the United Nations, the World Economic Forum, Time Magazine, CNBC, and Businessweek, amongst many others. *Id*.

B.      **ChargePoint's patented inventions**

ChargePoint's '570, '715, '131, and '967 patents are examples of patents that reflect ChargePoint's substantial investment in developing a network-controlled EV charging infrastructure.

---

[4] Bloch Dec. ¶ 3, Ex. B: Elsa Wenzel, *Coulomb Unveils Electric-Car Charging Stations*, CNET (July 22, 2008) https://www.cnet.com/news/coulomb-unveils-electric-car-charging-stations/ (last accessed December 14, 2017).

*The '570 patent* describes a system for network-controlled charging of electric vehicles that includes a charge transfer device, *e.g.*, an EV charging station, having a controller; a transceiver to enable the controller to access a remote network via a network; and a communication device for connecting the controller to an EV operator. Claim 31 of the '570 patent recites:

> 31. A network-controlled charge transfer system for electric vehicles comprising:
> a server;
> a data control unit connected to a wide area network for access to said server; and
> a charge transfer device, remote from said server and said data control unit, comprising:
> an electrical receptacle configured to receive an electrical connector for recharging an electric vehicle;
> an electric power line connecting said receptacle to a local power grid;
> a control device on said electric power line, for switching said receptacle on and off;
> a current measuring device on said electric power line, for measuring current flowing through said receptacle;
> a controller configured to operate said control device and to monitor the output from said current measuring device;
> a local area network transceiver connected to said controller, said local area network transceiver being configured to connect said controller to said data control unit; and
> a communication device connected to said controller, said communication device being configured to connect said controller to a mobile wireless communication device, for communication between the operator of said electric vehicle and said controller.

Claim 32 is a dependent claim that specifies that "the wide area network is the Internet."

*The '715 patent* describes a network-controlled charge transfer device for EVs having a controller, a control device, and a transceiver, where the controller causes the control device to turn the electric supply on based on communication from the remote server via the transceiver. Claim 1 of the '715 patent recites:

> 1. An apparatus, comprising:
> a control device to turn electric supply on and off to enable and disable charge transfer for electric vehicles;
> a transceiver to communicate requests for charge transfer with a remote server and receive communications from the remote server via a data control unit that is connected to the remote server through a wide area network; and
> a controller, coupled with the control device and the transceiver, to cause the control device to turn the electric supply on based on communication from the remote server.

Claim 2 is a dependent claim that specifies that the apparatus further comprises "an electrical coupler to make a connection with an electric vehicle, wherein the control device is to turn electric supply on and off by switching the electric coupler on and off."

*The '131 patent* describes a network-controlled charge transfer device for EVs having a controller, a control device, and a transceiver, where the controller causes the control device to modify the application of charge transfer based on the communications received as part of a demand response system. Claim 1 of the '131 patent recites:

> 1. An apparatus, comprising:
> a control device to control application of charge transfer for an electric vehicle;
> a transceiver to communicate with a remote server via a data control unit that is connected to the remote server through a wide area network and receive communications from the remote server, wherein the received communications include communications as part of a demand response system; and
> a controller, coupled with the control device and the transceiver, to cause the control device to modify the application of charge transfer based on the communications received as part of the demand response system.

Claim 8 is a dependent claim that specifies that "the communications received as part of the demand response system include power grid load data, and wherein the controller is further to manage charge transfer based on the received power grid load data."

*The '967 patent* describes a method in a server of a network-controlled charging system for electric vehicles for enabling charge transfer for a network-controlled charge transfer device by transmitting a communication to that device. Claim 1 of the '967 patent recites:

> 1. A method in a server of a network-controlled charging system for electric vehicles, the method comprising:
> receiving a request for charge transfer for an electric vehicle at a network-controlled charge transfer device;
> determining whether to enable charge transfer;
> responsive to determining to enable charge transfer, transmitting a communication for the network-controlled charge transfer device that indicates to the network-controlled charge transfer device to enable charge transfer; and
> transmitting a communication for the network-controlled charge transfer device to modify application of charge transfer as part of a demand response system.

Claim 2 is a dependent claim and specifies that "determining whether to enable charge transfer includes validating a payment source for the charge transfer."

## C.     The infringing SemaConnect EV charging infrastructure

SemaConnect manufactures and sells an EV charging infrastructure that includes ChargePro EV charging stations, "wireless technology," "smart phone authentication," and "demand response" functionalities.[5] They can connect to a computer network.[6] They enable "smart grid integration for [] demand response."[7] Users can initiate a charging session using the SemaConnect smart phone application and can pay for charge transfer using a debit account known as SemaConnect Account.[8]

## D.     SemaConnect's involvement in the ZEV Investment Plan

In 2015, the U.S. Environmental Protection Agency ("EPA"), the State of California, and classes of vehicle owners filed complaints against Volkswagen and related entities alleging violations of the Clean Air Act and state laws related to Volkswagen cars whose software was designed to cheat emissions tests. The government plaintiffs, including the EPA and the State of California, entered into a partial consent decree with Volkswagen to settle some of the claims.[9] As

---

[5] Bloch Dec. ¶4, Ex. C: *The Personal & Community Charging Stations*, SEMACONNECT, https://www.semaconnect.com/personal-2/ (last accessed December 14, 2017).

[6] Bloch Dec. ¶ 5, Ex. D: *ChargePro Tech Specs*, SEMACONNECT, https://www.semaconnect.com/tech-specs/ (last accessed December 14, 2017).

[7] Bloch Dec. ¶ 6, Ex. E: *SemaConnect Partners with Mobile NOW to Permit EV Charging Payment by Cell Phone with the ChargePro*, SEMACONNECT (2011), https://www.semaconnect.com/semaconnect-partners-with-mobile-now-to-permit-ev-charging-payment-by-cell-phone-with-the-chargepro/ (last accessed December 14, 2017).

[8] Bloch Dec. ¶ 7, Ex. F: *FAQ* SEMACONNECT, https://www.semaconnect.com/faq/ (last accessed December 14, 2017).

[9] *See* Order Granting the United States' Motion to Enter Proposed Amended Consent Decree (2016) (No. 2103), Order Granting California's Motion for Entry of Second Partial Consent Decree (2017) (No. 3226) and Order Granting the United States' Motion for Entry of Second Partial Decree (2017) (No. 3228), all three in the case of *In re Volkswagen "Clean Diesel" Marketing, Sales Practices, & Product Liability Litigation*, MDL No. 2672 CRB.

part of that settlement, Volkswagen agreed to invest $2 billion over the next 10 years in ZEV infrastructure and the promotion of ZEVs. Following the consent decree, Volkswagen created a wholly-owned subsidiary, Electrify America, to implement its obligations. Volkswagen's proposed implementation is outlined in its ZEV Investment Plans.

Electrify America released roadmaps for the first cycle of the ZEV Investment Plan in March and April 2017. It allocates $85 million to "community charging stations" free of charge to site hosts.[10] Electrify America sought a charging infrastructure that could "manage peak demand and ease grid loads."[11] It chose SemaConnect as the exclusive supplier of level 2 community charging stations and related services for the first cycle of the ZEV Investment Plan. Under this arrangement, the site hosts will receive charging stations and related services free of charge.

The first cycle of the ZEV Investment Plan is well under way. SemaConnect has for weeks been accepting applications from potential site hosts for the first cycle. SemaConnect has also entered into an agreement with at least one site host (CBRE) for providing free charging stations and related services till 2026. The CBRE deal promises $16 million in "free" SemaConnect charging stations and services in the next 90 days alone.[12] SemaConnect projects that it will start installing charging stations for the first cycle as soon as 2018 and finish installing all the charging stations for the first cycle by the third quarter of next year.

E.    The significant threat of the ZEV Investment Plan to ChargePoint

The projected market for electric vehicle charging stations and related services for the

---

[10] Bloch Dec. ¶¶ 8-9, Exs. G: CALIFORNIA ZEV INVESTMENT PLAN: CYCLE 1 at 5 ($45 million on community charging stations in California) and H: NATIONAL ZEV INVESTMENT PLAN: CYCLE 1 at 5 ($40 million on community charging stations nationwide").

[11] CALIFORNIA ZEV INVESTMENT PLAN: CYCLE 1 at 4 and NATIONAL ZEV INVESTMENT PLAN: CYCLE 1 at 4.

[12] See Complaint, Dkt. No. 1, at Exhibit E ($100,000 per site at up to 160 CBRE sites).

upcoming fiscal year 2018 is about $118 million, consisting of about $96 million for workplace and commercial sites and $22 million for multifamily sites. Adams Dec. ¶ 15. This translates into about $29.5 million per quarter. Under the ZEV Investment Plan, SemaConnect will make available for free $16 million worth of electric vehicle charging stations and related services *at CBRE locations alone* in the next quarter. This is likely only a fraction of SemaConnect's revenue from the first cycle of the ZEV Investment Plan. Given the size of the market, unless enjoined by this Court, SemaConnect will capture a dominant position in the EV charging infrastructure market through its infringing products and substantially erode ChargePoint's market position. *Id.*

## III. LEGAL STANDARD

ChargePoint seeks an emergency injunction pursuant to Rule 65. "For issues not unique to patent law, we apply the law of the regional circuit in which this appeal would otherwise lie." *Georgetown Rail Equip. Co. v. Holland L.P.*, 867 F.3d 1229, 1238 (Fed. Cir. 2017); *see also Abbott Labs. v. Sandoz, Inc.*, 544 F.3d 1341, 1367 (Fed. Cir. 2008) ("This court has observed that the standard for granting or denying a motion for a preliminary injunction is not unique to patent law, and has ruled that the standard of the regional circuit should apply"). "The standard for granting a TRO under Fed. R. Civ. P. 65(b) is the same as for granting a preliminary injunction." *Montgomery v. Hous. Auth. of Baltimore Cty*, 731 F. Supp. 2d 439, 441 (D. Md. 2010) (Quarles, J.). The Court analyzes four factors in determining whether a plaintiff is entitled to preliminary relief:

    1) the plaintiff is likely to succeed on the merits;

    2) the plaintiff is likely to suffer irreparable harm in the absence of preliminary relief;

    3) the balance of equities tips in plaintiff's favor; and

    4) an injunction is in the public interest.

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *Real Truth About Obama, Inc. v.*

*Fed. Election Comm'n*, 575 F.3d 342, 346 (4th Cir. 2009), *rev'd on other grounds*, 130 S. Ct. 2371 (2010). "The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). Emergency injunctions are appropriate in patent cases. *Trebro Mfg., Inc. v. Firefly Equip.*, LLC, 748 F.3d 1159, 1165 (Fed. Cir. 2014) ("The grant, denial, or modification of a preliminary injunction ... is not unique to patent law"); *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391- 92 (2006) (holding that traditional principles of equity "apply with equal force to disputes arising under the Patent Act"). Here, each of the four factors favors ChargePoint's request for emergency injunctive relief.

## IV.    ARGUMENT

If SemaConnect is allowed to install $16 million in infringing EV charging stations in the next 90 days "for free," ChargePoint will be permanently excluded from those customers and will suffer a critical blow in the marketplace. ChargePoint's patents are valid and infringed, and it is thus likely to succeed on the merits. It will suffer irreparable harm in the absence of an injunction by being unfairly excluded from a sizeable chunk of its core market. The balance of hardships favors ChargePoint, because SemaConnect has not yet started installing the infringing stations. And the public interest likewise favors an injunction so that SemaConnect's customers are not left with high-tech hardware they cannot use.

### A.    ChargePoint is likely to succeed on the merits

To demonstrate a likelihood of success on the merits, ChargePoint must "demonstrate that it will likely prove infringement of one or more claims of the patents-in-suit, and that at least one of those same allegedly infringed claims will also likely withstand the validity challenges presented by the accused infringer." *AstraZeneca LP v. Apotex, Inc.*, 633 F.3d 1042, 1050 (Fed. Cir. 2010) (internal quotations omitted). To overcome this showing, the alleged infringer must

"raise[] a substantial question concerning infringement or validity." *Id.* A showing of a likelihood of success on the merits does not require that infringement be "proved beyond all question, or that there be no evidence supporting the viewpoint of the accused infringer." *H.H. Robertson, Co. v. United Steel Deck, Inc*., 820 F.2d 384, 390 (Fed. Cir. 1987), *abrogated on other grounds by Markman v. Westview Instruments, Inc*., 52 F.3d 967 (Fed. Cir. 1995).

Notably, an issued patent "shall be presumed valid," 35 U.S.C. § 282, and "the burden of persuasion to the contrary is and remains on the party asserting invalidity." *Ralston Purina Co. v. Far-Mar-Co.*, Inc., 772 F.2d 1570, 1573 (Fed. Cir. 1985); *Impax Labs., Inc. v. Aventis Pharms., Inc.*, 468 F.3d 1366, 1378 (Fed. Cir. 2006). A patent "enjoys the same presumption of validity during preliminary injunction proceedings as at other stages of litigation." *Titan Tire Corp. v. Case New Holland, Inc.*, 566 F.3d 1372, 1377 (Fed. Cir. 2009).

As shown below, ChargePoint is highly likely to succeed on showing both infringement and validity. The infringement analyses for the '570, '715, '131, and '967 patents are straightforward and demonstrate a strong likelihood that ChargePoint will prove that the charging stations sold by SemaConnect, including the ChargePro community electric vehicle charging stations to be deployed under the ZEV Investment Plan, infringe the Asserted Patents. Moreover, there are no substantial questions relating to validity or enforceability. Thus, this factor weighs heavily in favor of granting an injunction.

## 1. The accused products infringe at least Claims 31-32 of the '570 Patent

To prove infringement, ChargePoint must show that the Accused Products meet each claim limitation either literally or under the doctrine of equivalents. *See, e.g., Planet Bingo, LLC v. GameTech Int'l, Inc.*, 472 F.3d 1338, 1343 (Fed. Cir. 2006); *Warner-Lambert Co. v. Teva Pharms. USA, Inc.*, 418 F.3d 1326, 1340 (Fed. Cir. 2005). An infringement analysis has two steps: first, construing the asserted claims, and second, comparing the construed claims to the accused product.

*Pfizer, Inc. v. Teva Pharm., USA, Inc.*, 429 F.3d 1364, 1372 (Fed. Cir. 2005). The claim language defines the scope of a patent's claims. *See, e.g., Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) ("It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude") (internal quotes omitted). But "when considering a motion for preliminary injunction, the Court is not required to engage in a comprehensive and final claim construction." *Port-a-Pour, Inc. v. Peak Innovations, Inc.*, 49 F. Supp. 3d 841, 869 (D. Colo. 2014).

The '570 patent claims network-controlled charge transfer devices and systems for electric vehicles. Claim 31 of the '570 patent claims a network-controlled charge transfer system for electric vehicles comprising: a server; a data control unit connected to a wide area network for access to said server; and a charge transfer device, remote from said server and said data control unit, comprising: an electrical receptacle configured to receive an electrical connector for recharging an electric vehicle; an electric power line connecting said receptacle to a local power grid; a control device on said electric power line, for switching said receptacle on and off; a current measuring device on said electric power line, for measuring current flowing through said receptacle; a controller configured to operate said control device and to monitor the output from said current measuring device; a local area network transceiver connected to said controller, said local area network transceiver being configured to connect said controller to said data control unit; and a communication device connected to said controller, said communication device being configured to connect said controller to a mobile wireless communication device, for communication between the operator of said electric vehicle and said controller. SemaConnect's Accused Products infringe at least claims 31 and 32 of the '570 patent.

David Baxter, co-inventor of the Asserted Patents and co-founder and Vice President,

Hardware Engineering, of ChargePoint, has analyzed the Accused Products against claims 31 and 32 of the '570 patent and confirms that they infringe. Baxter Dec. ¶¶ 9-10. Here, for the first step of analyzing infringement of claims 31 and 32, there are no terms that require construction because claims 31 and 32 use plain and ordinary language, and the Accused Products are infringing under any reasonable construction of these terms.

For the second step, in his declaration and claim chart, Mr. Baxter explains how SemaConnect's Accused Products meet every limitation of claim 31 of the '570 patent. He explains that the Accused Products are charge transfer systems for electric vehicles and that they are network-controlled. *Id.* ¶ 9. The network-controlled charge transfer system for electric vehicles comprises a server. *Id.* It also comprises a data control unit connected to a wide area network for access to the server. *Id.* Further, it includes a charge transfer device that is remote from the server and the data control unit. *Id.* That charge transfer device comprises an electrical receptacle configured to receive an electrical connector for recharging an electric vehicle. *Id.* It also comprises an electric power line connecting the receptacle to a local power grid. *Id.* Further, it includes a control device on the electric power line, for switching said receptacle on and off,, and a current measuring device on the electric power line that is for measuring current flowing through the receptacle. *Id.* The charge transfer device also has a controller configured to operate the control device and to monitor the output from the current measuring device. *Id.* And it employs a local area network transceiver connected to the controller, with the local area network transceiver being configured to connect the controller to the data control unit. *Id.* Finally, the charge transfer device comprises a communication device connected to the controller, and the communication device is configured to connect the controller to a mobile wireless communication device, for communication between the operator of the electric vehicle and the controller. *Id.*

Mr. Baxter likewise analyzed Claim 32, and confirmed that the accused products are indeed communicating via the Internet. *Id*. ¶ 10. Thus, Mr. Baxter has established that ChargePoint is more than likely to succeed in showing infringement of claims 31 and 32 of the '570 patent.

**2.** **The accused products infringe at least Claims 1-2 of the '715 Patent**

The '715 patent claims apparatuses and methods for controlling the electric supply transfer for electric vehicles. Claim 1 of the '715 patent claims an apparatus, comprising: a control device to turn electric supply on and off to enable and disable charge transfer for electric vehicles; a transceiver to communicate requests for charge transfer with a remote server and receive communications from the remote server via a data control unit that is connected to the remote server through a wide area network; and a controller, coupled with the control device and the transceiver, to cause the control device to turn the electric supply on based on communication from the remote server. SemaConnect's Accused Products infringe at least claims 1 and 2 of the '715 patent.

Using the same infringement analyses legal framework as described above for the '570 patent, Mr. Baxter has analyzed the Accused Products against claims 1 and 2 of the '715 patent and confirms that they infringe. Baxter Dec. ¶¶ 11-12. Again, for the first step of analyzing infringement of claims 1 and 2, there are no terms that require construction because claims 1 and 2 use plain and ordinary language, and the Accused Products are infringing under any reasonable construction of these terms.

For the second step, in his declaration and claim chart, Mr. Baxter explains how SemaConnect's Accused Products meet every limitation of claims 1 and 2 of the '715 patent. The Accused Product is an apparatus, *e.g.*, charging stations. *Id*. ¶ 11. The charging station comprises a control device to turn electric supply on and off to enable and disable charge transfer for electric vehicles. *Id*. It also comprises a transceiver to communicate requests for charge transfer with a

remote server and receive communications from the remote server via a data control unit that is connected to the remote server through a wide area network. *Id.* Finally, the charging station has a controller that is coupled with the control device and the transceiver to cause the control device to turn the electric supply on based on communication from the remote server. *Id.* And with respect to claim 2, Mr. Baxter confirms further that the SemaConnect Accused Products use an electrical coupler with an on/off controller. *Id.* ¶ 12. Thus, ChargePoint is more than likely to succeed in showing infringement of claims 1 and 2 of the '715 patent.

### 3. The accused products infringe at least Claims 1 and 8 of the '131 Patent

The '131 patent claims apparatuses and methods for controlling the electric supply transfer for electric vehicles as part of a demand response system. Claim 1 of the '131 patent claims an apparatus, comprising: a control device to control application of charge transfer for an electric vehicle; a transceiver to communicate with a remote server via a data control unit that is connected to the remote server through a wide area network and receive communications from the remote server, wherein the received communications include communications as part of a demand response system; and a controller, coupled with the control device and the transceiver, to cause the control device to modify the application of charge transfer based on the communications received as part of the demand response system. SemaConnect's Accused Products infringe at least claims 1 and 8 of the '131 patent.

Using the same infringement analyses legal framework as described above for the '570 patent, Mr. Baxter has analyzed the Accused Products against claims 1 and 8 of the '131 patent and confirms that they infringe. Baxter Dec. ¶¶ 13-14. Again, for the first step of analyzing infringement of claims 1 and 8, there are no terms that require construction because claims 1 and 8 use plain and ordinary language, and the Accused Products are infringing under any reasonable

construction of these terms.

For the second step, in his declaration and claim chart, Mr. Baxter explains how SemaConnect's Accused Products meet every limitation of claim 1 of the '131 patent. The Accused Product is an apparatus, *e.g.*, a charging stations. *Id.* ¶ 13. The charging station comprises a control device to turn electric supply on and off to enable and disable charge transfer for electric vehicles. *Id.* It also comprises a transceiver to communicate with a remote server via a data control unit that is connected to the remote server through a wide area network and receive communications from the remote server, wherein the received communications include communications as part of a demand response system. *Id.* Finally, it has a controller that is coupled with the control device and the transceiver to cause the control device to modify the application of charge transfer based on the communications received as part of the demand response system. *Id.* Claim 8 includes the use of power grid load data for managing EV power transfers, which Mr. Baxter also identifies in the Accused Products. *Id.* ¶ 14. Thus, ChargePoint is more than likely to succeed in showing infringement of claims 1 and 8 of the '131 patent.

### 4. The accused products infringe at least Claim 1 of the '967 Patent

The '967 patent claims servers and methods in a server for network-controlled charging systems for electric vehicles. Claim 1 of the '967 patent claims a method comprising: receiving a request for charge transfer for an electric vehicle at a network-controlled charge transfer device; determining whether to enable charge transfer; responsive to determining to enable charge transfer, transmitting a communication for the network-controlled charge transfer device that indicates to the network-controlled charge transfer device to enable charge transfer; and transmitting a communication for the network-controlled charge transfer device to modify application of charge transfer as part of a demand response system. SemaConnect's Accused Products infringe at least claim 1 of the '967 patent.

18

Using the same infringement analyses legal framework as described above for the '570 patent, Mr. Baxter has analyzed the Accused Products against claim 1 of the '967 patent and confirms that they infringe. Baxter Dec. ¶ 15. Again, for the first step of analyzing infringement of claim 1, there are no terms that require construction because claim 1 uses plain and ordinary language, and the Accused Products are infringing under any reasonable construction of these terms.

For the second step, in his declaration and claim chart, Mr. Baxter explains how SemaConnect's Accused Products meet every limitation of claim 1 of the '967 patent. He explains that the Accused Products practice a method using a server of a network-controlled charging system for electric vehicles. *Id.* ¶ 15. The Accused Products practice a method that comprises receiving a request for charge transfer for an electric vehicle at a network-controlled charge transfer device. *Id.* They also determine whether to enable charge transfer. *Id.* Further, in response to determining whether to enable charge transfer, the Accused Products transmit a communication for the network-controlled charge transfer device that indicates to the network-controlled charge transfer device to enable charge transfer. *Id.* Finally, the Accused Products practice a method that comprises transmitting a communication for the network-controlled charge transfer device to modify application of charge transfer as part of a demand response system. *Id.* Thus, Mr. Baxter has established that ChargePoint is more than likely to succeed in showing infringement of claim 1 of the '967 patent.

### 5. There are no substantial questions about the validity or enforceability of the Asserted Patents

The Asserted Patents are presumed valid under 35 U.S.C. § 282. And a "patent enjoys the same presumption of validity during preliminary injunction proceedings as at other stages of litigation." *Titan Tire Corp.*, 566 F.3d at 1377. To overcome this presumption, an infringer must

prove invalidity by clear and convincing evidence. *See, e.g., Technology Licensing Corp. v. Videotek, Inc.*, 545 F.3d 1316, 1329 (Fed. Cir. 2008). An alleged infringer must "identify any persuasive evidence of invalidity, [or] the very existence of the patent satisfies [movant's] burden on the validity issue"). *Canon Comput. Sys. v. Nu-Kote Int'l, Inc.*, 134 F.3d 1085, 1088 (Fed. Cir. 1998). SemaConnect will not be able to present a reasonable challenge to the validity or enforceability of the Asserted Patents.

The United States Patent and Trademark Office examined ChargePoint's parent patent application to all four Asserted Patents' claims over a period of more than three years. During the course of that examination, the Examiner considered over 20 separate prior art references and concluded that the claims of the '570 patent were patentable. *See* Dkt. 1, Ex. A. In ChargePoint's three subsequent continuation patent applications, the Examiner considered over 27 separate prior art references for the '715 patent (*id.* Ex. B), over 50 separate prior art references for the '131 patent (*id.* Ex. C), and over 48 separate prior art references for the '967 patent (*id.* Ex. D), each time concluding that the claims were patentable. The Asserted Patents have never been challenged in any *inter partes* review or other reexamination proceeding. Thus, there are no questions as to the validity of the Asserted Patents.

The presumption of validity of a patent is bolstered by any evidence of commercial success, industry praise, and copying. *L.A. Gear, Inc. v. Thom McAn Show Co.*, 988 F.2d 1117, 1124 (Fed. Cir. 1993). Indeed, "objective indicia may often be the most probative and cogent evidence of nonobviousness in the record." *Mintz v. Dietz & Watson, Inc.*, 679 F.3d 1372, 1378 (Fed. Cir. 2012) (internal quotations omitted); *Techtronic Indus. Co., Ltd., v. Chevron Holdings, Ltd.*, 395 F. Supp. 2d 720, 734 (N.D. Ill. 2005) (weighing secondary considerations against a finding of obviousness). Here, the presumption of validity for the Asserted Patents is bolstered by the

tremendous commercial success and industry praise that ChargePoint has achieved with respect to its own electric vehicle charging stations that embody the technology claimed in the Asserted Patents. Adams Dec. ¶¶ 6-7. ChargePoint has received numerous accolades including a 2016 Edison Award in the Electric Energy & Propulsion Systems category. Baxter Dec. ¶ 6. ChargePoint has also been a Global Cleantech winner six years in a row and has been recognized and praised by the United Nations, the World Economic Forum, Time Magazine, CNBC, and Businessweek, amongst many others. *Id*. ChargePoint's patented technology was able to solve a long-felt need in the industry—networked charging stations. *Id*. ¶¶ 5-6. Accordingly, SemaConnect cannot show a substantial question as to the validity of the asserted claims.

### B. ChargePoint will suffer irreparable harm from SemaConnect's infringement

ChargePoint will suffer irreparable harm starting in just over two weeks in the absence of preliminary injunctive relief. This is because installation of SemaConnect's infringing products is set to begin in the first quarter of 2018. Bloch Dec. ¶ 10, Ex. I ("The application process will begin November 2017, with actual EV charging stations installed in Q1 2018 through Q3 2018"). If the Court grants ChargePoint's TRO and preliminary injunction, ChargePoint's rights can be adjudicated before any construction for SemaConnect's infringing products has broken ground. As of now, however, SemaConnect is in the qualifying step of its program, and there is "[n]o commitment at this point" on its customers.[13] Thus, time is of the essence.

ChargePoint will suffer irreparable harm if SemaConnect is not enjoined. Irreparable harm can take a number of different forms, including lost market share, price erosion, lost goodwill, and lost downstream sales. *See Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*, 22 F.3d 546, 552 (4th Cir. 1994) ("when the failure to grant preliminary relief

---

[13] Bloch Dec. ¶ 2, Ex. A.

creates the possibility of permanent loss of customers to a competitor or the loss of goodwill, the irreparable injury prong is satisfied"); *see also Robert Bosch LLC v. Pylon Mfg. Corp.*, 659 F.3d 1142, 1151 (Fed. Cir. 2011); *Celsis In Vitro, Inc. v. CellzDirect, Inc.*, 664 F.3d 922, 930 (Fed. Cir. 2012); *Apple Inc. v. Samsung Elecs. Co.*, 809 F.3d 633, 645 (Fed. Cir. 2015) ("*Apple II*") (discussing how a patentee's lost sales can lead to fewer accessory sales and fewer customer recommendations of the product, resulting in a harm that cannot be quantified).

Here, ChargePoint is certain to suffer irreparable harm in the form of at least lost market share if this Court does not enjoin SemaConnect from infringing ChargePoint's patents. If this Court allows SemaConnect to continue to provide its charging stations under the ZEV Investment Plan free of charge to site hosts, SemaConnect will likely capture the market for charging stations in the upcoming year, eroding ChargePoint's leading market position. Adams Dec. ¶¶ 10, 14-16. Similarly, SemaConnect will erode ChargePoint's position in the market for providing services related to charging stations for the multiple years it provides such services free of charge to site hosts, which stands to be for as long as 8-10 years. Moreover, SemaConnect's increased revenue obtained from the ZEV Investment Plan will allow SemaConnect to increase its production, increase its research and development, while reducing its prices, all of which will enable SemaConnect to improve its market position at the expense of ChargePoint's eroding market position. *Id*. ¶¶ 10, 18.

In addition, a very substantial portion of ChargePoint's revenues comes from downstream sales. That means that the value of each new customer is not measured merely by the revenues we generate at installation, but also downstream revenues that can last for many years. Losing SemaConnect's "free" customers thus has long-term effects even greater than the immediate impact of lost sales. *Id*. ¶ 17. This, too, is an indicator of irreparable harm. *Occupational Health*

*Centers of the Sw., P.A. v. Toney*, ELH-17-0975, 2017 WL 1546430, at \*14 (D. Md. Apr. 28, 2017) (Hollander, J.) (quoting *Multi-Channel TV Cable Co.*). The Court also should grant an injunction against SemaConnect to prevent ChargePoint from suffering the irreparable injury to its pricing structure. Adams Dec. ¶ 14. Unless this Court enjoins SemaConnect, ChargePoint may be forced to reduce its prices, *id.* ¶ 16, because it finds itself in the position of having to compete with "free goods" (that practice its patents). In such an environment, the only available recourse for ChargePoint is to reduce prices for its own products and services. This price erosion will undermine ChargePoint's revenue, which in turn reduces the ability of ChargePoint to continue spending on research and development in order to maintain its position as a leading innovator in the EV charging infrastructure industry. *BioTechnology Gen. Corp. v. Genentech, Inc.*, 80 F.3d 1553, 1566 (Fed. Cir. 1996) (recognizing irreparable harm based on a reduction of funds available for research and development). Moreover, this price erosion will likely survive the ZEV Investment Plan, as a raise in prices will alienate customers.

The special circumstances of this case—SemaConnect's almost certain potential to increase its revenue and market share by many folds through offering free goods and services to customers—present an extreme and indisputable case of irreparable harm. In truth, in a case like this where SemaConnect is selling products that are in direct competition with ChargePoint's products, irreparable harm is all but inevitable. As the Federal Circuit explains:

> Competitors change the marketplace. Years after infringement has begun, it may be impossible to restore a patentee's (or an exclusive licensee's) exclusive position by an award of damages and a permanent injunction. Customers may have established relationships with infringers. The market is rarely the same when a market of multiple sellers is suddenly converted to one with a single seller by legal fiat. Requiring purchasers to pay higher prices after years of paying lower prices to infringers is not a reliable business option.

*Polymer Technologies, Inc.* v. *Bridwell,* 103 F.3d 970, 975-976 (Fed. Cir. 1996); *see also Douglas Dynamics, LLC* v. *Buyers Prods. Co.,* 717 F.3d 1336, 1345 (Fed. Cir. 2013) (holding in a case where

the patentee and accused infringer had only 65% of the market: "[w]here two companies are in competition against one another, the patentee suffers the harm-often inseparable-of being forced to compete against products that incorporate and infringe its own patented inventions").

Even if it weren't for the many harms addressed above, ChargePoint would be irreparably harmed merely from losing its right to exclude SemaConnect's infringing products from the market—a loss of rights that forces ChargePoint *to compete against its own patented inventions*. *See Black & Decker Inc. v. Robert Bosch Tool Corp.*, No. 04 C 7955, 2006 WL 3446144, at *3 (N.D. Ill. Nov. 29, 2006) (the "nature of the patent grant weighs against holding that monetary damages will always suffice to make the patentee whole") (quoting *Reebok Int'l, Ltd. v. J. Baker, Inc.*, 32 F.3d 1552, 1557 (Fed. Cir. 1994)); *Apple II*, 809 F.3d at 650 (Reyna, J., concurring). Accordingly, there is more than ample evidence to support a finding that ChargePoint is likely to be irreparably harmed by SemaConnect's infringement.

### C.     The equities weigh heavily in favor of an injunction

The equities also weigh heavily in favor of an injunction. ChargePoint expended significant time and resources in researching, developing and obtaining a patent, developing the products, services, and market for the patented technology, and building products and services covered by the Asserted Patents' claims, all of which will be irreversibly undermined by SemaConnect's infringement. Adams Dec. ¶ 6-7; Baxter Dec. ¶¶ 5-6. Such investments are strong factors favoring a preliminary injunction. *See MGM Well Servs., Inc. v. Mega Lift Sys., LLC*, H-05-1634, 2005 WL 1693152, at *5 (S.D. Tex. July 19, 2005), *aff'd*, 264 Fed. App'x 900 (Fed. Cir. 2008) (finding equities favored patentee who had "invested substantial financial and other resources over the past few years to develop its patented [system] and to build a market for it"); *John Fluke Mfg. v. North America Soar*, 5 U.S.P.Q.2d 1657, 1662 (D. N.J. 1987) (finding equities favored plaintiff who had invested in R&D, manufacturing facilities, and workforce to produce

and market its product). ChargePoint currently is responsible for more than half of the EV charging infrastructure market by virtue of its superior technology and intellectual property. Adams Dec. ¶ 6. Without an injunction, ChargePoint will suffer permanently lost sales and customers, potentially more than half of the available market in just the next 90 days. *Id.* ¶ 15. As a result, ChargePoint's investment in innovation will be severely undermined by SemaConnect's subsidized, *i.e.*, at no cost to SemaConnect, infringement. An injunction to prevent the infringement will preserve the status quo. *Litton Sys., Inc. v. Sundstrand Corp.*, 750 F.2d 952, 961 (Fed. Cir. 1984) (the purpose of a preliminary injunction is to maintain the status quo).

In contrast, SemaConnect will suffer no loss from an injunction. SemaConnect's infringing products are just about to enter the market in 2018 through Electrify America's subsidies, which further highlights the urgency of maintaining the status quo at this moment in time. *Tuf-Tite, Inc. v. Fed. Package Networks, Inc.*, No. 14-CV-2060, 2014 WL 6613116, at *9 (N.D. Ill. Nov. 21, 2014) (noting that party's recent entry to the market weighed against it). SemaConnect's Accused Products have yet to be installed,[14] and thus SemaConnect has made minimal expenditures associated with entering the patent-protected, network-controlled electric vehicle charging infrastructure market. Indeed, as part of the ZEV Investment Plan, Electrify America is the one that will be paying the fees associated with the installation of infringing SemaConnect charging stations as well as maintenance services related to the Accused Products. Thus, any injunction is unlikely to affect SemaConnect's current bottom line.

Moreover, any hardship that SemaConnect faces is self-inflicted. SemaConnect entered into its agreement with Electrify America and this market knowing that it was improperly copying ChargePoint's inventions for its own gain. Nor can SemaConnect allege that it will be harmed by

---

[14] Bloch Dec. ¶ 2, Ex. A ("No commitment at this point").

an injunction—"[o]ne who elects to build a business on a product found to infringe cannot be heard to complain if an injunction against continuing infringement destroys the business so elected." *Bosch*, 659 F.3d at 1156 (quoting *Windsurfing Int'l, Inc. v. AMF, Inc.*, 782 F.2d 995, 1003 n.12 (Fed. Cir. 1986)); *i4i*, 598 F.3d at 863 ("neither commercial success, nor sunk development costs, shield an infringer from injunctive relief. ... [The infringer] is not entitled to continue infringing simply because it successfully exploited its infringement").   Accordingly, this factor weighs heavily in ChargePoint's favor.

### D.     The public interest weighs heavily in favor of an injunction

The fourth and final factor—the public interest—also weighs heavily in favor of an emergency injunction.  This is true both because the public interest favors the enforcement of patent rights and because absent an injunction, unwitting customers (CBRE and others) will acquire and install infringing charging stations—significant fixtures that cannot be removed without substantial expense and remediation to the subject property.

As the Supreme Court has recognized, "[t]he patent laws promote ... progress by offering a right of exclusion for a limited period as an incentive to inventors to risk the often enormous costs in terms of time, research, and development" needed to create a new product and bring it to the market."  *Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 480 (1974).  "[A]bsent any other relevant concerns … the public is best served by enforcing patents that are likely valid and infringed."  *See, e.g., Abbott Labs. v. Andrx Pharms., Inc.,* 452 F.3d 1331, 1348 (Fed. Cir. 2006). Enforcing those rights encourages others to invent and make use of the patent system.  *See MGM Well Servs.*, 505 F. Supp. 2d at 379-80.  These principles are particularly true here where ChargePoint innovated, sought for, and was granted patent protection for its innovation. ChargePoint is entitled to the Court's protection of the Asserted Patents.  *See* 35 U.S.C. § 271 (whoever utilizes a patent during the patent term without authorization infringes the patent).

ChargePoint also markets products that embody the Asserted Patents.

Moreover, once construction begins, the interests and rights of third parties will be impacted. And once construction is complete, those third parties will be very reluctant to have SemaConnect's charging stations removed from their parking lots. Thus, an injunction protects the interests of third parties (such as CBRE) who might otherwise decide to accept SemaConnect's free-goods offer and then be left with stranded, infringing products installed at parking lots nationwide.

## V. CONCLUSION

For the reasons set forth above, this Court should enter a temporary restraining order and a preliminary injunction barring SemaConnect from infringing claims 31 and 32 of the '570 patent, claims 1 and 2 of the '715 patent, claims 1 and 8 of the '131 patent, and claim 1 of the '967 patent through trial in this matter.

**[Signatures on Following Page]**

Dated:  December 17, 2017

Respectfully Submitted,

_/s/ Charles Klein_
Charles Klein (Fed. Bar No. 14504)
Zachary Cohen (Fed. Bar No. 20159)
Winston & Strawn LLP
1700 K St., N.W.
Washington, DC 20006
(202) 282-5000
cklein@winston.com
zcohen@winston.com


*Pro hac vice applications forthcoming*

David S. Bloch
Michael Rueckheim
James C. Lin
Winston & Strawn LLP
275 Middlefield Road, Suite 205
Menlo Park, CA 94025-4004
(650) 858-6500
dbloch@winston.com
mrueckheim@winston.com
jalin@winston.com

*Counsel for Plaintiff*