quinn emanuel trial lawyers | washington, dc

777 Sixth Street NW, 11th Floor, Washington, District of Columbia 20001-3706 | TEL (202) 538-8000 FAX (202) 538-8100

WRITER'S DIRECT DIAL NO.
**(202) 538-8103**

WRITER'S EMAIL ADDRESS
**alanwhitehurst@quinnemanuel.com**

December 21, 2017

**VIA CM/ECF**

Hon. Marvin J. Garbis
Edward A. Garmatz Courthouse
Chambers 5C
101 W. Lombard Street
Baltimore, Maryland 21201

Re: *ChargePoint, Inc. v. SemaConnect, Inc.*, 17-cv-3717-MJG (D. Md.)

Dear Judge Garbis:

On behalf of Defendant SemaConnect, Inc. ("SemaConnect"), I write in connection with the above-captioned action and in advance of the Friday, December 22, 2017 hearing on Plaintiff ChargePoint Inc.'s ("ChargePoint") Motion For Emergency Injunctive Relief ("Motion"). *See* ECF No. 7-1. ChargePoint's Motion should be summarily denied. The alleged "irreparable harm" ChargePoint claims it will suffer will not occur for at least *six months*. Additionally, injunctive relief would harm the public's interest by delaying the roll out of hundreds of *free* electric vehicle charging stations around the country that would provide consumers with greater public access to clean energy sources and would reduce carbon emissions. Beyond that, ChargePoint is unlikely to succeed on its patent infringement claims because the patents-in-suit are invalid under at least 35 U.S.C. § 101. Finally, the balance of hardships strongly favors SemaConnect because injunctive relief will cause immediate and serious harm to its ongoing business operations, whereas the denial of injunctive relief will not cause any immediate (much less irreparable) harm to ChargePoint. At its core, ChargePoint's Motion is an obvious attempt to restrain free and fair competition by asserting baseless patent infringement claims against SemaConnect instead of competing fairly in the market.

I.         **BACKGROUND OF THE DISPUTE**

ChargePoint claims to be "the market leader in electric vehicle [] charging infrastructure." ECF No. 1 ¶ 1. SemaConnect, on the other hand, is, at least according to ChargePoint, "a minor player in the market." *Id.* ¶ 2. As SemaConnect continues to grow, however, it threatens to negatively impact ChargePoint's purported market dominance. In a desperate attempt to stop, or slow-down SemaConnect's rapid rise within the electric vehicle charging industry, ChargePoint has come to this Court under the guise of a purported patent infringement action, seeking extraordinary injunctive relief that would stop SemaConnect's legitimate expansion efforts right in their tracks. In actuality, this dispute has nothing to do with ChargePoint's patents (which are invalid); instead, it has everything to do with ChargePoint's attempts to use the courts to preserve its fragile market dominance—efforts which have time and time again failed.

The specific facts of this dispute arise from the multi-district litigation involving the well-known Volkswagen emissions scandal, pursuant to which Volkswagen and other companies (collectively, "Volkswagen") agreed to a $15 billion settlement ("Settlement") stemming from allegations that Volkswagen illegally manipulated emissions information on its diesel vehicles. Of the $15 billion, Volkswagen agreed to dedicate $2 billion to developing electric vehicle infrastructure, including the development of electric vehicle charging stations around the country. As the purported market leader in this field, ChargePoint was, not surprisingly, unhappy with the prospects of such a large cash infusion into a marketplace that it claims to have dominated since it was founded in 2007, and the inevitable competition that would follow. Thus, when Volkswagen sought preliminary court-approval of its historic $15 billion Settlement on August 26, 2016, ChargePoint formally objected. *See In re VOLKSWAGEN "CLEAN DIESEL" MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION*, 3:15-md-02672-CRB, Dkt. No. 1784 at 10 (Amicus Curiae Brief of ChargePoint).

According to ChargePoint, Volkswagen's large commitment to the electric vehicle infrastructure industry would "flood a competitive market with $2 billion in goods" and would "threaten[] the survival of the current participants in that market, and thus the market itself." *Id.* at 9. In other words, the $2 billion investment threatened ChargePoint's market dominance, and was, therefore, highly objectionable for the company. Yet despite ChargePoint's objections, the court approved the Settlement, which included Volkswagen's commitment to invest $2 billion into the electric vehicle infrastructure industry over the next ten years.

In furtherance of these commitments, Volkswagen created a wholly-owned subsidiary, Electrify America, to oversee and administer the $2 billion investment in Zero Emission Vehicle ("ZEV") infrastructure and education programs nationwide. *See* Declaration of James Wright, dated Dec. 21, 2017, ¶ 5 (attached hereto as Exhibit A) (hereinafter, "Wright Dec."). These programs include the development of a nationwide network of workplace, community, and highway charging stations that are convenient and reliable and will allow millions of Americans to discover the benefits of electric driving. *See id.* The plan for investing this $2 billion is known as the ZEV Investment Plan. *See id.* ¶ 6. In the Spring of 2017, Electrify America released a plan for the first of four cycles of the ZEV Investment Plan. *See id.* ¶¶ 6-7. As part of that plan, Electrify America allocated funds to finance "community charging stations" (i.e. public charging stations) that provide consumers with greater access to clean and renewable energy. *See id.* ¶ 7.

This funding will provide over 2,800 electric vehicle charging units in over 550 charging sites nationwide, making electrical vehicle charging much more accessible to the public than ever before.  *See id.*

On March 24, 2017, Electrify America invited suppliers of community charging stations and related services to submit a request for proposal ("RFP").  *See id.* ¶ 8.  Many companies, including SemaConnect and ChargePoint, submitted RFPs for this contract.  *See id.*  Electrify America ultimately shortlisted four companies:  SemaConnect, ChargePoint, Greenlots, and EV Connect.  *See id.*  Electrify America later awarded the contract for this first cycle to SemaConnect, Greenlots, and EV Connect.  *See id.*  ChargePoint, however, was not selected and did not receive any funding for the first cycle.  *See id.*  SemaConnect, on the other hand, has since moved forward with its development plans and is currently in the process of evaluating possible sites for charging stations.  *See id.* ¶¶ 9-10.  SemaConnect does not, however, expect any such stations to be live until June 2018, at the earliest.  *See id.* ¶ 10.

As SemaConnect prepares for the development and eventual launch of hundreds of new electric vehicle charging stations across the country, ChargePoint remains on the sidelines.  In an attempt to prevent SemaConnect's further expansion, however, ChargePoint has now come to this Court on an emergency and expedited basis seeking extraordinary relief in the form of a temporary restraining order on the grounds that SemaConnect's charging station patents purportedly infringe upon ChargePoint's charging station patents.  They do not.  As should be obvious, ChargePoint's instant filing is nothing more than a transparent and recycled attempt to use the courts to preserve its market dominance.  The Court should not countenance ChargePoint's gamesmanship; instead, it should deny ChargePoint's Motion.

## II. CHARGEPOINT IS NOT ENTITLED TO A TEMPORARY RESTRAINING ORDER

A temporary restraining order or preliminary injunction is an "'extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.'"  *Dewhurst v. Cnty. Aluminum Co.*, 649 F.3d 287, 290 (4th Cir. 2011) (quoting *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)).  In order for a temporary restraining order to be entered, the moving party must show:  "(1) likelihood of success on the merits; (2) likelihood the movant will suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in movant's favor; and (4) the injunction is in the public interest."  *The Real Truth About Obama, Inc. v. Fed. Election Comm'n*, 575 F.3d 342, 346-47 (4th Cir. 2009).  All four requirements must be met in order for a temporary restraining order to be granted.  ChargePoint has failed to meet any of these requirements.

### A. ChargePoint Has Not Shown That It Will Suffer Irreparable Harm Absent Injunctive Relief.

ChargePoint has failed to show that it will suffer irreparable harm absent a temporary restraining order.  In determining whether a party has suffered irreparable harm, "the court must determine whether [1] plaintiff is suffering actual and imminent harm, not just a mere possibility, and [2] whether that harm is truly irreparable, or whether it can be remedied at a later time with

money damages." *Torres Advanced Enter. Sols. LLC v. Mid-Atl. Prof'ls Inc.*, 2013 WL 531215, at *4 (D. Md. Feb. 8, 2013). ChargePoint cannot satisfy either showing.

For one, the alleged harm that ChargePoint claims it will suffer—loss of market share and price erosion—are neither "actual" nor "imminent." Although ChargePoint speculates throughout its Motion that SemaConnect will be installing charging stations in the next ninety (90) days (*see* ECF No. 7-1 at 2-4, 10-11, 25), it is mistaken. Indeed, ChargePoint grossly misapprehends the process by which SemaConnect's charging stations will come online. Executing Electrify America's plan for the first cycle of the ZEV Investment Plan is a complex and lengthy process that involves the following six steps: (1) site identification; (2) site qualification; (3) site validation; (4) pre-construction acquisition; (5) permit approval; and (6) owner acceptance package. Wright Dec. ¶ 9. For each customer with which SemaConnect enters into an agreement, SemaConnect must complete the above six steps. *See id.* At the end of the six-steps, the customer will have electric vehicle charging stations installed on their site(s). *See id.* Installation of electric vehicle charging stations does not begin until steps (1)-(5) are complete. *See id.*

SemaConnect is currently working on step (1) (evaluating applications for potential site hosts) and step (2) (site qualification). The earliest start for step (3) (site validation) is mid-to-late January 2018. *See id.* ¶ 10. SemaConnect anticipates that completing these six steps (i.e., installing electrical vehicle charging stations will take until ***at least June 2018*** for early customers and until the end of 2018 for the remaining customers. Thus, SemaConnect ***will not*** be installing any of its charging stations in the next ninety days; rather it will take at least six months. Thus, the alleged harm ChargePoint claims it will suffer is not actual nor imminent. *See Dan River, Inc. v. Icahn*, 701 F.2d 278, 284 (4th Cir. 1983) (requiring movant to show "immediate threat of irreparable harm" to injunctive relief to issue); *see also In re Baker*, 2017 WL 6015380, at *5 (E.D. Mich. Dec. 5, 2017) ("a foreclosure sale [four] months away . . . [not shown to] constitute[] imminent harm"). While ChargePoint complains that it will be harmed by SemaConnect's activities now (i.e., securing sites and customers), ChargePoint will not suffer, and has not claimed, any alleged harm until SemaConnect actually installs charging stations.

Beyond that, ChargePoint has failed to sufficiently quantify the extent of its harm. At most, ChargePoint maintains that it is "certain to suffer irreparable harm in the form of at least lost market share if this Court does not enjoin SemaConnect from infringing ChargePoint's patent." ECF No. 7-11 at 22. But such vague generalities are not enough to sustain a request for extraordinary injunctive relief. Rather, "lost market share must be proven (or at least substantiated with some evidence) in order for it to support entry of a" temporary restraining order. *Automated Merch. Sys., Inc. v. Crane Co.*, 357 F. App'x 297, 301 (Fed. Cir. 2009). Because ChargePoint has failed to even attempt to quantify or substantiate its claim of lost market share, injunctive relief on this basis would be improper. *See Mike's Train House, Inc. v. Broadway Ltd. Imports, LLC*, 708 F. Supp. 2d 527, 533 (D. Md. 2010) (no irreparable harm where movant "has not quantified the expected loss of [] market share but merely asserts that [it] 'will lose existing customers and potential customers' and its current five percent market share 'will be eroded'").

Nor could ChargePoint ever make the requisite showing of loss of market share. ChargePoint states on its website that it has installed 42,939 commercial charging spots. *See* ChargePoint Homepage, available at https://www.chargepoint.com/ (last visited Dec. 21, 2017).

By comparison, the total scope of the Electrify America ZEV Investment Plan is only 2,800 charging units. *See* Wright Dec. ¶ 7. Of that, SemaConnect is only responsible for 1,440 charging units—roughly 3.4% of ChargePoint's total volume of charging stations. *See id.* ¶ 8. Thus, whatever impact SemaConnect's involvement in the ZEV Investment Plan may or may not have on ChargePoint's market share, it can hardly be said to be irreparable or even significant. This is particularly true because there are other companies, namely Greenlots and EV Connect that, like SemaConnect, are also developing and installing electric charging units under the ZEV Investment Plan.[1] *See id.* That ChargePoint has not sought to enjoin their activities under the plan further undercuts the notion that it will suffer irreparable harm absent injunctive relief.

The same is true for the purported "price erosion" that ChargePoint predicts absent a temporary restraining order. Here again, ChargePoint claims generally and without support that it "may be forced to reduce its prices." ECF No. 7-11 at 23. Claims concerning price erosion, however, must be supported by evidence or something beyond mere speculation that such erosion will occur. *See MicroAire Surgical Instruments, LLC v. Arthrex, Inc.*, 726 F. Supp. 2d 604, 640 (W.D. Va. 2010) (no irreparable harm where movant "has offered no evidence or rationale supporting [claim for price erosion] beyond the baseline economic principle that the introduction of a competitor product in the market will place downward pressure on prices"); *see also Automated Merch. Sys., Inc.*, 357 F. App'x at 301 ("To the extent that failing to grant a preliminary injunction would permit Crane to drop its prices in order to drive AMS out of the market entirely, this might support a finding of irreparable harm sufficient to warrant a preliminary injunction. But the district court cited no evidence (and neither party points to any evidence here) that this would be likely to occur; the only support for this theory of harm is the district court's conclusory statement that price erosion is possible.").

Finally, harm is not "irreparable" if it can be compensated by money damages during the normal course of litigation. *See Pers. v. Mayor & City Council of Baltimore*, 437 F. Supp. 2d 476, 479 (D. Md. 2006). ChargePoint's Motion is entirely silent on whether it licenses its patents. To the extent ChargePoint licenses its patents, any harm it claims to have suffered would be compensable in the form of a licensing fee. *See Acumed LLC v. Stryker Corp.*, 551 F.3d 1323, 1328 (Fed.Cir. 2008) ("While the fact that a patentee has previously chosen to license the patent may indicate that a reasonable royalty does compensate for an infringement, that is but one factor for the district court to consider.") We understand that ChargePoint recently offered to license its patents to the Open Charge Point Protocol, a standards organization for setting protocols for EV charging. This fact alone kills ChargePoint's Motion.

B.   **The Public Interest Disfavors Injunctive Relief.**

ChargePoint must also show that the public interest would be served by injunctive relief. *See The Real Truth About Obama, Inc.*, 575 F.3d at 346. In this respect, ChargePoint contends

---

[1] ChargePoint incorrectly stated in its Complaint (ECF No. 1) and Motion that SemaConnect is an exclusive provider of networked level 2 electric vehicle charging stations under the ZEV Investment Plan. SemaConnect is one of three providers—the other two providers being Greenlots and EV Connect. We have not seen any complaint filed by ChargePoint against the other two providers, Greenlots and EV Connect.

that the "public interest favors the enforcement of patent rights." ECF No. 7-1 at 26. "Although enforcing the right to exclude serves the public interest, the public interest factor requires consideration of other aspects of the public interest." *ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1341 (Fed. Cir. 2012). Here, ChargePoint has not considered any other aspects of the public interest that may be harmed should injunctive relief be granted.

For example, as ChargePoint asserts in its Motion, SemaConnect is on the cusp of providing electric vehicle "charging stations to customers *free of charge*, and provide services related to those stations *free of charge* for the next eight years." ECF No. 7-1 at 2 (emphasis added). Injunctive relief could, therefore, ultimately deprive consumers of their ability to obtain *free* charging stations, forcing them, instead, to have to pay supra-competitive prices for such stations, which obviously does not suit the public's best interest. *See Allied Const. Indus. v. City of Cincinnati*, 2014 WL 2931421, at *15 (S.D. Ohio June 30, 2014) (finding "the public interest in promoting fair competition and low costs for tax payers that would be served by injunctive relief").

Similarly, injunctive relief would further inhibit the public's already limited ability to access electric vehicle charging stations. Providing the public with increased access to these freely installed, cutting-edge charging stations would obviously benefit the public's interest. *See FTC. v. Imo Indus. Inc.*, 1989 WL 362363, at *6 (D.D.C. Nov. 22, 1989) (public interest favored when conduct would "strengthen competition" and "encourage heightened technology"). Finally, injunctive relief would also harm the public by inhibiting the full execution and implementation of the Volkswagen Settlement and the related ZEV Investment Plan, the purpose of which was, at least in part, to protect the environment and to promote sustainable and renewable energy sources. *See Earth Island Inst. v. U.S. Forest Serv.*, 442 F.3d 1147, 1177 (9th Cir. 2006) ("The preservation of our environment . . . is clearly in the public interest.).

### C.     ChargePoint Is Not Likely To Succeed On The Merits.

Since a preliminary injunction is a drastic and extraordinary remedy that is not to be routinely granted, courts require a patentee to establish a likelihood of success on the merits. *See Winter v. National Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). This involves establishing that the patentee will likely prove infringement of one or more claims of the patents-in-suit and that at least one of those allegedly infringing claims will also likely withstand a validity challenge. *See Astra-Zeneca LP v. Apotex, Inc.*, 633 F.3d 1042, 1050 (Fed. Cir. 2010). ChargePoint cannot meet this burden—each of the patents-in-suit is invalid under 35 U.S.C. § 101 for failing to claim patent eligible subject matter, under the two-part test articulated by the Supreme Court in *Alice Corp v. CLS Bank Int'l*, 134 S. Ct. 2347 (2014). ChargePoint describes its patents as directed to "network-controlled EV charging infrastructure" and describes each asserted patent as being a system, apparatus, or method for communicating and providing "network-controlled charging"—a textbook example of a patent ineligible abstract idea. ECF No. 7-1 at 6-8. According to ChargePoint, the network defined by the patent claims is the Internet. *See id*. at 7. There is nothing new about an electric vehicle charging station—this has been a concept in practice for years and SemaConnect has had products in the market that do just that since March 10, 2011.

District Courts throughout this country, including the Federal Circuit, have time and time again invalidated patents that merely recite the use of the Internet to invoke an abstract idea, which

is exactly what the patents-in-suit claim—communicating and providing charging via the Internet. *See e.g.*, *Intellectual Ventures I LLC v. Capitol One Bank (USA),* 792 F.3d 1363, 1366-67 (Fed. Cir. 2015) (holding claims drawn to an abstract idea where they recite storing a user profile and communicating user data to a remote device over the Internet or telephone networks as invalid); *Cyberfone Sys., LLC v. CNN Interactive Grp., Inc.*, 558 Fed. App'x 988, 991-92 (Fed. Cir. 2014) ("the idea of collecting information in classified form, then separating and transmitting that information . . . is an abstract idea that is not patent-eligible"); *CyberSource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366, 1370 (Fed. Cir. 2011) (reasoning that the use of the Internet to verify credit card transaction does not meaningfully add to the abstract idea of verifying the transaction); *Ultramercial, Inc. v. Hulu*, *LLC*, 772 F.3d 709, 722-23 (Fed. Cir. 2014) (holding that claims directed to the abstract idea of using an advertisement as an exchange or currency were ineligible even though the claims were tied to a general purpose computer and invoked the Internet). Each patent-in-suit is invalid under at least Section 101, and therefore ChargePoint cannot show that it has a likelihood of prevailing on the merits.

### D. The Balance of Equities Favors SemaConnect.

Finally, the balance of equities favors SemaConnect. For one, ChargePoint is not likely to succeed on the merits and it has not shown it will suffer irreparable harm. SemaConnect, on the hand, will be severely harmed in the event the Court orders injunctive relief. ChargePoint's requested relief is broad and expansive, seeking a "pause in SemaConnect's activities." ECF No. 7-1 at 1 n.1. A pause in SemaConnect's activities, even temporarily, would have an immediate and serious impact on SemaConnect's business operations, which include providing network and maintenance services to over 650 customer accounts, providing driver support to tens of thousands of EV drivers, training new commercial property customers as well as educating and selling to prospecting commercial property customers. *See* Wright Dec. ¶ 11. Any pause in these activities would have a material impact on SemaConnect's customer, industry partner, and elective vehicle driver relationships and, as a result, its product and service revenue going forward. *See id.* Also, with regard to the Electrify America program, SemaConnect is currently well underway in the site identification and qualification process, and any pause in activities would have an outsized impact on SemaConnect's ability to meet Electrify America's contract targets and timeline. *See id.* These harms far outweigh the harms ChargePoint would suffer in the event injunctive relief is denied.

Respectfully Submitted,

Alan Whitehurst

*Pro Hac Vice* Pending

cc:   CM/ECF Distribution List