## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### (Northern Division)

| | | |
|---|---|---|
| CHARGEPOINT, INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | Civil Action No. 8:17-cv-03717-MJG |
| SEMACONNECT, INC., | § | |
| | § | |
| Defendant. | § | |
| | § | |
| | § | |

### <u>DEFENDANT SEMACONNECT'S MEMORANDUM IN SUPPORT OF ITS MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM</u>

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ........................................................................................................1

II.    BACKGROUND ........................................................................................................3

     A.     The Asserted Patents ....................................................................................3

     B.     The Asserted Claims .....................................................................................6

          1.     '715 Patent, Claims 1-2 ....................................................................7

          2.     Claims 1 and 8 of the '131 Patent ...................................................9

          3.     Claims 1 and 2 of the '967 Patent ...................................................9

          4.     Claims 31 and 32 of the '570 Patent .............................................10

          5.     Representative Claim .....................................................................11

     C.     The Prior Art ..............................................................................................11

III.   APPLICABLE LAW ...............................................................................................16

     A.     Patent Eligibility Is Properly Decided Upon a Motion To Dismiss .....................16

     B.     The Post-*Alice* Legal Standard for Patent Eligibility .............................18

IV.   THE ASSERTED CLAIMS ARE INVALID UNDER § 101 ...............................20

     A.     The Asserted Claims Fail *Alice*'s Step One .............................................21

          1.     The Asserted Claims are Directed to the Abstract Idea of Turning a Switch "On" and "Off" ...........................................................21

          2.     The Asserted Claims Preempt an Entire Industry ......................25

          3.     The Asserted Claims are Directed to an Abstract Idea Because They Recite a Conventional Task that Could Be Performed by a Human .....................................................................................27

     B.     The Asserted Claims Fail *Alice* Step Two ...............................................29

          1.     The Asserted Patents Lack an Inventive Concept ......................29

V.    CONCLUSION ........................................................................................................35

**TABLE OF AUTHORITIES**

Page(s)

**Cases**

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l,*
134 S. Ct. 2347 (2014) ........................................................................ 1-4, 18-20, 24, 26, 29-32

*Amdocs (Israel) Ltd. v. Openet Telecom. Inc.,*
841 F.3d 1288 (Fed. Cir. 2016) ................................................................... 33, 34

*Apple, Inc. v. Ameranth, Inc.,*
842 F.3d 1229 (Fed. Cir. 2016) ................................................................... 31

*B.H. Papsan v. Allain,*
478 U.S. 265 (1986) ................................................................... 15

*Bascom Glob. Internet Servs., Inc. v. AT&T Mobility LLC,*
827 F.3d 1341 (Fed. Cir. 2016) ................................................................... 20, 33, 34, 35

*Bilski v. Kappos,*
561 U.S. 593 (2010) ................................................................... 17

*buySAFE, Inc. v. Google, Inc.,*
765 F.3d 1350 (Fed. Cir. 2014) ................................................................... 20, 21, 22

*Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n,*
776 F.3d 1343 (Fed. Cir. 2014) ................................................................... 11, 17

*Credit Acceptance Corp. v. Westlake Servs.,*
859 F.3d 1044 (Fed. Cir. 2017) ................................................................... 1, 19, 22, 23

*DDR Holdings, LLC v. Hotels.com, L.P.,*
773 F.3d 1245 (Fed. Cir. 2014) ................................................................... 24, 33, 34

*Dealertrack, Inc. v. Huber,*
674 F.3d 1315 (Fed. Cir. 2012) ................................................................... 21

*Electric Power Group, LLC v. Alstom S.A.,*
830 F.3d 1350 (Fed. Cir. 2016) ................................................................... 2, 19, 25, 32

*Electric Power Group, LLC v. Alstom, S.A.,*
No. CV 12-06365-JGB(RZx), 2015 WL 12720309 (C.D. Cal. May 21, 2015) ................. 19

*Enfish, LLC v. Microsoft Corp,*
822 F.3d 1327 (Fed. Cir. 2016) ................................................................... 24

*Groundswell Techs., Inc. v. Synapsense Corp.*,
No. CV 15-06024-AB(JPRx), 2016 WL 6661177 (C.D. Cal. Apr. 28, 2016) ....................... 32

*I/P Engine, Inc. v. AOL, Inc.*,
576 Fed. App'x 982 (Fed. Cir. 2014) .................................................................................. 17

*In re Chromar*,
656 F. App'x 1016 (Fed. Cir. 2016) .................................................................................... 22

*In re TLI Commc'ns*,
823 F.3d 607 (Fed. Cir. 2016) ............................................................ 19, 24, 29, 31

*Intellectual Ventures I LLC v. Capital One Financial Corp.*,
850 F.3d 1332 ...................................................................................................................... 27

*Intellectual Ventures I LLC v. Erie Indemnity Co.*,
850 F.3d 1315 (Fed. Cir. 2017) ......................................................................... 17, 34, 35

*Intellectual Ventures I LLC v. J. Crew Group, Inc.*,
No. 6:16-CV-196-JRG, 2016 WL 4591794 (E.D. Tex. Aug. 24, 2016) ................................ 20

*Inventor Holdings, LLC v. Bed Bath & Beyond, Inc.*,
876 F.3d 1372 (Fed. Cir. 2017) .......................................................................................... 4

*Lumen View Tech. LLC v. Findthebest.com, Inc.*,
984 F. Supp. 2d 189 (S.D.N.Y. 2013) ................................................................................. 17

*Mayo Collaborative Servs. v. Prometheus Labs., Inc.*,
566 U.S. 66 (2012) .......................................................................................... 19, 26, 32

*McRO, Inc. v. Bandai Namco Games Am. Inc.*,
No. 2015-1080, 2016 WL 4896481 (Fed. Cir. Sept. 13, 2016) ............................................ 24

*McRO, Inc. v. Naughty Dog, Inc.*,
49 F. Supp. 3d 669 (C.D. Cal. 2014) .................................................................................. 22

*Microsoft Corp. v. i4i Ltd. P'ship*,
564 U.S. 91 (2011) ............................................................................................................... 3

*Morales v. Square, Inc.*,
75 F. Supp. 3d 716 (W.D. Tex. 2014) .................................................................................. 17

*Mortg. Grader, Inc. v. First Choice Loan Servs. Inc.*,
811 F.3d 1314 (Fed. Cir. 2016) .......................................................................................... 31

*Network Apparel Grp., LP v. Airwave Networks Inc.*,
No. 6:15-CV-00134, 2016 WL 4718428 (W.D. Tex. Mar. 30, 2016) ..................................... 29

*NexusCard, Inc. v. Kroger Co.*,
    173 F. Supp. 3d 462 (E.D. Tex. 2016) ................................................................. 11

*OIP Techs., Inc. v. Amazon.com, Inc.*,
    788 F.3d 1359 (Fed. Cir. 2015) ......................................................................... 17

*Open Parking, LLC v. ParkMe, Inc.*,
    No. 2:15-cv-976, 2016 WL 3547957 (W.D. Penn. June 30, 2016) ......................... 29

*Parker v. Flook*,
    437 U.S. 584 (1987) ....................................................................................... 32

*Secured Mail Sols. LLC v. Universal Wilde, Inc.*,
    873 F.3d 905 (Fed. Cir. 2017) ........................................................................... 13

*Smart Sys. Innovations, LLC v. Chicago Transit Auth.*,
    873 F.3d 1364 (Fed. Cir. 2017) ........................................................... 1, 19, 23, 24

*Ultramercial, Inc. v. Hulu, LLC*,
    772 F.3d 709 (Fed. Cir. 2014) ........................................................................... 17

*Uniloc USA, Inc. v. AVG Techs. USA, Inc.*,
    No. 16-CV-00393-RWS, 2017 WL 1154927 (E.D. Tex. Mar. 28, 2017) ................. 25

*Vehicle Intelligence & Safety, LLC v. Mercedes-Benz USA, LLC*,
    635 Fed. App'x. 914, 919 (Fed. Cir. 2015) .......................................................... 31

*V-Formation, Inc. v. Benetton Group SpA*,
    401 F.3d 1307 (Fed. Cir. 2005) ......................................................................... 13

**Statutory Authorities**

35 U.S.C. § 101 ................................................................. 1, 16-19, 22, 26, 29, 35

**Rules and Regulations**

Fed. R. Civ. P. 1 ................................................................................................. 17

Fed. R. Civ. P. 12(b)(6)........................................................................ 1, 13, 15, 17, 35

## TABLE OF EXHIBITS

| Exhibit No. | Description |
|---|---|
| Ex. 1 | U.S. Patent No. 586,193 |
| Ex. 2 | Excerpts of the File History of U.S. Patent No. 8,138,715 |
| Ex. 3 | Excerpts of the File History of U.S. Patent No. 8,432,131 |
| Ex. 4 | Excerpts of the File History of U.S. Patent No. 7,956,570 |
| Ex. 5 | Excerpts of the File History of U.S. Patent No. 8,450,967 |
| Ex. 6 | U.S. Patent No. 6,081,205 |
| Ex. 7 | International Patent Application Publication No. WO2007/141543 |
| Ex. 8 | U.S. Patent Application Publication No. 2009/0021213 |
| Ex. 9 | AeroVironment, Inc., "PosiNET: Fleet Performance Management for your Fast-Charged Vehicles" (2006) |
| Ex. 10 | United States Patent & Trademark Office's July 2015 Update: Subject Matter Eligibility |
| Ex. 11 | U.S. Patent No. 7,566,003 |

Pursuant to Federal Rule of Civil Procedure 12(b)(6) and 35 U.S.C. § 101, Defendant SemaConnect, Inc. ("SemaConnect") respectfully moves to dismiss the Complaint of Plaintiff ChargePoint, Inc. ("ChargePoint") for failure to state a claim upon which relief can be granted because the eight asserted claims—claims 31 and 32 of U.S. Patent No. 7,956,570 (Dkt. 1-1); claims 1 and 2 of U.S. Patent No. 8,138,715 (Dkt. 1-2); claims 1 and 8 of U.S. Patent No. 8,432,131 (Dkt. 1-3); and claims 1 and 2 of U.S. Patent No. 8,450,967 (Dkt. 1-4) (collectively, "the Asserted Claims")—are directed to patent-ineligible subject matter and thus invalid under 35 U.S.C. § 101.

## I.  INTRODUCTION

Since the Supreme Court's seminal *Alice* decision in 2014, patent infringement lawsuits, like this one, are frequently dismissed at the pleading stage for lack of patentable subject matter. In fact, courts are encouraged to dismiss lawsuits on 35 U.S.C. § 101 grounds to avoid frivolous lawsuits and costly litigation.  In ChargePoint's own words, the Asserted Claims are "straightforward," and no claim construction is required to understand the breadth of their claims.  According to ChargePoint, the claims are so broad that they are infringed by *any* electric charging station that is connected to the Internet—even an electric charging station that has *not* been built or installed yet (Dec. 22, 2017 Hearing on Temporary Restraining Order Tr. at 4:12-20).  These are the very types of accusations that *Alice* intended to end, and it is entirely proper to dismiss these accusations at the pleadings stage.  *See Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2359-60 (2014).

As the popularity of the Internet grew in the mid-2000s, there was a rush to patent routine tasks that were now being performed on the Internet.  For example, companies tried to patent the idea of using a remote server to process a car loan application (*Credit Acceptance Corp. v. Westlake Servs.*, 859 F.3d 1044, 1047 (Fed. Cir. 2017)), to control a turnstile (*Smart Sys.*

*Innovations, LLC v. Chicago Transit Auth.*, 873 F.3d 1364, 1368-69 (Fed. Cir. 2017)), and to monitor a power grid (*Electric Power Group, LLC v. Alstom S.A.*, 830 F.3d 1350, 1354 (Fed. Cir. 2016)). The Federal Circuit found each of these patents invalid as they were *not* real inventions—they merely used the Internet to remotely control a known process. 859 F.3d at 1056-57; 873 F.3d at 1374-75; 830 F.3d at 1356. The Asserted Claims do just that—they use the Internet to remotely perform a known method of turning a switch "on" and "off."

The Asserted Claims recite generic, known structures (*e.g.*, transceiver, controller) for performing this task. The only invention—to the extent there is one at all—is using a network to turn the charging station "on" and "off." ChargePoint claims to have a monopoly on *all* networked electric charging stations. Fortunately *Alice* was the death knell for these types of patent claims, and if ChargePoint were to apply for its patent claims today, the Patent Office would *not* allow them.[1] The Patent Office's revised 2015 examination guidelines and *Alice*'s progeny make it clear that routine every-day tasks, like turning an outlet "on" and "off," are abstract ideas, and therefore unpatentable subject matter. Simply connecting well-known and conventional structures to transmit information over a network to remotely control this outlet to turn "on" and "off" is not a technical advancement and does not transform the abstract idea into something more inventive.

ChargePoint's infringement allegations are even more disturbing given the scope of the prior art. There is *no* dispute that ChargePoint did *not* invent the electric car or the electric car charging station, much less the Internet. In fact, one of the named inventors, Mr. David Baxter,

---

[1] ChargePoint has two more patents (U.S. Patent Nos. 9,597,974 and 9,610,856) that issued after the Supreme Court's *Alice* decision and share the same specification as the Asserted Patents. These later issued claims are narrower in subject matter, presumably due to the cautions of *Alice*. Tellingly, ChargePoint has not asserted these patent claims against SemaConnect, nor can they, because SemaConnect does not infringe those narrower claims.

admits in his declaration that electric vehicle (EV) charging stations existed for many years before his claimed invention.  (Dkt. 2-3 ¶ 5.)  Instead he claims that he was the first to "network" those charging stations.  (*Id*.)  To the contrary, numerous companies were networking charging stations well before ChargePoint did.  For example, any electric charging station that allowed a user to pay by credit card was "networked."  Because the Asserted Claims recite generic, known structures for running a charging station that are simply connected to the network, there is *no* way for ChargePoint to read those claims on SemaConnect's charging stations without also reading them on the prior art.  The prior art, discussed herein, is definitive proof that the Patent Office erred when it allowed the Asserted Claims.  If, for any reason, the Court decides not to grant this Motion, SemaConnect respectfully requests that the Court permit SemaConnect the opportunity to file an expedited Rule 56 motion that the claims are invalid under §§ 102 and 103.

## II.     BACKGROUND[2]

### A.     The Asserted Patents

The '570, '715, '131, and '967 patents (collectively "the Asserted Patents") claim priority to a provisional patent application filed on January 7, 2008, and they all share the same specification.  The earliest patent, the '570 patent, issued on June 7, 2011.  The '715 patent, which is a continuation of the '570 patent, issued on March 20, 2012.  The '131 patent, which is a continuation of the '715 patent, issued on April 30, 2013.  Finally, the '967 patent, which is a divisional of the '715 patent, issued on May 28, 2013.  All Asserted Patents were examined and issued before the Supreme Court's seminal *Alice* decision on June 19, 2014, and before the Patent Office changed its examination guidelines in 2015.[3]  *See Microsoft Corp. v. i4i Ltd.*

---

[2]    More background on the parties and their present dispute can be found in Dkt. 24 at 2-3.

[3]    *See https://www.uspto.gov/sites/default/files/documents/ieg-july-2015-update.pdf* (last visited 1/1/2018).

*P'ship*, 564 U.S. 91, 111 (2011) ("if the PTO did not have all material facts before it, its considered judgment may lose significant force"); *see also Inventor Holdings, LLC v. Bed Bath & Beyond, Inc.*, 876 F.3d 1372, 1379 (Fed. Cir. 2017) (holding that "*Alice* was a significant change in the law").

The Asserted Patents describe at a very high-level the business of running a charging station, and using a network (*e.g.*, the Internet) to control the electrical outlet at the charging station by turning the charging station's outlet "on" and "off." ('570 patent at 3:35-47.)[4] It goes without saying that in order to charge an electric vehicle, there has to be an electrical outlet to plug the car into. The purported invention is using the network to turn this electrical outlet "on" and "off." The specification is surprisingly short (*see* columns 1-11). Even a cursory review of the patent figures, reveals that there is no cutting-edge technology in the Asserted Patents. Figure 1, reproduced below, shows how simple the purported invention is:



---

[4] For convenience, the specification cites are to the '570 patent. While the column and line numbers may differ slightly in the other patents, the corresponding text is the same, because the Asserted Patents all share the same specification.

('570 patent, Fig. 1 (highlighting added).)  In Figure 1, the electrical outlet (*see* reference numeral 112, highlighted yellow) is connected to a power grid (*see* 120, highlighted red).  Like all functional electrical outlets there is an electric power line (*see* 170) running from the power grid to the electrical outlet.  At the bottom of Figure 1, there is another electrical power line 175 and another electrical outlet 152.  This is merely the power cord that runs from the electrical outlet to the electric vehicle 150.  Of course, it is quite common to plug power cords into electrical outlets.

The only purported invention is using the Internet to turn this electrical outlet "on" and "off" remotely.  There is a data control unit 130 (highlighted green) that communicates with a remote server 140 (highlighted blue) via a wide area network (*e.g.*, the Internet).  The Asserted Patents do not disclose any specific structure or technology for the data control unit or the server. It is telling that these elements are shown as non-descript rectangles, *i.e.*, "black boxes," in Figure 1.  The data control unit 130 communicates with a controller at the outlet to turn it "on" and "off."

For the bulk of the Asserted Claims, Figure 1 is all you need to understand the alleged invention.  Figure 2 is substantially similar to Figure 1.  ('570 patent, Fig. 2.)  The only difference is that in Figure 2, the data control unit 130 has been replaced by a payment station 135.  ('570 patent at 6:54.)  This payment station is not, however, recited in any of the Asserted Claims.

Moving onto Figure 3, the controller at the electrical outlet is shown in slightly more detail, but still only provides high level descriptions using black boxes:



('570 patent, Fig. 3 (highlighting added).) Like before, there is an electrical outlet (*see* 112, yellow) that is connected to a power grid (*see* power line 170). The controller turns the electrical outlet "on" and "off" by using a switch (*see* 171, yellow). The switch in the Asserted Patents does the same thing that any other switch would do—it turns the power "on" and "off." Switches have been used since designing electrical circuits in the early 19th Century. For example, Guglielmo Marconi's patent on the radio, issued on July 13, 1897, describes "switch[ing]" a receiver connection to a circuit on and off. (Ex. 1, U.S. Patent No. 586,193 at 5:18-22.) There is also a current measuring device (*see* 172, yellow). ('570 patent at 7:45-55.) Like any power meter, this measuring device measures the amount of current that passes through the electrical outlet to the electric vehicle. (*Id*.) Finally, the controller has a transceiver (*see* 181, yellow) that can communicate with the data control unit (shown in Fig. 1). (*Id*. at 8:13-21.)

**B.    The Asserted Claims**

All of the Asserted Claims have the same basic elements, which were seen in Figure 1

6

above (*e.g.*, a controller, a data control unit, and a remote server). Stripped of their technical jargon, the Asserted Claims amount to nothing more than using a network (*e.g.*, the Internet) to remotely turn an electrical outlet "on" and "off."

1. **'715 Patent, Claims 1-2**

Independent claim 1 of the '715 patent is directed to a non-descript "apparatus" (*see* **[1A]**) and recites:

> **[1A]** An apparatus, comprising:
>
> **[1B]** a **control device to turn electric supply on and off** to enable and disable charge transfer for electric vehicles;
>
> **[1C]** a **transceiver** to communicate requests for charge transfer with a **remote server** and receive communications from the remote server via a **data control unit** that is connected to the remote server through a wide area network; and
>
> **[1D]** a **controller**, coupled with the control device and the transceiver, to cause the control device **to turn the electric supply on** based on communication from the remote server.

ChargePoint contends that the claimed "control device" (*see* **[1B]**) is any component capable of "turn[ing] electric supply on and off"—something even common household items, such as light switches, are capable of performing. ChargePoint's infringement allegations contend that the limitation must be met because the Accused Products are capable of "switching" between an "on" and an "off" state—as long as a device is capable of switching between an "on" and "off" state, it satisfies this claim limitation, according to ChargePoint. (*See* Dkt. 1 at 18.) Moreover, the specification confirms that even non-networked charging stations from the 1990s had a switch. (*See* Dkt. 2-3 ¶ 5.) For example, the "Background of the Invention" explains that a user could control when an electrical vehicle was being charged, which means there had to be a switch in the prior art. (*See* '570 patent at 1:22-24.)

ChargePoint contends that the claimed "transceiver" (*see* **[1C]**) is any "device that both

sends and receives signals" from a remote server.  Based on this understanding, the "transceiver" could be any one of a number of commercially available transceivers.  (*See id.* at 8:13-36 (identifying "Wi-Fi®," "BlueTooth®," "ZigBee®," and "FasTrak®" transceivers).)  Tellingly, ChargePoint alleges that the Accused Products meet this limitation (including its recitation of "via a data control unit"), regardless of what type of transceiver it uses, by "send[ing] and receiv[ing] important energy usage information."  (*See* Dkt. 1 at 18.)  Based on ChargePoint's contentions, this limitation covers all forms of transceivers for network connectivity.

ChargePoint contends that the claimed "controller" (*see* **[1D]**) merely "cause[s] the control device to turn the electric supply on based on communication from the remote server."  ChargePoint's infringement allegations contend that the "controller" limitation is met by any component capable of using the information received by the claimed "transceiver," which presumably includes a generic processor or generic computer that can communicate with a remote server.  (*See* Dkt. 18-19.)

Therefore, claim 1 includes only three components:  (1) a switch for turning an electric supply "on" and "off," which existed in well-known electric vehicle charging stations; (2) the ability to communicate with a remote server using any possible means; and (3) an instruction to turn the switch "on" and "off" using the remote server.

Claim 2 of the '715 patent further requires "an electrical coupler," but (as revealed by claim 3 and ChargePoint's infringement allegations) that is nothing more than just "an outlet."  Even the larger "electrical receptacle," which allows an electric vehicle to connect to a charging station, is well-known and standardized technology.  (*See* '570 patent at 5:63-66 ("Examples of suitable receptacles are those conforming to the NEMA (National Electrical Manufacturers Association) standards 5-15, 5-20 and 14-50.").)

### 2. Claims 1 and 8 of the '131 Patent

Claim 1 of the '131 patent is virtually identical to claim 1 of the '715 patent. Claim 1 of the '131 patent includes the same three components discussed above for claim 1 of the '715 patent: (1) a switch for turning an electric supply "on" and "off," which existed in well-known electric vehicle charging stations; (2) the ability to communicate with a remote server using any possible means; and (3) an instruction to turn the switch "on" and "off" using the remote server.

Asserted dependent claim 8 further specifies that "the communications received as part of the demand response system include power grid load data, and wherein the controller is further to manage charge transfer based on the received power grid load data." The '131 patent, therefore, only adds the concept of a "demand response system," which, according to ChargePoint, is met by taking demand into consideration when deciding how much to charge customers. (*See* '570 patent at 1:45-58 ("Demand Response may also be used to increase demand at times of high electricity production. For example, the cost of electricity may be reduced during periods of low demand."); Dkt. 2-1 at 6 (quote article describing ChargePoint's practice of "charg[ing] a premium for tapping into the grid during peak demand times").) ChargePoint contends that merely controlling the source of the electricity constitutes a "demand response system." (*See* Dkt. 1 at 21.) This "demand response system" could, therefore, be any generic processor or computer that is capable of calculating how much to charge customers or selecting an electricity supplier.

### 3. Claims 1 and 2 of the '967 Patent

Claims 1 and 2 of the '967 patent are substantively identical to claim 1 of the '131 patent, but are phrased as "[a] method in a server" that "determin[es] whether to enable charge transfer" (claim 1) such as by first "validating a payment source for the charge transfer" (claim 2).

### 4. Claims 31 and 32 of the '570 Patent

Claim 31 of the '570 patent may appear to be the most technical, but stripped of technical jargon it is actually broader than even claim 1 of the '715 patent. Claim 31 of the '570 patent is substantively identical to claim 1 of the '715 patent—it requires a "server," "a data control unit connected to a wide area network for access to said server," "a controller" that controls the energy transfer, and a "transceiver" that connects the "controller" to the "data control unit" (and from there to the "server").[5] Unlike claim 1 of the '715 patent, claim 31 of the '570 patent is broader when it comes to the allegedly novel concept of connecting a charging station to a network, since it does not require that the charging station is in any way controlled by the remote "server"; instead, merely having a connection to such a server for any purpose appears to satisfy those claim limitations. Other claim limitations, such as the "electrical receptacle," the "electric power line," and the "current measuring device" have no relation to the alleged novelty of a "network connected electric vehicle charging station," and are instead found even in non-networked electric vehicle charging stations that have existed for many years. (*See* Dkt. 2-3 ¶ 5.)

Moreover, ChargePoint alleges that the "communication device" limitation is met merely by "enabl[ing] a connection between a charging station and the mobile wireless communication device of an operator of an electric vehicle being charged," regardless of how that connection is established or what information is exchanged over that connection, and thereby appears to conflate it with the "transceiver" limitation, which ChargePoint alleges is similarly met by "send[ing] and receiv[ing] important energy use information." (*See* Dkt. 1 at 14-15.) Accordingly, while the additional limitations of claim 31 of the '570 patent may sound technical, ChargePoint contends that they either refer to generic components of an electric vehicle charging

---

[5] Asserted claim 32 of the '570 patent only adds that the "wide area network is the Internet."

station or are broad enough to render them duplicative of other limitations, and thus do not add anything inventive to the claim.

### 5. Representative Claim

In the briefing below, SemaConnect uses claim 1 of the '715 patent as representative of the other claims, because, as explained above, the Asserted Claims are substantially similar. *See Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*, 776 F.3d 1343, 1348 (Fed. Cir. 2014) (approving use of a representative claim in § 101 analysis if the various claims are "substantially similar"). While the claims vary slightly in the specific components claimed (as explained above), each of these additional components are further abstract concepts that cannot render them patent eligible. *See NexusCard, Inc. v. Kroger Co.*, 173 F. Supp. 3d 462, 467 (E.D. Tex. 2016) ("[T]he Court finds that describing two abstract ideas in connection with each other—'collecting customer information' and 'membership discount programs'—does not cause either abstract idea to then become a concrete thing"). Accordingly, for the same reasons described below for why claim 1 of the '715 patent is directed to patent ineligible subject matter, all the Asserted Claims are directed to patent ineligible subject matter.

### C. The Prior Art

ChargePoint does not claim to have invented "electric vehicles," "charging stations," or the "network." Instead, ChargePoint's alleged invention was simply to use the network to turn the outlet at the charging station "on" and "off." One of the named inventors, David Baxter, readily admitted as much: "Prior to their invention by ChargePoint (then Coulomb) there were no networked electric vehicle charging stations, although ***non-networked electric vehicle charging stations had existed for many years***." (*See* Dkt. 2-3 ¶ 5 (emphasis added).)

The fact that non-networked electric vehicle charging stations had existed for many years prior to the Asserted Patents is also confirmed by the prosecution history of the Asserted Patents.

For example, the Patent Office initially rejected the claims of the '715 patent as anticipated by the prior art, but allowed the claims after they were amended to specify that the claimed "apparatus" was "connected to the remote server through a wide area network." (Ex. 2 ('715 File History, *Amendment* (Oct. 11, 2011)) at 3.) Similarly, the '131 patent was allowed because the Examiner found that the art of record did not disclose using a remote server to modify the application of charge transfer. (Ex. 3 ('131 File History, *Notice of Allowability* (Sept. 19, 2012)) at 2.)[6]

Mr. Baxter, one of the named inventors of the Asserted Patents, readily admitted that his claimed invention does not lead to a technological improvement of an electric vehicle charging station by (for example) making the charging faster, but instead he claims that the alleged invention provides business features consumers or service providers may find desirable, such as "circuit and grid load management capabilities," "remote monitoring and diagnostics," "a method to pay for services at disparate locations," and "the ability to implement access control and navigation services." (Dkt. 2-3 ¶ 5.) The fact that the claimed invention of the Asserted Patents offers business and not technical benefits is further confirmed by the alleged "praise" touted by ChargePoint in its TRO motion, which explains that ChargePoint "envision[s] a subscription model that would charge a premium for tapping into the grid during peak demand times." (Dkt. 2-1 at 6.)

---

[6]    The '570 patent was allowed on its first action because "[t]he prior art made of record fails to disclose or suggest a network-controlled charge transfer device having, among other claimed allowable features, [a] controller [that] manages charger transfer based on . . . power grid load data available from the remote server and where the transfer is in either direction between the local power grid and the vehicle; and possibly access a payment station." (Ex. 4 ('570 File History, *Notice of Allowability* (Jan. 21, 2011)) at 2.) None of these limitations, however, are found in claim 31 or 32 asserted by ChargePoint in this case. The '967 patent was allowed after the Applicants amended the claims to overcome an obviousness-type double patenting rejection in light of the '570 patent. (Ex. 5 ('967 File History, *Amendment* (Dec. 24, 2012)) at 2, 7.)

The prior art demonstrates that ChargePoint did not even invent the abstract idea of turning an electric switch "on" and "off" using a network. (*See* Dkt. 2-3 ¶ 5.) For decades, charging stations have (for example) allowed customers to pay by credit card and would use a network to verify and process such credit card payments, turning a charging station "on" only if the network verified the credit card. For example, U.S. Patent No. 6,081,205 ("the Williams patent"),[7] whose application was filed in 1992 and which issued in 2000, discloses a network connected electric car battery recharging station. (Ex. 6 (the Williams patent) at 1:10-15.) The Williams patent confirms that network connected electric vehicle charging stations have existed since at least the 1990s. The Williams patent discloses all the limitations of claim 1 of the '715 patent (under ChargePoint's claim interpretation):

| Claim 1 of the '715 Patent | Williams Patent |
|---|---|
| An apparatus, comprising: | Williams discloses "an electric car battery recharging station." (*Id.* at 1:10-15.) |
| a control device to turn electric supply on and off to enable and disable charge transfer for electric vehicles; | Williams discloses a "switch" that controls the flow of power from a power source to an electric vehicle. (*Id.* at 4:42-46.) |
| a transceiver to communicate requests for charge transfer with a remote server and receive communications from the remote server via a data control unit that is connected to the remote server through a wide area network; and | The Williams patent discloses "a communications link" that communicates with "a central clearing computer" to request verification of credit card information. (*Id.* at 3:55-63.) |

---

[7] The Williams patent was cited on the face of the Asserted Patents, and therefore, is part of the intrinsic record and can properly be considered even on a Rule 12(b)(6) motion to dismiss. *See Secured Mail Sols. LLC v. Universal Wilde, Inc.*, 873 F.3d 905, 912-13 (Fed. Cir. 2017) ("[T]his court has determined claims to be patent-ineligible at the motion to dismiss stage based on intrinsic evidence from the specification without need for 'extraneous fact finding outside the record.'"); *V-Formation, Inc. v. Benetton Group SpA*, 401 F.3d 1307, 1311 (Fed. Cir. 2005) ("The Meibock patent is prior art that was listed as a reference on the face of the '466 patent and in an Information Disclosure Statement. This prior art reference to Meibock is not extrinsic evidence. This court has established that 'prior art cited in a patent or cited in the prosecution history of the patent constitutes intrinsic evidence.'").

| Claim 1 of the '715 Patent | Williams Patent |
|---|---|
| a controller, coupled with the control device and the transceiver, to cause the control device to turn the electric supply on based on communication from the remote server. | Williams discloses a "processor" that receives information back from the central clearing computer and then "sends appropriate signals to various switches to turn on or turn off electric power." (*Id.* at 3:55-63, 4:11-17.) |

The "recharging station" described in the Williams patent also includes all of the other, non-network related components required by even claim 31 of the '570 patent, such as "an electrical receptacle configured to receive an electrical connector for recharging an electric vehicle," "an electric power line connecting said receptacle to a local power grid," "a control device on said electric power line, for switching said receptacle on and off," "a current measuring device on said electric power line, for measuring current flowing through said receptacle," and "a controller configured to operate said control device and to monitor the output from said current measuring device." (*See, e.g., id.* at FIG. 2 (annotated).)



FIG. 2

14

As another example, WO2007141543 ("the Taylor-Haw patent") to Elektromotive,[8] which was published on June 8, 2007, discloses a charging station that can be connected to a data network that can receive and transmit data over a network such as "(i) customer identification data; (ii) customer account data, such as the credit that the customer currently has in an account; (iii) the start time and end time that the charging station was used by a customer; (iv) the period of time that the charging station was used by a customer; (v) the date; (vi) the total electricity consumed during a charging cycle; and/or (vii) vehicle registration details." (Ex. 7 (the Taylor-Haw patent) at 4:3-14.) This may be accomplished using networks, such as "a GSM module [that] communicate[s] with an external computer" in addition to a transmitter/receiver that communicates with an RFID tag. (*Id.* at 13:5-11, 18:3-6.) The "GSM module" also controls "access to use the site" by allowing "a user [to] send[] a text to the number shown on the unit" in order "for the power that they use [to be charged] to their mobile phone." (*Id.* at 18:13-18.) Finally, the Taylor-Haw patent's "charging station" could also "allow users to access the internet" and/or "enable electronic or digital communication with the vehicle being charged." (*Id.* at 19:28-32.)

A third example of a prior art patent that anticipates and/or renders obvious the subject matter of the Asserted Patents is U.S. Patent App. Pub. No. 2009/0021213 ("the Johnson patent publication").[9] The Johnson patent publication discloses a pay-per-use, self-service charging station for electric vehicles that uses the Internet to verify a customer's credit card information with a remote banking service. (Ex. 8 (the Johnson patent publication) at Abstract, ¶ 54.) If the

[8] The Taylor-Haw patent is also part of the intrinsic evidence and accordingly can be considered when deciding a Rule 12(b)(6) motion to dismiss.

[9] Since patents and patent application publications are government records, this Court may take judicial notice of them when deciding this Motion to Dismiss. *See B.H. Papsan v. Allain*, 478 U.S. 265, 268 n.1 (1986) ("[W]e are not precluded in our review of the complaint from taking notice of items in the public record.").

banking service rejects the sale, the charging stations displays a rejection message; if the banking service authorizes the sales, the charging station's CPU closes a series of relays and switches and thereby provides an electric supply to the vehicle being charged (remotely switching charging to "on"). (*Id.* at ¶¶ 95-96, 107.) The charging station's CPU also monitors a digital meter and disconnects the vehicle from the electric supply once the amount of power requested by the customer has been transferred to the vehicle (remotely switching charging to "off"). (*Id.* at ¶ 110.) The Johnson patent publication further discloses that the charging stations take power demand into consideration by locally storing electricity during off-peak hours for later use. (*Id.* at ¶ 52.) Finally, the Patent Office did not consider the Johnson patent publication during prosecution of the Asserted Patents. Had the Patent Office been aware of the Johnson patent publication, it would never have allowed the Asserted Patents to issue.[10]

In addition to the art mentioned above, some prior art charging stations made even more extensive use of a network connection than ChargePoint's alleged "invention." For example, already in 2006, AeroVironment's PosiNET "link[ed] all fast chargers together into a single network" and thereby allowed an operator to remotely monitor its entire fleet of electric vehicles. (*See* Ex. 9 (AeroVironment, Inc., "PosiNET: Fleet Performance Management for your Fast-Charged Vehicles" (2006)).)[11]

## III. APPLICABLE LAW

### A. Patent Eligibility Is Properly Decided Upon a Motion To Dismiss

Patent eligibility under 35 U.S.C. § 101 is a "threshold question" that should be answered

---

[10] SemaConnect intends to pursue an inequitable conduct defense based on the named inventors' failure to disclose the Johnson patent publication to the Patent Office during the prosecution of the Asserted Patents.

[11] For a list of additional prior art that SemaConnect may use to show that the Asserted Claims are invalid alone or in combination, please see SemaConnect's Identification of Noninfringement Defenses filed concurrently.

early in a case. *See Bilski v. Kappos*, 561 U.S. 593, 602 (2010). In addition, patent eligibility is an issue of law. *See Intellectual Ventures I LLC v. Erie Indemnity Co.*, 850 F.3d 1315, 1319 (Fed. Cir. 2017). In light of these circumstances, claim construction or an extensive factual record is not required before ruling on a motion to dismiss under § 101. *See Content Extraction & Transmission*, 776 F.3d at 1349; *Morales v. Square, Inc.*, 75 F. Supp. 3d 716, 721-22 (W.D. Tex. 2014) ("Given the absence of [any] dispute [requiring resolution] and the 'salutary effects' of addressing § 101 at the outset of litigation, the Court finds that neither separate claim construction proceedings nor further development of the factual record is required before addressing the § 101 issue." (internal citations omitted)) *aff'd* 621 F. App'x 660 (Fed. Cir. 2015); *Lumen View Tech. LLC v. Findthebest.com, Inc.*, 984 F. Supp. 2d 189, 205 (S.D.N.Y. 2013) ("[T]he Federal Circuit has said that conducting a claim construction analysis before addressing § 101 is not required." (quotation marks omitted)).

Indeed, the Federal Circuit frequently affirms patent ineligibility at the pleading stage. *See, e.g., Content Extraction & Transmission*, 776 F.3d at 1347-49 (affirming lower court holding that abstract software claims were unpatentable at the pleading stage under Rule 12(b)(6)); *Ultramercial, Inc.* v. *Hulu, LLC*, 772 F.3d 709, 717 (Fed. Cir. 2014) (same). Judge Mayer, has even issued opinions "commend[ing]" district courts' "adherence to the Supreme Court's instruction that patent eligibility is a 'threshold' issue." *OIP Techs., Inc. v. Amazon.com, Inc.*, 788 F.3d 1359, 1364-65 (Fed. Cir. 2015) (Mayer, J., concurring); *see also I/P Engine, Inc. v. AOL, Inc.*, 576 Fed. App'x 982, 996 (Fed. Cir. 2014) (Mayer, J., concurring) (discussing the "clear advantages" of addressing section 101 requirements at the outset of litigation). The benefits in terms of conservation of judicial resources that flow from deciding this threshold issue now are self-evident, especially in light of the mandate of Fed. R. Civ. P. 1 for a just,

speedy, and inexpensive resolution.

Here, in ChargePoint's own words, the eight asserted claims "use plain and ordinary language" and have "no terms that require construction." (Dkt. 7-1 at 15-17, 19.) ChargePoint has thereby admitted that the main reason courts occasionally delay ruling on a § 101 motion—the need to construe the asserted claims—is not applicable here. The Asserted Claims are all invalid using ChargePoint's own interpretation of the claims, as set forth in their infringement allegations in the Complaint.[12] (*See* Dkt. 1 at 11-15, 18-19, 21-22, 24-26.) Accordingly, there is no reason for the Court to delay resolving the "threshold question" of whether ChargePoint's Asserted Patents are even patent eligible. By addressing this issue now, the Court can conserve party and judicial resources that would otherwise be spent on protracted litigation.

## B. The Post-*Alice* Legal Standard for Patent Eligibility

To be subject matter eligible for patenting, a patent must claim a "new and useful process, machine, manufacture, or composition of matter." 35 U.S.C. § 101. Excluded from the scope of patentable inventions are "[l]aws of nature, natural phenomena, and abstract ideas," because they "are the basic tools of scientific and technological work." *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2354 (2014) (internal quotation marks omitted). As the Supreme Court observed, allowing a patent holder to broadly preempt other applications of an abstract idea within a particular technological environment "might tend to impede innovation more than it would tend to promote it, thereby thwarting the primary object of the patent laws." *Id.* at 2354. For example, in the context of a power grid, "[g]ranting a monopoly on a particular method for simultaneously monitoring data from multiple power grid operators would

---

[12] For purposes of this Motion, given that it is being brought at the pleadings stage, SemaConnect is applying ChargePoint's apparent interpretation of the scope of the Asserted Claims. If the Court denies SemaConnect's Motion and fact discovery commences in earnest, SemaConnect reserves the right to pursue alternative constructions.

incentivize further innovation in the form of alternative methods for achieving the same result," whereas granting a patent on the general concept, such as on any type of power grid monitoring "inhibits innovation by prohibiting other inventors from developing their own solutions to the problem without first licensing the abstract idea." *See Electric Power Group, LLC v. Alstom, S.A.*, No. CV 12-06365-JGB (RZx), 2015 WL 12720309, at *7 (C.D. Cal. May 21, 2015), *cited with approval in* 830 F.3d 1350, 1356 (Fed. Cir. 2016). To determine patent eligibility under 35 U.S.C. §101, *Alice* sets forth a two-step test.

Under *Alice* **Step One**, the Court must determine whether the claims at issue are directed to an abstract idea or other patent-ineligible concept. *Alice,* 134 S. Ct. at 2355. Here, the identification of abstract ideas can be facilitated by "contrast[ing] claims 'directed to an *improvement* in the functioning of a computer' with claims 'simply adding *conventional components* to well-known business practices.'" *In re TLI Commc'ns*, 823 F.3d 607, 612 (Fed. Cir. 2016) (emphasis added). For example, the Federal Circuit has found processing a car loan application using a remote server (*Credit Acceptance Corp.*, 859 F.3d at 1047), a device for controlling access to a transit system (*i.e.*, a turnstile) using a network connection (*Smart Sys. Innovations*, 873 F.3d at 1368-69), or remotely monitoring a power grid (*Electric Power Group*, 830 F.3d at 1354) are all directed to patent ineligible abstract ideas.

Under *Alice* **Step Two**, if a patent claims an abstract idea, the court must consider whether the claims include additional elements, *i.e.,* an inventive concept, sufficient to "'transform the nature of the claim' into a patent-eligible application." *Alice*, 134 S. Ct. at 2350 (quoting *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 566 U.S. 66, 72-73 (2012)). An inventive concept cannot be supplied by limiting an abstract idea "to a particular technological environment" or adding "well-understood, routine, conventional activities previously known to

the industry." *Id.* at 2358-59 (internal quotation marks omitted). Instead, the asserted claims must "describe[] how [their] particular arrangement of elements is a ***technical*** improvement over prior art ways of" accomplishing the abstract ideas identified in step one of the *Alice* framework. *Bascom Glob. Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1350 (Fed. Cir. 2016) (emphasis added).

Accordingly, simply using generic technology "does not alter the analysis" in step two of the *Alice* inquiry, even if that technology is embodied in a tangible form. For example, "the mere recitation of a generic computer cannot transform a patent-ineligible abstract idea into a patent-eligible invention." *Alice*, 134 S. Ct. at 2357-58. Similarly, "merely disclos[ing] the use of generic computer network technology to achieve an online variation of a well-established, real-world practice" does not transform an abstract idea into a patent-eligible invention. *Intellectual Ventures I LLC v. J. Crew Group, Inc.*, No. 6:16-CV-196-JRG, 2016 WL 4591794, at *4 (E.D. Tex. Aug. 24, 2016); *see also buySAFE, Inc. v. Google, Inc.*, 765 F.3d 1350, 1355 (Fed. Cir. 2014) ("That a computer receives and sends the information over a network—with no further specification—is not even arguably inventive.").

## IV.   THE ASSERTED CLAIMS ARE INVALID UNDER § 101

The Asserted Claims are invalid because they fail the two-step *Alice* framework. The Asserted Claims are directed to the unpatentable abstract idea of turning a switch "on" and "off." Moreover, as one of the named inventors of the Asserted Patents admitted, Asserted Patents only add network connectivity to already existing electric vehicle charging stations. (*See* Dkt. 7-3 ¶ 5.) But, as reflected in the Patent Office's 2015 patent examination guidelines, "receiving or transmitting data over a network, *e.g.*, using the Internet to gather data" is presumptively insufficient to confer patent eligibility onto an abstract idea. (Ex. 10 at 7.)

**A.    The Asserted Claims Fail *Alice*'s Step One**

**1.    The Asserted Claims are Directed to the Abstract Idea of Turning a Switch "On" and "Off"**

Each of the Asserted Claims is directed to the abstract idea of turning a switch "on" and "off."  This idea is both a routine task (humans have been flipping light switches for well over a century) and a business practice (controlling customer access to a good).  The Patent Office's 2015 patent examination guidelines and similar claims from analogous cases prove that this is not patentable subject matter.

In its guidelines, the Patent Office identifies managing "transactions between people" as abstract ideas.  (Ex. 10 at 4.)  The Asserted Claims fall squarely within this identified abstract idea.  Each Asserted Claim is directed to a routine task of running an electric vehicle charging station and turning the electric supply "on" and "off" via a remote server to allow a customer to charge his electrical vehicle, creating a transaction between the station owner and the customer.  As demonstrated by the cases cited in the Patent Office's examination guidelines (Ex. 10 at 4), such as *Dealertrack, Inc. v. Huber*, 674 F.3d 1315 (Fed. Cir. 2012) and *buySAFE, Inc. v. Google, Inc.*, 765 F.3d 1350, 1355 (Fed. Cir. 2014), combining a routine task with references to a server, network, or even the Internet results in an abstract idea.  (*See* Ex. 10 at 4.)

In *Dealertrack*, the claims at issue were directed to the computer that received credit applications from customer computers and coordinated with computers of a credit bureau and a lender to process the credit application.  674 F.3d at 1319.  Notwithstanding the claims' recitation of "a central processor," "communications medium," and multiple, different "terminal[s]," the Federal Circuit nonetheless found that the claims were directed to "the basic concept of processing information through a clearinghouse."  *Id.* at 1333.  Here, too, the claimed "remote server" does not alter the conclusion that the Asserted Claims are directed to the basic

and routine task of turning a charging station "on" and "off." The "remote server" is just a conduit to turn a charging station "on" and "off," so a customer can charge his electric vehicle.

In *buySAFE*, the Federal Circuit invalidated claims directed to using computers to close an "online commercial transaction." 765 F.3d at 1352. The *buySAFE* claims were, therefore, inherently "online." The Federal Circuit concluded that "[t]he claims in this case do not push or even test the boundaries of the Supreme Court precedents under section 101" and are instead directed to a patent ineligible transaction, since the claim limitation of "online transactions" was at best a reference to a field of use, which cannot confer patent eligibility. *Id.* at 1354-55. Accordingly, *buySAFE* indicates that performing a simple transaction (in the case of the Asserted Patents, turning an outlet "on" and "off" based on a customer request) using a network (*e.g.*, the Internet) still results in an abstract idea.

More recent 101 decisions, also confirm that performing such a routine task using a network is an abstract idea. When deciding whether a claim is directed to an abstract idea, it is important to compare the asserted claims to claims that other courts have previously adjudicated. *See In re Chromar*, 656 F. App'x 1016, 1019 (Fed. Cir. 2016) ("[I]t is sufficient to compare claims at issue to those claims already found to be directed to an abstract idea in previous cases.") (quotation marks omitted); *see also McRO, Inc. v. Naughty Dog, Inc.*, 49 F. Supp. 3d 669, 675 (C.D. Cal. 2014) (Wu, J.) (noting that "comparisons to previously adjudicated patents—or more precisely, to past cases' characterizations of those patents—have done the heavy lifting" in the Section 101 analysis).

For example, in *Credit Acceptance Corp.*, the Federal Circuit found that a patent on using a server that communicates with a user terminal over a network to facilitate a car sale was patent ineligible. 859 F.3d 1044, 1047 (Fed. Cir. 2017). Specifically, the Federal Circuit concluded

that, notwithstanding the claimed "server" and "network," the patent was directed to the abstract idea of processing an application for financing as part of a purchase. *Id.* at 1054. In fact, the Federal Circuit expressly held that introducing "communication between previously unconnected system" did not make the claims any less abstract. *Id.* 1055. This is the exact situation we face here—one of the Asserted Patent's named inventors admitted that the claimed invention merely added a server connection to a previously known transaction (turning on and off an electric supply to charge a vehicle) performed with a previously unconnected electric vehicle charging station. (*See* Dkt. 2-3 ¶ 5 ("Prior to their invention by ChargePoint (then Coulomb) there were no networked electric vehicle charging stations, although non-networked electric vehicle charging stations had existed for many years.").) Just like in *Credit Acceptance Corp.*, using a server to turn an electric supply on and off instead of making that determination at the charging station does not render the underlying transaction any less abstract.

The Federal Circuit has previously found patent ineligible claims directed to similar subject matter as the Asserted Claims. In *Smart Systems Innovations*, the Federal Circuit invalidated patents directed to using a networked connected "bankcard verification system" to grant or deny access to a transit system. 873 F.3d at 1368-69 (Fed. Cir. 2017). (*See* Ex. 11 (U.S. Patent No. 7,566,003) at 9:28-29, 10:52-56 (explaining that the claimed system communicated with the "bankcard verification system" through "an Ethernet connection to the Internet").) Claim 1 of the '715 patent is similar to the invalided claims at issue in *Smart Systems*—both claim 1 of the '715 patent and the claims in *Smart Systems* grant or deny access to a good or service ("transit system" in *Smart Systems*; "electric supply" in the '715 patent) and do so using generic hardware components ("bankcard reader" in *Smart Systems*; "control device" in the '715 patent) and by communicating with a remote entity ("bankcard verification system" in *Smart*

*Systems*; "remote server" in the '715 patent). The Federal Circuit found that the patents at issue in *Smart Systems* were directed to an abstract idea because they claimed the formulation of financial transactions and not "a new type of bankcard, turnstile, or database"—there was no technological improvement. *Id.* at 1372. Claim 1 of the '715 patent is directed to an abstract idea for the same reasons—it does not claim a new or technologically improved electric vehicle charging station (as the inventor himself admitted), and instead covers the abstract idea of controlling access to the station's electric supply using a remote server.

The Asserted Patents are distinguishable from patents that the Federal Circuit recently concluded were subject matter eligible, including in *Enfish, LLC v. Microsoft Corp*, 822 F.3d 1327, 1330 (Fed. Cir. 2016) and *McRO, Inc. v. Bandai Namco Games Am. Inc.*, No. 2015-1080, 2016 WL 4896481, at *1 (Fed. Cir. Sept. 13, 2016).[13] In these cases, the Federal Circuit found that claims were "directed to an improvement in the functioning of a computer," rather than "simply adding conventional components to well-known business practices," as is the case here. *TLI Commc'ns*, 823 F.3d at 612. More specifically, the Asserted Patents are not directed to improving the functioning of either the electric vehicle charging station or the remote server, but instead describe turning an electric station "on" or "off' from a remote server—an arrangement that allows a business to exercise control over its charging station and maximize revenue, *i.e.*, a "well-known business practice[]." *Id.*

Further, unlike in *Enfish* and *McRO*, the Asserted Patents make clear that they are concerned with customer convenience and maximizing revenue by allowing a charging station operator to exercise control over the station, which are business concepts, and not directed to

---

[13] As explained below in connection with step two, the Federal Circuit's *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245 (Fed. Cir. 2014), which courts occasionally also consider as part of step one of the *Alice* framework, is equally distinguishable.

improving the technical functioning of the underlying machines. As the Asserted Patents' specification explains, "[a]n important part of any consumer experience is the ease of acquiring a product—to recharge an electric vehicle this entails finding an available recharging facility, controlling the facility, and paying for the electricity consumed." ('570 patent at 1:34-40.) As revealed by ChargePoint's TRO motion, however, the primary goal of the claimed invention is to leverage this control to maximize revenue through ChargePoint's "subscription model [that] charge[s] a premium for tapping into the grid during peak demand times." Dkt. 2-1 at 6. The Asserted Patents, therefore, do not claim any improvement to an electrical vehicle charging station, and instead are directed to improving consumer convenience and maximizing revenue.[14] The Asserted Patents provide "a business benefit rather than a benefit to the client server environment itself." *See Uniloc USA, Inc. v. AVG Techs. USA, Inc.*, No. 16-CV-00393-RWS, 2017 WL 1154927, at *6 (E.D. Tex. Mar. 28, 2017).

Accordingly, the Asserted Patents are directed to an abstract idea under *Alice* step one.

## 2. The Asserted Claims Preempt an Entire Industry

That the Asserted Patents are directed to an abstract idea is further confirmed by ChargePoint's infringement allegations, which demonstrate that ChargePoint is attempting to

---

[14] ChargePoint may attempt to characterize the benefits of the Asserted Patents as including "managing local grid load." (*See* Dkt. 7-1 at 5.) No such benefit, however, is apparent from the actual language of the claims. Claims 1-2 of the '715 patent and claims 31-32 of the '570 patent do not even mention a "demand response system." And while claims 1 and 8 of the '131 patent and claims 1-2 of the '967 patent require a "demand response system" or "power grid load data," these limitations are apparently met even if the "system" and "data" are used to maximize revenue instead of improving the performance of the overall power grid. (Dkt. 7-1 at 11.) Moreover, optimizing resource allocation is an economic/business concept, and not a technological improvement, and applying that context to a power grid does not constitute an inventive concept. *See Electric Power Group, LLC v. Alstom S.A.*, 830 F.3d 1350, 1354 (Fed. Cir. 2016) ("[L]imiting the claims to the particular technological environment of power-grid monitoring is, without more, insufficient to transform them into patent-eligible applications of the abstract idea a their core.").

preempt all competition in network-connected electric vehicle charging stations using its patents. *See Alice*, 134 S. Ct. at 2354. The Supreme Court has explained that the concern about preemption in its Section 101 jurisprudence "is a *relative* one: how much future innovation is foreclosed relative to the contribution of the inventor." *Mayo*, 566 U.S. at 88 (emphasis in original). The named inventor's alleged "contribution" here is nothing but ChargePoint's (disputed) contention that it was the first to network a collection of well-known electric charging stations to carry out the abstract idea of turning the charging stations "on" and "off." Under *Mayo*, any alleged "contribution" of the inventor here is outweighed by the impermissible attempt to foreclose use of the network (*e.g.*, the Internet) to remotely control electric charging stations. ChargePoint's infringement allegations demonstrate the preemptive expansiveness of its claims. (Dkt. 1; Dkt. 7-3.)

*First*, ChargePoint is accusing charging stations of infringement that have not even been built. (Dec. 22, 2017 Hearing on Temporary Restraining Order Tr. at 4:12-20.) The fact that ChargePoint somehow knows that non-existent charging stations—that have not even been built yet—will inevitably infringe its patents alone demonstrates that the Asserted Patents are not directed to any particular application of controlling a charging station using a remote server and instead seek to monopolize the entire industry.

*Second*, the main feature ChargePoint accuses of infringing claim 1 of the '715 patent is the accused product's alleged "smart grid integration" which allows "chargers to operate with more solar and wind energy as it comes onto the grid." (Dkt. 1 at 18.) The specification for the Asserted Patents, however, are entirely silent on the use of solar, wind, and other clean energy sources, demonstrating that the inventors at the time of invention did not foresee that charging stations might be able to use network connectivity to leverage newly available power sources.

The claims are drafted so broadly and with such abstract language, that ChargePoint is using its claims to read on the entire network-connected electric vehicle charging stations, even where such invention was not contemplated. This further demonstrates that the Asserted Patents do not claim actual inventions and instead are an improper attempt at stifling competition and innovation in the field of electric vehicle charging stations.

**Third**, ChargePoint's infringement allegations do not specifically identify a single hardware component—they do not name the make or model of one modem, chip, conductor, switch, or outlet—in the accused products, but instead characterize the accused products entirely based on their functionalities. (*See* Dkt. 1 at 11-15, 18-19, 21-22, 24-26.) This is because the Asserted Patents do not claim any particular implementation, and instead attempt to preempt the functionalities of a charging station (*i.e.*, the underlying abstract ideas) themselves. Such broad, functional claiming is further evidence that the Asserted Patents preempt an entire industry and another tell-tale sign of a patent ineligible abstract idea. *Intellectual Ventures I LLC v. Capital One Financial Corp.*, 850 F.3d 1332, 1342 (affirming summary judgment of invalidity under Section 101 because: "[T]he claim language here provides only a result-oriented solution, with insufficient detail for how a computer accomplishes it. Our law demands more.").

### 3. The Asserted Claims are Directed to an Abstract Idea Because They Recite a Conventional Task that Could Be Performed by a Human

The Asserted Claims recite a conventional task that could easily be performed by a human. Stripped of their technical jargon, the claims are directed to merely turning the charging station "on" and "off" remotely. This is exactly what gas stations have done for decades—add energy back into a car by remotely turning the gas pump "on" and "off." In the "old" days before the prevalence of credit card readers, there was a gas station attendant that worked the cash register and monitored the gas pumps from inside the store. A customer would pull his car

to the gas pump; walk inside and pay the attendant; and then the attendant turned on the gas pump remotely from the store for the pre-paid amount.  If it was a neighborhood gas station where the attendant knew the customer, maybe the customer could wave to the attendant without pre-paying.  At the end of the day, the attendant could flip a switch remotely from inside the store to turn off all the pumps for the night.

The attendant in this analogy is no different from the remote server in the Asserted Claims, and the hardware that the attendant used to turn the pump on and off is no different from the remaining limitations in the Asserted Claims.  As shown by the following table, the Asserted Claims are no different from a traditional gas station, and thus, are directed to an abstract idea.

| Claim 1 of the '715 Patent | Traditional Gas Station |
|---|---|
| 1. An apparatus, comprising: | Gas pumps are an apparatus that can be turned "on" and "off" by a gas station attendant. |
| a control device to turn electric supply on and off to enable and disable charge transfer for electric vehicles; | Gas pumps have a control device that is turned "on" and "off" by the attendant.<br><br>For example, the gas pump can be turned on when the customer pre-pays.  The gas pump can be turned "on" when the attendant recognizes the customer.  The gas pump can be turned "off" at the end of the day. |
| a transceiver to communicate requests for charge transfer with a remote server and receive communications from the remote server via a data control unit that is connected to the remote server through a wide area network; and | The customer communicates with the attendant to ask him to turn the gas pump "on."  Maybe he pre-pays and asks the attendant to turn "on" the pump for a certain amount.  Or maybe he just waves to the attendant to turn the pump "on," and then pays later.<br><br>In response, the attendant turns the pump "on" from inside the store.  In the pre-pay case, the attendant enters the amount that the customer pre-paid into a computer in the store.  This computer transmits a signal to a computer in the gas pump.  This signal turns the gas pump "on," and then turns it "off" when the pre-paid amount is reached.[15] |

---

[15]  According to ChargePoint's interpretation of the claims, any form of communication meets this limitation.  (*See* Dkt. 1 at 18 (arguing that the "transceiver" limitation is met by "send[ing]

| Claim 1 of the '715 Patent | Traditional Gas Station |
|---|---|
| a controller, coupled with the control device and the transceiver, to cause the control device to turn the electric supply on based on communication from the remote server. | The computer in the gas pump turns the pump "on" and "off" based on the signal from inside the gas station. |

Merely using a network to do what gas station attendants have done for decades, even if now done in the context of electric charging, is not patentable. *See, e.g., TLI Commc'ns*, 823 F.3d at 612; *Open Parking, LLC v. ParkMe, Inc.*, No. 2:15-cv-976, 2016 WL 3547957, at *9 (W.D. Penn. June 30, 2016) ("[T]he existence of a brick and mortar analog to the solution [specified in the patent claims] will be fatal under § 101); *Network Apparel Grp., LP v. Airwave Networks Inc.*, No. 6:15-CV-00134, 2016 WL 4718428, at *6 (W.D. Tex. Mar. 30, 2016) (finding that claims were patent ineligible because "the problem the [patent-at-issue] addresses . . . did exist in the 'brick and mortar' context" and thus "longstanding practices to address this problem predate the Internet"). Accordingly, the Asserted Claims are directed to an abstract idea.

### B. The Asserted Claims Fail *Alice* Step Two

#### 1. The Asserted Patents Lack an Inventive Concept

All of the claims of the Asserted Patents fail *Alice* step two because the claim elements do not disclose an inventive concept sufficient to transform the abstract idea into a patent-eligible application. *Alice*, 134 S. Ct. at 2355. "It is well-settled that mere recitation of concrete, tangible components is insufficient to confer patent eligibility to an otherwise abstract idea." *TLI Commc'ns*, 823 F.3d at 613. Rather, "the components must involve more than performance of well-understood, routine, conventional activities previously known to the industry." *Id.*, *citing*

and receiv[ing] important energy usage information").) ChargePoint thereby appears to read the "via a data control unit" limitation out of the claims.

*Alice*, 134 S. Ct. at 2359 (internal quotations and punctuation omitted). Here, all the recited claim elements, tangible and otherwise, are conventional and generic and thus present no patentable inventive concept.

*First*, the claims at issue recite various generic pieces of computer equipment found in almost any modern system, such as one or more of a "control device" (*i.e.*, the "on" and "off" switch) "transceiver," "server," "controller," and "communication device" for transmitting data over a network (*e.g.*, the Internet). The Patent Office's updated 2015 patent examination guidelines, which requires "significantly more" than the recitation of generic computer components (*see* Ex. 10 at 1-2), sets forth a list of elements that are well-understood, routine, and conventional functions that fail *Alice* step two:

> For Step 2B, examiners should rely on what the courts have recognized, or those in the art would recognize, as **elements that are well-understood, routine, and conventional functions when they are claimed in a merely generic manner**:
>
> - performing repetitive calculations,
> - receiving, processing, and storing data,
> - electronically scanning or extracting data from a physical document,
> - electronic recordkeeping,
> - automating mental tasks, and
> - **receiving or transmitting data over a network, e.g., using the Internet to gather data**.

(Ex. 10 at 7 (footnotes omitted and emphasis added).) While some of the other examples may also apply to the Asserted Claims, the last one (receiving or transmitting data over a network) is directly on point, because it sets forth the exact function used in the claims. Based on the 2015 patent examination guidelines (which were published *after* the Asserted Patents issued), using a remote server *cannot* transform the abstract idea of turning a switch "on" and "off" into a patentable invention.

The Federal Circuit has routinely found that generic communication and processing

components, such as those recited by the Asserted Claims, cannot confer patent eligibility.  *See TLI Commc'ns*, 823 F.3d at 615 (affirming invalidity of claims utilizing computer components which "behave exactly as expected according to their ordinary use"); *Apple, Inc. v. Ameranth, Inc.*, 842 F.3d 1229, 1241-43 (Fed. Cir. 2016) (finding that "the recited central processing unit, data storage device, and operating system components" were merely "conventional computer components" and therefore did not add an inventive concept); *Mortg. Grader, Inc. v. First Choice Loan Servs. Inc.*, 811 F.3d 1314, 1324-25 (Fed. Cir. 2016) ("No . . . inventive concept is present here.  Instead, the claims 'add' only generic computer components such as an 'interface,' 'network,' and 'database.'  These generic computer components do not satisfy the inventive concept requirement."); *Vehicle Intelligence & Safety, LLC v. Mercedes-Benz USA, LLC*, 635 Fed. App'x. 914, 915, 919 (Fed. Cir. 2015) (claimed "processor" was simply a "purely conventional computer implementation" of claimed function).  Indeed, given the ubiquity of computers and computer networks today, these generic computer components do not provide any meaningful limitation to the scope of ChargePoint's alleged monopoly over the networked-electric charging station.  *See Alice*, 134 S. Ct.. at 2358 (2014) ("Given the ubiquity of computers, wholly generic computer implementation is not generally the sort of additional feature that provides any practical assurance that the process is more than a drafting effort designed to monopolize the abstract idea itself.") (internal quotation marks and citation omitted).

**Second**, the claims at issue recite various generic components found in every electrical vehicle charging station, such as one or more of a "electrical coupler," "electrical receptacle," "electric power line," and "current measuring device."  As explained above, these components were all found in previously known electric vehicle charging stations.  (*See* Dkt. 2-3 ¶ 5 ("[N]on-networked electric vehicle charging stations had existed for many years."); Ex. 6 at Figure 2

(patent from the mid 1990s that already discloses all components claimed by the Asserted Patents).)  Accordingly, these limitations at best confine the Asserted Patents to the technological environment of electric charging stations, but still seek to monopolize the entire network-electric charging station market.  Under Supreme Court precedent, such an attempt at using patents on an abstract idea to control an entire market is forbidden.  *See Alice*, 134 S. Ct. at 2358 ("[T]he prohibition against patenting abstract ideas cannot be circumvented by attempting to limit the use of the idea to a particular technological environment.") (internal quotation marks omitted); *see also Mayo*, 566 U.S. at 88 ("[A]s we have previously pointed out, even a narrow law of nature (such as the one before us) can inhibit future research.").

Moreover, the Supreme Court, Federal Circuit, and district courts throughout this country have not hesitated to find physical components insufficient to confer patent eligibility onto an abstract idea even if they were specialized for a particular technical field (such as the generic charging station components of the Asserted Patents), because the resultant claims still threatened to preempt use of the abstract idea in the entire field (networked-electric charging stations).  *See*, *e.g.*, *Parker v. Flook*, 437 U.S. 584, 586 (1987) (finding that "the catalytic chemical conversion of hydrocarbons" did not confer patent eligibility, since "there are numerous processes of that kind in the petrochemical and oil-refining industries"); *Electric Power Group*, 830 F.3d at 1351-52, 1354 (claiming "an interconnected electric power grid," "synchronized phasor measurements," and "power grid vulnerability" did not confer patent eligibility because it merely "limit[ed] the claims to the particular environment of power-grid monitoring"); *Groundswell Techs., Inc. v. Synapsense Corp.*, No. CV 15-06024-AB (JPRx), 2016 WL 6661177, at *8 (C.D. Cal. Apr. 28, 2016) (finding that "using generic sensors and telemetry equipment to collect environmental data" does not confer patent eligibility).

***Finally***, the "ordered combination" of these claim elements fails to transform the abstract ideas of the claims into patent-eligible applications. The claim elements merely comprise generic computer and charging station components performing their basic functions, and nothing more. Thus, these claims are nothing like those held to provide an inventive concept in *Amdocs (Israel) Ltd. v. Openet Telecom. Inc.*, 841 F.3d 1288 (Fed. Cir. 2016), *Bascom Global Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341 (Fed. Cir. 2016), and *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245 (Fed. Cir. 2014). In *Amdocs*, the Federal Circuit found the claims at issue to be patent eligible, because, while the claimed solutions required "arguably generic components," they involved "an unconventional ***technological solution*** (enhancing data in a distributed fashion) to a ***technological problem*** (massive record flows which previously required massive databases)" and "depend[ed] upon the invention's ***unique*** distributed architecture." 841 F.3d at 1301-03 (emphasis added). In *Bascom*, the Federal Circuit found that the patent at issue claimed an "inventive concept . . . in the ordered combination of claim limitations" because it "claimed a ***technology-based solution*** (***not an abstract-idea-based solution*** implemented with generic technical components in a conventional way) to filter content on the Internet that overcomes existing problems with other Internet filtering systems." 827 F.3d at 1351-52 (emphasis added). In particular, the court in *Bascom* found that the patent did not claim an abstract idea, but instead "describe[d] how its particular arrangement of elements is ***a technical improvement*** over prior art ways of" accomplishing the abstract ideas identified above. *See Id.* at 1351 (emphasis added). Finally, in *DDR Holdings*, the Federal Circuit found that the asserted patent addressed a problem specific to the Internet—retaining website visitors on a website. 773 F.3d at 1257. The Federal Circuit drew a careful distinction between the asserted claims in *DDR Holdings*, which the court found were "necessarily rooted in computer

technology in order to overcome a problem specifically arising in the realm of computer networks," and claims that "merely recite the performance of some business practice known from the pre-Internet world along with the requirement to perform [them] on the Internet." *Id*.

Unlike the claims found patent eligible in *Amdocs*, *Bascom*, and *DDR*, the Asserted Claims merely disclose generic computer and charging station components in a generic arrangement being used precisely as they were designed, to perform a function that was well-known in the computer arts. They do not solve a technological problem, nor present a technological solution or technical improvement over the prior art. First, as discussed above, the problems purportedly addressed by the Asserted Patents—giving a charging station operator additional control over the station—are commonly encountered in the context of operating even a traditional gas station. Thus, the Asserted Patents do not solve a technological problem. Second, the Asserted Claims are only directed to aspirational functions and results, without actually providing any "technology-based solution" for achieving these results. For example, claim 1 of the '131 patent refers to a "demand response system" and "modifying the application of charge transfer based on communications received as part of" that system without setting forth how those communications are generated by the "remote server" or how they are used by the claimed "apparatus." Simply identifying an overarching desirable outcome (such as optimizing power usage) without any specifying technical improvements over the prior art to achieve this outcome does not rise to the level of an inventive and thus patent-eligible concept. *See Erie Indemnity*, 850 F.3d at 1330-32 (Fed. Cir. 2017) (affirming invalidity because the claims did not recite "any particular unique delivery of information" and holding without an explanation of the mechanism for how the result is accomplished, the invention cannot supply an inventive concept."). Any implementation details found in the claims are, instead, a natural consequence

of applying the abstract idea at issue to a generic electric vehicle charging station. *See Erie Indemnity*, 850 F.3d at 1329 (distinguishing *Bascom* on the basis that "[t]he use of metafiles . . . is yet another natural consequence of carrying out the abstract idea in a computing environment and is, therefore, also insufficient to transform a patent-ineligible abstract idea into a patent-eligible invention").

In sum, the Asserted Patents simply utilize generic computer and electric vehicle charging station components arranged in conventional fashion. These claimed components merely set forth functionally-claimed solutions with no *inventive* technical mechanisms for *how* those solutions are to be achieved. Thus, the Asserted Patents lack an inventive concept at *Alice* step two and are invalid under §101.

## V. CONCLUSION

For the above reasons, Defendant respectfully requests that this Court dismiss ChargePoint's Complaint with prejudice under Fed. R. Civ. P. 12(b)(6), because all the Asserted Claims fail to set forth patent eligible subject matter under 35 U.S.C. § 101.

DATED: January 8, 2018

Respectfully submitted,

*/s/ Alan L. Whitehurst*

Alan L. Whitehurst
DC Bar No. 484873 (admitted *pro hac vice*)
alanwhitehurst@quinnemanuel.com
Marissa R. Ducca
DC Bar No. 979328 (admitted *pro hac vice*)
marissaducca@quinnemanuel.com
Deepa Acharya
DC Bar No. 267654 (admitted *pro hac vice*)
deepaacharya@quinnemanuel.com
Scott E. Lerner
D. Md. Bar No. 13327
scottlerner@quinnemanuel.com
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
777 6th St., N.W., 11th Floor
Washington, DC 20001
Tel: (202) 538-8000
Fax: (202) 538-8100

Sean S. Pak
CA Bar No. 219032 (admitted *pro hac vice*)
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
50 California Street, 22nd Floor
San Francisco, CA 94111
Tel: (415) 875-6600
Fax: (415) 875-6700

*Attorneys for Defendant SemaConnect, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document on January 8, 2018.

_/s/ Alan L. Whitehurst_____
Alan L. Whitehurst