**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
<u>(Northern Division)</u>**

| | |
|---|---|
| ChargePoint, Inc., | Civil Action No: MJG-17-3717 |
| Plaintiff, | |
| v. | |
| SemaConnect, Inc., | |
| Defendant. | |

**PLAINTIFF'S MEMORANDUM
<u>IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS</u>**

## <u>TABLE OF CONTENTS</u>

**Page**

I.   INTRODUCTION ................................................................................................ 1

II.  FACTUAL BACKGROUND .............................................................................. 4

    A.  The '715 Patent ........................................................................................... 4

    B.  The '570 Patent ........................................................................................... 6

    C.  The '131 Patent ........................................................................................... 7

    D.  The '967 Patent ........................................................................................... 8

III. ARGUMENT ...................................................................................................... 9

    A.  The Asserted Claims are patent-eligible under step 1 of the Alice test ..... 10

        1.  SemaConnect fails to analyze all of the asserted claims of each asserted patent ........................................................................................ 10

        2.  Neither Claim 1 of the '715 patent nor any of the Omitted Claims is directed to the abstract idea of turning a switch on or off .............. 14

            a.  Claim 1 of the '715 patent .................................................... 14

            b.  The Omitted Claims .............................................................. 18

        3.  All of the Asserted Claims have a tangible application .................... 19

        4.  Each of the Asserted Claims improve the functioning of EV charging stations .......................................................................... 22

        5.  The PTO's examination guidelines support patentability ................ 24

    B.  The Asserted Claims are patent-eligible under step 2 of the Alice test ..... 25

        1.  The Asserted Claims recite non-conventional and non-generic arrangements of networked EV charging stations .......................... 25

        2.  The Asserted Claims provide technical solutions to technical problems ....... 30

    C.  The Asserted Claims do not implicate preemption concerns ...................... 32

IV.  CONCLUSION ................................................................................................. 33

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alice Corp. v. CLS Bank International*,
    573 U.S. __, 134 S. Ct. 2347 (2014).............................................................. *passim*

*Amdocs (Israel) Ltd. v. Openet Telecom, Inc.*,
    841 F.3d 1288 (Fed. Cir. 2016), *cert. denied*, 138 S. Ct. 469 (2017) ............................ *passim*

*Bascom Glob. Internet Servs., Inc. v. AT&T Mobility LLC*,
    827 F.3d 1341 (Fed. Cir. 2016)...................................................................... *passim*

*Bilski v. Kappos*,
    561 U.S. 593 (2010)......................................................................................2, 19

*buySAFE, Inc. v. Google, Inc.*,
    765 F.3d 1350 (Fed. Cir. 2014).............................................................................21

*Canrig Drilling Tech. Ltd. v. Trinidad Drilling L.P.*,
    Civ. Action No. H-15-0656, 2015 WL 5458576 (S.D. Tex. Sept. 17, 2015) ...............2, 19, 20

*CertusView Techs., LLC v. S&N Locating Servs.*,
    No. 2:13cv346, slip op. (E.D. Va. Jan. 21, 2015) .....................................................9

*CFMT, Inc. v. Yieldup Int'l Corp.*,
    349 F.3d 1333 (Fed. Cir. 2003)...........................................................................10

*Chamberlain Grp. v. Linear*,
    114 F. Supp. 3d 614 (N.D. Ill. 2015) ...............................................................17, 20

*Content Extraction & Transmission LLC v. Wells Fargo Bank*, *Nat'l Ass'n*,
    776 F.3d 1343 (Fed. Cir. 2014)........................................................................11, 12

*ContourMed Inc. v. Am. Breast Care L.P.*,
    Civ. Action No. CV H-15-2769, 2016 WL 1059531 (S.D. Tex. Mar. 17, 2016) ...................20

*Credit Acceptance Corp. v. Westlake Servs.*,
    859 F.3d 1044 (Fed. Cir. 2017)...........................................................................21

*DataTern, Inc. v. MicroStrategy, Inc.*,
    No. 11-11970-FDS, slip op. (D. Mass. Sept. 4, 2015)................................................9

*DDR Holdings v. Hotels.com*,
    773 F.3d 1245 (Fed. Cir. 2014).....................................................................3, 22, 32

*Dealertrack, Inc. v. Huber,*
    674 F.3d 1315 (Fed. Cir. 2012)..........................................................................21

*Diamond v. Diehr,*
    450 U.S. 175 (1981)..................................................................................9, 29

*Elec. Power Grp., LLC v. Alstom S.A.,*
    830 F.3d 1350 (Fed. Cir. 2016)..........................................................................21

*Elec. Power Grp., LLC v. Alstom, S.A.,*
    No. CV1206365JGBRZX, 2015 WL 12720309 (C.D. Cal. May 21, 2015)...........................29

*Enfish, LLC v. Microsoft Corp.,*
    822 F.3d 1327 (Fed. Cir. 2016)..................................................................3, 16, 22

*Enzo Biochem, Inc. v. Gen-Probe Inc.,*
    323 F.3d 956 (Fed. Cir. 2002)............................................................................25

*Exergen Corp. v. Brooklands Inc.,*
    No. 12-12243-DPW, slip op. (D. Mass. Aug. 28, 2015) ...........................................9

*Fitbit, Inc. v. AliphCom,*
    233 F. Supp. 3d 799 (N.D. Cal. 2017) ..................................................................31

*Groundswell Techs., Inc. v. Synapsense Corp.,*
    No. CV1506024ABJPRX, 2016 WL 6661177 (C.D. Cal. Apr. 28, 2016) ......................21, 30

*Intellectual Ventures I, LLC v. Canon Inc.,*
    143 F. Supp. 3d 143 (D. Del. 2015).....................................................................20

*Intellectual Ventures I LLC v. Ricoh Americas Corp.,*
    170 F. Supp. 3d 673 (D. Del. 2016)................................................................17, 20

*Interconnect Planning Corp. v. Feil,*
    774 F.2d 1132 (Fed. Cir. 1985)..........................................................................10

*King Pharm., Inc. v. Eon Labs, Inc.,*
    616 F.3d 1267 (Fed. Cir. 2010)..........................................................................10

*McRO, Inc. v. Bandai Namco Games Am. Inc.,*
    837 F.3d 1299 (Fed. Cir. 2016).............................................................2, 14, 15, 16

*Microsoft Corp. v. i4i Ltd. Pship,*
    131 S. Ct. 2238 (2011)....................................................................................9

*Mortg. Grader, Inc. v. First Choice Loan Servs. Inc.,*
    811 F.3d 1314 (Fed. Cir. 2016)...........................................................................3

*Network Apparel Grp., LP v. Airwave Networks Inc.*,
    No. 6:15-CV-00134, 2016 WL 4718428 (W.D. Tex. Mar. 30, 2016) ....................................32

*Open Parking, LLC v. ParkMe, Inc.*,
    No. 2:15-CV-976, 2016 WL 3547957 (W.D. Pa. June 30, 2016) ..........................................21

*Parker v. Flook*,
    437 U.S. 584 (1978).............................................................................................................29

*Prism Techs. LLC v. Sprint Spectrum L.P.*,
    849 F.3d 1360 (Fed. Cir.), *cert. denied*, 138 S. Ct. 429 (2017)................................17

*Research Tech., Inc. v. Corazonix Corp.*,
    958 F.2d 1053 (Fed.Cir.1992)............................................................................................3

*Shelcore, Inc. v. Durham Indus., Inc.*,
    745 F.2d 621 (Fed. Cir. 1984)...........................................................................................11

*Smart Meter Techs., Inc. v. Duke Energy Corp.*,
    Civ. Action No. 16-208 2017 WL 2954916 (D. Del. July 11, 2017) .....................................31

*Smart Sys. Innovations, LLC v. Chicago Transit Auth.*,
    873 F.3d 1364 (Fed. Cir. 2017)..........................................................................................29

*StoneEagle Servs. v. Pay-Plus Solutions*,
    Civ. Action. No. 8:13-cv-2240-T-33MAP, 2015 WL 518852 (M.D. Fla. Feb.
    9, 2015) ...........................................................................................................................11

*Thales Visionix Inc. v. United States*,
    850 F.3d 1343 (Fed. Cir. 2017)...........................................................................................2

*Trading Techs. Int'l v. CQG, Inc.*,
    No. 05-cv-4811, slip op. (N.D. Ill. Feb. 24, 2015) ...............................................................9

*Uniloc USA, Inc. v. AVG Techs. USA, Inc.*,
    No. 216CV00393-RWSLEAD, 2017 WL 1154927 (E.D. Tex. Mar. 28, 2017) ....................23

**Statutes**

35 U.S.C. § 101 ........................................................................................................ *passim*

35 U.S.C. § 102 ........................................................................................................ *passim*

35 U.S.C. § 103 ........................................................................................................ *passim*

**Other Authorities**

Charles Morris, *ClipperCreek Adds ChargeGuard Access Control Option to Its HCS Series Charging Stations* .................................................................................... 27

Federal Rule of Civil Procedure 12 (d) ........................................................................ 3

Michael Kent, *Lean and Mean: The EV Charging Pioneers at ClipperCreek* ............................. 27

U.S. Patent No. 6,081,205 ........................................................................................... 17

U.S. Patent No. 6,314,169 ........................................................................................... 17

U.S. Patent No. 7,956,570 .................................................................................... *passim*

U.S. Patent No. 8,042,631 ........................................................................................... 17

U.S. Patent No. 8,138,715 .................................................................................... *passim*

U.S. Patent No. 8,432,131 .................................................................................... *passim*

U.S. Patent No. 8,450,967 .................................................................................... *passim*

U.S. Patent No. 9,704,145 ........................................................................................... 17

I.     **INTRODUCTION**

Since its founding more than a decade ago, ChargePoint has invested substantial

resources toward developing a network-controlled electric vehicle (EV) charging infrastructure.

The technology developed by ChargePoint allows owners and operators of EV charging stations

to manage their stations from a geographically remote location, enables the management of the

load imposed by electric vehicles on electric grids, allows for access and pricing control based on

specific driver characteristics, and informs drivers of charging station availability as well as

important events (such as the interruption of a charging session) occurring during charging—all

in a geographically dispersed infrastructure that the site host can manage centrally and remotely.

These developments marked a major breakthrough in the EV charging infrastructure industry—a

dramatic departure from the gas station-centric ideas that prevailed before ChargePoint's

innovations.  The Asserted Claims—all of which SemaConnect infringes—recite various aspects

of ChargePoint's innovative network-controlled electric vehicle charging infrastructure.

SemaConnect seeks to invalidate an imaginary invention that is not recited in any of the

eight claims of the four patents ChargePoint has asserted against SemaConnect: "use [of] the

Internet to remotely perform a known method of turning a switch 'on' or 'off.'"  Dkt. 41-1

("Motion") at 2.  But that is not what the Asserted Patents claim.  Rather, the Asserted Claims

recite substantial structural elements and inventive arrangements of elements.  For example,

claim 1 of the '715 patent recites a novel approach to communicate requests for charge transfer

with a remote server and an inventive coupling between an EV charging station, a remote server,

and a wide area network, as well as various couplings between two or more components of the

electric vehicle charging station—a controller, a control device, and a transceiver.  The Asserted

Claims also recite inventions that are tied to particular physical machines—electric vehicle

charging stations—and improve the functioning of those machines by, *e.g.*, enabling them to communicate real-time data with remote servers and the local electric grid.  Through these features, the Asserted Claims provide technological solutions to some of the most important technological problems facing the electric vehicle charging industry, such as grid instability, EV charging station availability, and customer-centric availability and pricing.

Faced with this reality, SemaConnect was forced to take the (improper and unsupportable) approach of (i) overgeneralizing the one ChargePoint claim substantively discussed in the Motion ('715 patent claim 1); (ii) labeling the remaining Asserted Claims as "substantially similar" without providing a claim-by-claim analysis; and (iii) attempting to inject a prior art novelty analysis into a § 101 patentability motion.  Each of these approaches have been rejected by the courts.

Extensive case law from the Supreme Court, the Federal Circuit, and the district courts makes it clear that the Asserted Claims are far removed from the type of claims that the Supreme Court intended to invalidate in *Alice*.  *Alice* itself warned against carelessly broad applications of its holding, noting that courts must "tread carefully in construing this exclusionary principle lest it swallow all of patent law."  *Alice Corp. v. CLS Bank International*, 573 U.S. __, 134 S. Ct. 2347, 2352 (2014).  Since *Alice*, courts have also provided clarifications by denying motions— like SemaConnect's—that seek to stretch the *Alice* holding.  For example, a court must deny an *Alice* motion if the claims include specific limitations that render them, as a whole, not directed to an abstract idea[1]; or if the claims have tangible applications[2]; or if the claims improve the

---

[1] *McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1312 (Fed. Cir. 2016); *Thales Visionix, Inc. v. United States*, 850 F.3d 1343, 1347 (Fed. Cir. 2017).
[2] *Bilski v. Kappos*, 561 U.S. 593, 604 (2010); *Canrig Drilling Tech. Ltd. v. Trinidad Drilling L.P.*, Civ. Action No. H-15-0656, 2015 WL 5458576, at *4 (S.D. Tex. Sept. 17, 2015).

functioning of a device[3]; or if the claims involve non-conventional and non-generic arrangement

of elements[4]; or if the claims offer non-conventional technological solutions to technological

problems.[5]  *Any one* of these is an adequate ground for denying SemaConnect's motion.  *All of*

*them* are present in this case.  *None of them* have been substantially addressed by SemaConnect.

As confirmed by the accompanying Declaration of Dr. Zygmunt Haas[6] and the

Supplemental Declaration of inventor David Baxter, the specificity, inventiveness, and tangible

features of the Asserted Claims place them unquestionably outside the scope of the *Alice*

doctrine, which focuses on pure and broad software or business method patents that lack tangible

components and technological applications.  Nor do the Asserted Claims preempt abstract ideas:

they include features, arrangements, and advantages that go far beyond a mere recitation or

implementation of abstract concepts.  The EV charging station industry includes many other

manufacturers, including some that make non-network-controlled charging stations and believe

those types of stations offer advantages in reduced cost and complexity.  Supp. Baxter Dec. ¶¶ 9-

10.  SemaConnect had the option of following the path of other industry actors and avoid

infringing ChargePoint's patents; it chose not to.  It now seeks to distract the Court and misuse a

legal doctrine to avoid accountability for its actions.  The Court should deny SemaConnect's

motion.

---

[3] *Alice v. CLS Bank Int'l*, 134 S. Ct. 2347, 2359 (2014); *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1335 (Fed. Cir. 2016); *DDR Holdings v. Hotels.com*, 773 F.3d 1245, 1257 (Fed. Cir. 2014).

[4]  *Bascom Glob. Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1350 (Fed. Cir. 2016).

[5] *Amdocs (Israel) Ltd. v. Openet Telecom, Inc.*, 841 F.3d 1288, 1296-97 (Fed. Cir. 2016), *cert. denied*, 138 S. Ct. 469 (2017).

[6] Submitting expert declarations is proper in opposing a motion to dismiss on § 101 grounds.  *See Research Tech., Inc. v. Corazonix Corp.*, 958 F.2d 1053, 1055–56 (Fed.Cir.1992); *Mortg. Grader, Inc. v. First Choice Loan Servs. Inc.*, 811 F.3d 1314, 1325 (Fed. Cir. 2016) (analyzing two expert declarations submitted in opposition to a summary judgment motion on subject matter eligibility).  More generally, because SemaConnect's Motion is replete with arguments regarding evidence outside the four corners of the Complaint, ChargePoint has responded in kind.  The Court can consider these matters pursuant to Federal Rule of Civil Procedure 12 (d).

## II.     FACTUAL BACKGROUND

The Asserted Claims come from four patents, each of which includes numerous distinct claims in separate statutory categories.

### A. The '715 patent

U.S. Patent No. 8,138,715 (the '715 patent) has 58 claims, including six independent claims that are directed to apparatuses or methods.  It issued on March 20, 2012, after the Examiner considered at least 27 separate prior art references.  SemaConnect infringes claims 1 and 2 of the '715 patent.  Claim 1 of the '715 patent recites:

> An apparatus, comprising:
> a control device to turn electric supply on and off to enable and disable charge transfer for electric vehicles;
> a transceiver to communicate requests for charge transfer with a remote server and receive communications from the remote server via a data control unit that is connected to the remote server through a wide area network; and
> a controller, coupled with the control device and the transceiver, to cause the control device to turn the electric supply on based on communication from the remote server.

In other words, claim 1 of the '715 patent recites a networked EV charging station where a remote server controls whether a user is able to charge his vehicle based on whatever decision criteria the site host implements at the remote server.  This is dramatically different than the non-networked "gas station" model SemaConnect tries to invoke (Motion at 27-29).  Claim 1 identifies specific pieces of hardware: an EV charging station, a controller, a control device, a transceiver, a remote server, and a wide area network.  It also explains what these components do: for example, the transceiver communicates requests for charge transfer to the remote server through a data control unit, and the data control unit in turn connects to the remote server through the WAN.  Before the '715 patent, the state of the art was to handle charge transfer requests locally at each charging station, and thus the patent represents a significant advance over the prior art.  Supp. Baxter Dec.  ¶¶ 3-7; Haas Dec. ¶¶ 39.

Claim 2 depends from claim 1 but includes the additional feature of "an electrical coupler to make a connection with an electric vehicle, wherein the control device is to turn electric supply on and off by switching the electric coupler on and off."

Figure 1 of the '715 patent (reproduced below) illustrates an example system that includes some aspects of the inventions recited in claims 1 and 2. As illustrated in Figure 1, the electric vehicle charging station (110) connects to the remote server (140) through a data control unit (130). The charging station (110) connects to the data control unit (130) through a local area network (LAN), while the data control unit (130) connects to the remote server (140) through a wide area network (WAN). Through the connection between the electric vehicle charging station (110) and the server (140), the server may obtain load data about a power grid (120) that supplies electric power (170) to the station (110).



Communication of power grid load data between the remote server and the electric vehicle charging station enables "managing peak load leveling using Demand Response and V2G [vehicle to grid]." '715 patent at 2:9-10. These functionalities are critical to maintaining the stability of electric grids. *Id*. at 1:39-2:2.

**B. The '570 patent**

U.S. Patent No. 7,956,570 (the '570 patent) has 87 claims, including seven independent claims that are directed to systems, devices, and methods.  It issued on June 7, 2011 after the Examiner considered at least 20 separate prior art references.  SemaConnect infringes claims 31 and 32 of the '570 patent.  Claim 31 of the '570 patent recites:

> A network-controlled charge transfer system for electric vehicles comprising:
> a server;
> a data control unit connected to a wide area network for access to said server; and
> a charge transfer device, remote from said server and said data control unit, comprising:
>> an electrical receptacle configured to receive an electrical connector for recharging an electric vehicle;
>> an electric power line connecting said receptacle to a local power grid;
>> a control device on said electric power line, for switching said receptacle on and off;
>> a current measuring device on said electric power line, for measuring current flowing through said receptacle;
>> a controller configured to operate said control device and to monitor the output from said current measuring device;
>> a local area network transceiver connected to said controller, said local area network transceiver being configured to connect said controller to said data control unit; and
>> a communication device connected to said controller, said communication device being configured to connect said controller to a mobile wireless communication device, for communication between the operator of said electric vehicle and said controller.

Thus, claim 31 recites a network-controlled charge transfer system that includes a server, a data control unit connected to a wide area network for access to the server, and a charge transfer device that is remote from the server and the data control unit.  The charge transfer device includes various components, including, e.g., a controller, a control device, a current measuring device, a local area network transceiver, and a communication device connected to a mobile wireless communication device.

Various elements recited in claim 31 do not appear in claim 1 of the '715 patent: a local area network transceiver, a communication device, and a current measuring device.  It is also a system claim, not an apparatus claim.  This invention, including the use of a wide area network and a current measuring device, allows an EV charging station to be controlled and to report current measurements to an operator who is not physically near the charging station.

Claim 32 depends from claim 31, but includes the additional feature that the "wide area network is the Internet."  This is the only asserted claim that specifically recites "the Internet."

**C.  The '131 patent**

U.S. Patent No. 8,432,131 (the '131 patent) has 33 claims, including four independent claims that are directed to apparatuses and methods.  It issued on April 30, 2013, after the Examiner considered at least 50 separate prior art references.  SemaConnect infringes claims 1 and 8 of the '131 patent.  Claim 1 of the '131 patent recites:

> An apparatus, comprising:
> a control device to control application of charge transfer for an electric vehicle;
> a transceiver to communicate with a remote server via a data control unit that is connected to the remote server through a wide area network and receive communications from the remote server, wherein the received communications include communications as part of a demand response system; and
> a controller, coupled with the control device and the transceiver, to cause the control device to modify the application of charge transfer based on the communications received as part of the demand response system.

In other words, claim 1 of the '131 patent covers an EV charging station (with a controller that modifies application of electric charge, a transceiver, a remote server, a data control unit, and a wide area network—all arranged so that the amount of charge applied in particular EV charging session is based in whole or in part on information coming from the grid, other charging stations on the network, or from other users (a "demand response system").  This "demand response

system" is not recited in claim 1 of the '715 patent.  Demand response functionality helps maintain the stability of electric grids.  '131 patent at 1:41-58.  The ability "to modify the application of charge transfer based on the communication received as part of the demand response system" was completely novel at the priority date of the Asserted Patents.  The state of the art at the time—including all of the references cited by SemaConnect—consisted of charging stations that did not interact with a demand-response system.  Supp. Baxter Dec. ¶¶ 10; Haas Dec. ¶¶ 40.

Claim 8 depends from claim 1, but includes the additional features that "the communications received as part of a demand-response system include power grid load data, and [] the controller is further to manage charge transfer based on the received power grid load data." Claim 8 is the only Asserted Claim that specifically includes grid "load balancing" information and managing charge transfers based on power grid load data.

**D.  The '967 patent**

U.S. Patent No. 8,450,967 (the '967 patent) has 18 claims, including two independent claims that are directed to servers and methods.  It issued on May 28, 2013, after the Examiner considered over 48 separate prior art references.  SemaConnect infringes claims 1 and 2 of the '967 patent.  Claim 1 of the '967 patent recites:

> A method in a server of a network-controlled charging system for electric
> vehicles, the method comprising:
>> receiving a request for charge transfer for an electric vehicle at a network-
>> controlled charge transfer device;
>> determining whether to enable charge transfer;
>> responsive to determining to enable charge transfer, transmitting a
>> communication for the network-controlled charge transfer device that
>> indicates to the network-controlled charge transfer device to enable charge
>> transfer; and
>> transmitting a communication for the network-controlled charge transfer
>> device to modify application of charge transfer as part of a demand response
>> system.

Thus, claim 1 covers "transmitting a communication for the network-controlled charge transfer device to modify application of charge transfer as part of a demand response system," a novel feature not recited in claim 1 of the '715 patent.  It is also a method, not an apparatus, claim.

Claim 2 depends from claim 1 and includes the additional feature that "determining whether to enable charge transfer includes validating a payment source for the charge transfer."  Claim 2 is the only Asserted Claim that recites validating a payment source for charge transfer.

## III.   ARGUMENT

SemaConnect has the burden to prove by clear and convincing evidence that the elements of each Asserted Claim, alone and as ordered combinations, are directed to (**1**) an abstract idea and (**2**) do not include sufficient additional elements or features that amount to significantly more than an abstract idea.[7]  This SemaConnect fails to do.  Moreover, SemaConnect improperly uses concepts related to *other* patentability doctrines, such as novelty or obviousness, in its attempt to show that the Asserted Claims are directed to unpatentable subject matter.  "The 'novelty' of any element or steps in a process, or even of the process itself, is of no relevance in determining whether the subject matter of a claim falls within the § 101 categories of possibly patentable subject matter."  *Diamond v. Diehr*, 450 U.S. 175, 188-89 (1981); *see also Amdocs (Israel) Ltd.*, 841 F.3d at 1311.[8]  SemaConnect's discussion of alleged prior art as it applies to the Asserted Patents is a red herring and plays no role in the determination of this motion.  SemaConnect has not analyzed

---

[7] *Microsoft Corp. v. i4i Ltd. Pship*, 131 S. Ct. 2238, 2241 (2011); *accord*, *CertusView Techs., LLC v. S&N Locating Servs.*, No. 2:13cv346, slip op. at 34 n. 6 (E.D. Va. Jan. 21, 2015) (applying the clear and convincing standard in light of *i4i*); *DataTern, Inc. v. MicroStrategy, Inc.*, No. 11-11970-FDS, slip op. at 14 (D. Mass. Sept. 4, 2015); *Exergen Corp. v. Brooklands Inc.*, No. 12-12243-DPW, slip op. at 6-7 (D. Mass. Aug. 28, 2015); *Trading Techs. Int'l v. CQG, Inc.*, No. 05-cv-4811, slip op. at 4 (N.D. Ill. Feb. 24, 2015).

[8] "To be clear, the concept of inventiveness is distinct from that of novelty.  Novelty is the question of whether the claimed invention is new.  Inventiveness is the question of whether the claimed matter is invention at all, new or otherwise.  The inventiveness inquiry of § 101 should therefore not be confused with the separate novelty inquiry of § 102 or the obviousness inquiry of § 103."

the alleged prior art against any of the Asserted Claims,[9] and so fails to introduce even a triable

issue of fact with respect to novelty or obviousness.  *See* Haas Dec. ¶¶ 67-72.

### A.    The Asserted Claims are patent-eligible under step 1 of the *Alice* test

#### 1.    SemaConnect fails to analyze all of the asserted claims of each asserted patent

For seven of the eight Asserted Claims—claim 2 of the '715 patent, claims 1 and 8 of the

'131 patent, claims 1 and 2 of the '967 patent, and claims 31 and 32 of the '570 patent (collectively,

"the Omitted Claims")—SemaConnect provides no analysis as to why they are directed to

unpatentable subject matter.  Thus, from the outset, SemaConnect's motion must be denied with

respect to the Omitted Claims.  Whether a patent is directed to patentable subject matter requires

a close analysis of the claim elements of each claim being challenged, as each claim of a patent is

an independent invention.  *Interconnect Planning Corp. v. Feil*, 774 F.2d 1132, 1137 (Fed. Cir.

1985) ("it is well settled that each claim of a patent is entitled to a presumption of validity and is

to be treated as a complete and independent invention").  It requires analyzing "[each] element[]

of each claim both individually and as an ordered combination."  *Amdocs*, 841 F.3d at 1296-97.

To show that a claimed invention is not eligible for patent protection, a movant must not only

discuss "each claim element [] by itself," but must also analyze particular arrangements of those

claim elements.  *Bascom*, 827 F.3d at 1350.[10]  SemaConnect's motion utterly fails at this task.

Rather, SemaConnect asks this Court to dismiss all eight Asserted Claims while discussing

the elements of only one, sweeping the elements of the remaining seven claims (the Omitted

Claims) under the rug.  But claim 1 of the '715 patent simply is not representative of the Omitted

---

[9] *King Pharm., Inc. v. Eon Labs, Inc.*, 616 F.3d 1267, 1274 (Fed. Cir. 2010) (anticipation); *CFMT, Inc. v. Yieldup Int'l Corp.*, 349 F.3d 1333, 1342 (Fed. Cir. 2003) (obviousness).

[10] "The inventive concept inquiry requires more than recognizing that each claim element, by itself, was known in the art. ... [A]n inventive concept can be found in the non-conventional and non-generic arrangement of known, conventional pieces."

Claims.  Six of them come from three different patents, two of them are system claims, and two of them are method claims.  SemaConnect's analysis of apparatus claim 1 of the '715 patent wholly ignores the asserted system and method claims of the '570 and '967 patents.  It tries to explain its incomplete analysis by noting generally that the additional claim elements of the Omitted Claims capture broad applications or have no relationship to "the alleged novelty" of a network connected electric vehicle charging station.  Motion at 9-10.  But those arguments are both false and irrelevant.  The case law is clear "that a party challenging the validity of a claim, absent a pretrial agreement or stipulation, must submit evidence supporting a conclusion of invalidity of each claim the challenger seeks to destroy."  *Shelcore, Inc. v. Durham Indus., Inc.*, 745 F.2d 621, 625 (Fed. Cir. 1984); *see also StoneEagle Servs. v. Pay-Plus Solutions,* Civ. Action. No. 8:13-cv-2240-T-33MAP, 2015 WL 518852, at *5 (M.D. Fla. Feb. 9, 2015).  SemaConnect has failed to analyze the seven Omitted Claims and thus has failed to meet its burden with respect to them.  *StoneEagle*, 2015 WL 518852, at *5 ("Defendants' Motion fails to meaningfully address the claims not designated [by the defendants] as 'representative'").

SemaConnect relies on *Content Extraction & Transmission LLC v. Wells Fargo Bank*, *Nat'l Ass'n*, 776 F.3d 1343, 1348 (Fed. Cir. 2014) for the proposition that a movant may simply ignore some Asserted Claims if the claims it *does* attack are "substantially similar."  But *Content Extraction* says no such thing.  In that case, the Federal Circuit heavily relied on the fact that the plaintiff "never asserted in its opposition to [the defendant's] motion that the district court should have differentiated any claim from those identified as representative by [the defendant]," nor did the plaintiff "identify any other claims as purportedly containing an inventive concept."  *Id.*  In essence, the Federal Circuit estopped the plaintiff from raising an untimely argument. *Id.*[11]  That

---

[11] "If [the plaintiff] disagreed with [the defendant's] or the district court's assessment, [the plaintiff] could have

is not the case here.  Moreover, unlike the claims not analyzed in *Content Extraction* that included trivial steps of "extracting and detecting specific data fields, repeating some steps, and storing data as images or text and included no inventive concept," *id.* at 1347-48, the Omitted Claims in this case include additional structural features, such as a local area network transceiver, a communication device, a current measuring device (claim 31 of the '570 patent), and recite narrowing limitations such as implementing demand response functionalities to enhance grid stability through network-controlled solutions (in claim 1 of the '131 patent and claim 1 of the '967 patent).

SemaConnect has the burden to prove that the elements of each Asserted Claim, both alone and as ordered combinations, are directed to an abstract idea *and* do not include sufficient additional elements or features that amount to significantly more than an abstract idea.  Yet the Omitted Claims recite non-conventional and non-generic arrangements of hardware.  Examples include "a local area network transceiver connected to said controller, said local area network transceiver being configured to connect said controller to said data control unit" (claim 31 of the '570 patent); "a controller, coupled with [a] control device and [a] transceiver, to cause the control device to modify the application of charge transfer based on communications received as part of [a] demand response system" (claim 1 of the '131 patent); "[a] controller [] to manage charge transfer based on the received power grid load data" (claim 8 of the '131 patent); "[a] method in a server of a network-controlled charging system for electrical vehicles" (claim 1 of the '967 patent); and "whether to enable charge transfer includes validating a payment source for the charge transfer" (claim 2 of the '967 patent).  Though SemaConnect ignores them, these additional limitations each provide an independent basis for their subject-matter eligibility.  *Bascom*, 827

---

identified claims in its opposition brief that it believed would not be fairly represented by claims 1 of the '855 and '416 patents for purposes of [the defendant's] § 101 challenge."

F.3d at 1350 (a claimed invention is patent-eligible if it includes "non-conventional and non-generic arrangement of known, conventional pieces").

The Omitted Claims also provide technological solutions to particular technological problems.  Examples of such solutions include addressing problems associated with grid stability in times of peak electricity demand by utilizing network-controlled electric vehicle charging stations that communicate with power grids and charge electric vehicles according to a demand-response system ('131 patent at 2:5-7, 10-12[12]); "a transceiver to communicate with a remote server via a data control unit that is connected to the remote server through a wide area network and receive communications from the remote server, wherein the received communications include communications as part of a demand response system" (claim 1 of the '131 patent); "the communications received as part of the demand response system include power grid load data" (claim 8 of the '131 patent); "a controller configured to operate said control device and to monitor the output from said current measuring device;" (claim 31 of the '570 patent); and "transmitting a communication for the network-controlled charge transfer device to modify application of charge transfer as part of a demand response system" (claim 1 of the '967 patent).  Each of these claims are narrowly drafted to provide distinct technological solutions to technological problems, and thus provide an independent basis for concluding that the Omitted Claims are directed to patentable subject matter.  *Amdocs*, 841 F.3d at 1300.[13]  SemaConnect simply ignores all of the above-mentioned elements, in contravention of Federal Circuit law.

---

[12] "For Demand Response and V2G to be implemented effectively, real time communication of a need for power input into the local electricity grid is required. ... There is a need for an efficient communication network for managing peak load leveling using Demand Response and V2G."

[13] A claimed invention is patent eligible if it "entails a technological solution [] to a technological problem[,] even if the [claimed] solution requires arguably generic components."

In short, and contrary to SemaConnect's cursory analysis, claim 1 of the '715 patent is not representative of the Omitted Claims. Each Omitted Claim contains important elements that make each claim substantially *different* from every other. These differences are critical to each independently patented invention and show beyond question that the Asserted Claims are not directed to an unpatentable abstract idea. By failing to even discuss the elements of the Omitted Claims, alone or as ordered combinations, SemaConnect falls far short of meeting its burden of proving that the Omitted Claims are invalid.

This failure by omission is particularly glaring considering that the Court ordered SemaConnect—at SemaConnect's own request —to focus its anticipated motion to dismiss on the eight Asserted Claims in ChargePoint's complaint. Transcript of Proceedings held on Dec. 22, 2017, at 34:1-4, 52:14-19. Yet of the eight Asserted Claims, SemaConnect has only substantively engaged with one. As to the other seven Omitted Claims, SemaConnect's motion is dead on arrival. And even as to claim 1 of the '715 patent, SemaConnect fails to carry its burden because claim 1 of the '715 patent manifestly is directed to patentable subject matter.

> **2.  Neither Claim 1 of the '715 patent nor any of the Omitted Claims is directed to the abstract idea of turning a switch on or off**

> **a.  Claim 1 of the '715 patent**

"At some level, all inventions [] embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas." *Alice*, 134 S. Ct. at 2354 (2014) (citations omitted). As such, a broad application of the abstract idea doctrine can "swallow all of patent law." *Id.* Thus, the relevant inquiry is not whether some aspect of the invention involves an abstract idea; instead, "the claims are considered in their entirety to ascertain whether their character as a whole is directed to excluded subject matter." *McRO*, 837 F.3d at 1312 (citations omitted). Courts "must look to both the claim as a whole and the individual claim elements to determine whether the

claims contain an element or combination of elements that is sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the ineligible concept itself." *Id.* (citations, internal quotations, and brackets omitted).   SemaConnect overly generalizes the Asserted Claims collectively while failing to actually analyze the individual elements of '715 patent claim 1.

SemaConnect essentially admits that it is not considering the claims it contends are invalid "in their entirety."   It contends that, "[s]tripped of their technical jargon, the Asserted Claims amount to nothing more than using a network (*e.g.*, the Internet) to remotely turn an electrical outlet 'on' and 'off.'"   Motion at 7.   SemaConnect thus asks the Court to grossly oversimplify the Asserted Claims (or, more precisely, just claim 1 of the '715 patent) by ignoring various claim elements (*e.g.*, metering) reciting technical details of the Asserted Claims, dismissing them as nothing more than "technical jargon."   But by characterizing claim 1 of the '715 patent as directed to the abstract idea of turning a switch "on" and "off," SemaConnect asks the Court to pass over the specific components of the claimed apparatus in claim 1, *e.g.*, a control device, a transceiver to communicate charge requests with a remote server via a data control unit, a WAN, and a controller coupled with the control device and the transceiver.   As the specification discloses, "[t]he server stores: consumer profiles (including account information for payment); utility company power grid load data (updated in real time by the utility company); and electricity consumption data that may be required for government tax purposes."   '715 patent at 3:44-48. And when determining whether to enable charge transfer for an electric vehicle owner, the specification explains:

> 5. the server 140 accesses the subscriber profile from the database 143, validates the payment source by contacting the credit card company, FasTrak® database or bank, and via the communication network enables the Smartlet™ 110 to charge the vehicle 150;

> *6. based on the subscriber profile and load management data from the utility company the server determines the charging periods and communicates this information to the Smartlet™ 110.*

*Id.* at 10:30-38.  Notably, the Smartlet™ is not a generic machine but rather a specific ChargePoint device rolled out in mid-2008.  Supp. Baxter Dec. ¶ 8.

Thus, contrary to SemaConnect's contention, claim 1 of the '715 patent is directed to more than simply turning a switch on and off; the apparatus of claim 1 comprises specific components for providing a specific technological solution to address the technological problem of grid stability in times of peak electricity demand.  *See, e.g.,* '715 patent at 10:53-58.[14]  SemaConnect has offered nothing to show that this particular arrangement of coupling charge transfer for electric vehicles to a network is conventional or generic.  Nor has SemaConnect explained why the Court should ignore this arrangement and reduce claim 1 of the '715 patent to "using a network [] to remotely turn an electrical outlet 'on' and 'off'."  Motion at 7.  The Federal Circuit has expressly rejected this style of oversimplified analysis.  *McRO*, 837 F.3d 1299 at 1313[15]; *Enfish*, 822 F. 3d at 1337-38.[16]

And when the claim elements of the '715 patent are actually analyzed, it is obvious that claim 1 includes specific limitations about how the transceiver is configured to communicate with a remote server: it does so through a "data control unit [] connected to the remote server via a wide area network."  '715 patent at 12:13-14.  Thus, the transceiver must be coupled to both the data

---

[14] "For example, the utility company could send a message to the Smartlet™ server 140 requiring a reduction in load.  The Smartlet™ server 140 then turns off charging of some vehicles 150.  Which vehicles have charging stopped will depend on the subscriber profiles and the requirements of the Demand Response system."

[15] "[C]ourts must be careful to avoid oversimplifying the claims by looking at them generally and failing to account for the specific requirements of the claims" (citations and internal quotations omitted).

[16] "In finding that the claims were directed simply to 'the concept of organizing information using tabular formats,' the district court oversimplified the self-referential component of the claims and downplayed the invention's benefits'" (citations and internal parentheses omitted).

control unit and the controller, while the data control unit is coupled to the transceiver and maintains a connection through a WAN.

By ignoring the specific limitations of '715 patent claim 1, *i.e.*, the components of the apparatus that allow the invention to enable and disable charge transfer for electric vehicles, SemaConnect seeks a holding that would render a vast number of patents invalid, including at least four issued patents cited by SemaConnect as prior art[17] and at least one patent obtained by SemaConnect itself.[18]   Applying SemaConnect's oversimplification of the Asserted Patents as nothing more than turning a switch "on" and "off" also would render many past court decisions incorrect.  *See, e.g., Chamberlain Grp. v. Linear*, 114 F. Supp. 3d 614, 625-26 (N.D. Ill. 2015); *Intellectual Ventures I LLC v. Ricoh Americas Corp.*, 170 F. Supp. 3d 673, 682 (D. Del. 2016); *Prism Techs. LLC v. Sprint Spectrum L.P.*, 849 F.3d 1360, 1364 (Fed. Cir.), *cert. denied*, 138 S. Ct. 429 (2017).  Stripped of their technical and functional aspects, or what SemaConnect dismisses as "technical jargon," all of these patents in one way or another turn an electric switch on or off. SemaConnect's approach is simply wrong.

---

[17] U.S. Patent No. 6,314,169 includes claims reciting a "control unit [] for controlling [an] electronic circuit and [a] telecommunications channel access circuit."  US Patent No. 5,297,664 includes claims reciting "charging means for connecting to and supplying power to an electric car charger inlet; and fast-charge setting means for causing said charging means to operate in a fast-charge mode."  U.S. Patent No. 6,081,205 includes claims reciting "a power controller interconnected between the power source and the connector and coupled to the processor, the power controller selectively providing power to the connector in response to commands from the processor."  U.S. Patent No. 8,042,631 includes claims reciting "[a] controller [] configured to bring [an auxiliary power unit (APU)] into electrical connection with [a] regional electric supply grid when said APU is needed to partly satisfy a power requirement of said regional electric supply grid."
[18] SemaConnect's U.S. Patent No. 9,704,145 recites the following feature: "in response to a determination that the [electric vehicle charging station (EVCS)] is legitimate based on the received station identifier that is decoded from the optically captured code, *triggering the EVCS to initiate charging of the electric vehicle plugged into the EVCS*" (emphasis added).  Declaration of David S. Bloch ¶ 2, Exhibit A.

17

### b.    The Omitted Claims

And quite aside from claim 1 of the '715 patent, the notion that the seven other Omitted Claims merely cover "using a network (*e.g.*, the Internet) to remotely turn an electrical outlet 'on' and 'off,'" Motion at 7, is risible:

- Claim 2 of the '715 patent is not directed to an on-off switch, but rather includes narrow limitations such as the "electric coupler."

- Claim 31 of the '570 patent is directed to a system for charging electric vehicles that includes multiple data control units, charge transfer devices, electrical receptacles, current measurement devices, controllers, local area networks, and wireless communications devices.  It does not mention activation or deactivation at all.

- Claim 32 of the '570 patent defines the wide area network of the claims as the Internet. It, again, says nothing about turning electrical charges on or off.

- Claim 1 of the '131 patent is directed to an apparatus (the charging station itself), and defines particular components of that apparatus (a control device, a transceiver, a controller, and so on), all configured to operate within a "demand response system."  The claim says nothing at all about turning charging on or off.

- Claim 8 of the '131 patent is even further afield.  It incorporates '131 patent claim 1 but adds that communications from the demand response system will "include power grid load data," so that the controller can "manage charge transfer based on the received power grid load data."  This dynamic load-balancing concept is a far cry from the on-off switch SemaConnect appears to equate with the Marconi patent.

- Claim 1 of the '967 patent is not directed to a device at all.  Rather, it claims a method of controlling charge transfers based on accessing information from a demand-response system.  It certainly is not directed to turning a charging station on or off via the Internet.

- Claim 2 of the '967 patent depends on claim 1 and indicates that the claimed charging method will only be authorized after "validating a payment source for the charge transfer."  Thus, the question solved by claim 2 is not how to turn charging on or off but rather how to pay for it.

SemaConnect's effort to force these seven very different Omitted Claims into the language of claim 1 of the '715 patent fails at each point.

### 3.    All of the Asserted Claims have a tangible application

"If [] a patent's subject matter has a 'concrete or tangible application,' it is not a patent-ineligible abstract idea."  *Canrig Drilling Tech. Ltd. v. Trinidad Drilling L.P.*, Civ. Action No. H-15-0656, 2015 WL 5458576, at *4 (S.D. Tex. Sept. 17, 2015).  As the Supreme Court explained, whether a claimed invention is tied to a particular machine "is a useful and important clue, an investigative tool, for determining whether some claimed inventions are [patent eligible] processes under § 101 … [This test] may well provide a sufficient basis for evaluating processes similar to those in the Industrial Age—for example, inventions grounded in a physical or other tangible form."  *Bilski*, 561 U.S. at 604.  Each of the Asserted Claims has a concrete or tangible application: they each modify charge transfer between EV charging stations and electric vehicles.  This alone provides sufficient basis for finding that the Asserted Claims are not directed to an abstract idea.

District courts have repeatedly held that claimed inventions directed to affecting the operations of machines or systems are patent-eligible.  For example, in *Canrig Drilling*, the Southern District of Texas held that patents directed to oil and gas drilling methods are "directed

to a physical apparatus and drilling process" and thus are "tangible, industrial processes [that] have long been considered eligible to receive patent protection." *Canrig Drilling*, 2015 WL 5458576, at *4.  Similarly, in *Chamberlain*, the Northern District of Illinois held that a patent directed to a novel movable barrier, such as a garage door, that included a network interface is patent eligible because the claimed inventions "have a clear concrete and tangible form in that they are directed to monitoring and opening and closing a movable barrier—a particular tangible form." *Chamberlain Grp.*, 114 F. Supp at 611.  And in *Intellectual Ventures I, LLC v. Canon Inc.*, 143 F. Supp. 3d 143, 173 (D. Del. 2015), the District of Delaware held that a method of operating a scanner was not directed to an abstract idea, even though the claims "includ[ed] determining [] parameters [according to] a certain mathematical formula []."

The facts here are similar to the facts of the above-referenced cases.  Like drills in *Canrig Drilling*, movable barriers in *Chamberlain*, and scanners in *Intellectual Ventures*, EV charging stations are devices with tangible, physical applications.  All the Asserted Claims affect and improve the functioning of those apparatuses by measuring or modifying charge transfer into and out of electric vehicle charging stations.  In this way, the claimed inventions are characteristically distinct from patents held to be directed to ineligible abstract ideas.  As a general rule, inventions that are directed to abstract ideas "lack physical components[,] merely begin[] with data collection[,] and end[] with data storage." *ContourMed Inc. v. Am. Breast Care L.P.*, Civ. Action No. CV H-15-2769, 2016 WL 1059531, at *2 (S.D. Tex. Mar. 17, 2016).  In contrast, when—as is the case here—a claimed invention "involves substantial tangible components," even if the claimed invention "does employ software," it is likely patent eligible. *Id.*  Such "tangible, industrial processes have long been considered eligible to receive patent protection." *Canrig Drilling*, 2015 WL 5458576, at *4.  In essence, by challenging the patentability of a tangible

claimed apparatus comprising physical components in a specific arrangement, SemaConnect wrongly seeks to import an idea from the world of pure software patents into the world of hardware-based patents.  A specifically claimed apparatus for a "concrete or tangible application" is patentable, period.

The cases relied upon by SemaConnect involve patent claims that lacked any tangible applications and were directed to mere abstract data processing executed in a generic computer. For example, in *Dealertrack, Inc. v. Huber*, 674 F.3d 1315, 1333 (Fed. Cir. 2012), the patented process involved the steps of "receiving data from one source [], selectively forwarding the data [], and forwarding reply data to the first source []."  In *buySAFE, Inc. v. Google, Inc.*, 765 F.3d 1350, 1355 (Fed. Cir. 2014), the claimed process simply involved "receiv[ing] a request for a guarantee and transmit[ing] an offer of guarantee in return."  In *Credit Acceptance Corp. v. Westlake Servs.*, 859 F.3d 1044, 1047 (Fed. Cir. 2017), the claims recited "maintaining a database of the dealer's inventory, gathering financing information from the customer, and presenting a financing package to the dealer for each individual product in the dealer's inventory" (citations and internal quotations omitted).  In *Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1354 (Fed. Cir. 2016), the claims recited a "process of gathering and analyzing information of a specified content, then displaying the results []."  In *Open Parking, LLC v. ParkMe, Inc.*, No. 2:15-CV-976, 2016 WL 3547957, at *8 (W.D. Pa. June 30, 2016), the Court found that "[e]ssentially, the patents are aimed at moving data (open parking spots or not, and maybe where they are) from one place (the parking lot) to another (the driver's location)."  In *Groundswell Techs., Inc. v. Synapsense Corp.*, No. CV1506024ABJPRX, 2016 WL 6661177, at *5 (C.D. Cal. Apr. 28, 2016), the claims were directed broadly to "tasks" that led to the creation of a map.  None of these cases apply to physical inventions with tangible applications.

      **4.**      **Each of the Asserted Claims improve the functioning of EV charging stations**

Both the Supreme Court and the Federal Circuit have recognized that, when a claimed invention improves the functioning of an electric device or of a technological process, the claimed invention is not directed to an abstract idea. *Alice*, 134 S. Ct. at 2359 (finding the claimed inventions were directed to an abstract idea because they "do not [] purport to improve the functioning of the computer itself [or] effect an improvement in any other technology or technical field") (citations omitted); *Enfish*, 822 F.3d at 1335 ("Therefore, we find it relevant to ask whether the claims are directed to an improvement to computer functionality versus being directed to an abstract idea, even at the first step of the *Alice* analysis."). This can, for instance, occur in situations when "the claimed invention is necessarily rooted in [a particular] technology [field] in order to overcome a problem specifically arising in [a] realm within that [field]." *DDR Holdings*, 773 F.3d at 1257.

Here, the claimed inventions are not directed to abstract ideas because they improve the functioning of EV charging stations. SemaConnect mocks the idea that networking charging stations could be patentable, but in fact it is important and novel to enable these communications. For example, the claimed inventions provide an "efficient communication network for [electric vehicle charging stations to] manage[] peak load leveling using Demand Response and V2G" functionalities. '715 patent at 2:8-10. Demand response and V2G functionalities in turn assist in maintaining the stability of electric grids, especially in times of peak demand. *Id.* at 1:39-44,[19] 1:59-66.[20]

---

[19] "Electricity grids have periods of high demand from customers where the demand may approach or even exceed the electricity supply. Conversely, there are periods of low demand which coincide with high electricity production. Demand Response is a mechanism for reducing consumption of electricity during periods of high demand."

[20] "The transfer of electricity stored in electric vehicles to the local electric grid is referred to as vehicle-to-grid (V2G). … V2G is desirable for peak load leveling—helping to meet the demand for electricity when demand is at its highest."

Using ChargePoint's inventions, the owner/operator of a charging station or network of charging stations (a "site host") has an array of technical options not available in prior art systems. The site host can identify individual customers and accommodate them differently (for example, it can provide discounts to residents versus visitors at an apartment complex, or charge a driver using a retail store's EV charging station based on how much that particular driver has used that store's stations during the last 24 hours); it can reserve charging slots for particular customers at particular times (and enable a charging session only for that customer); it can redirect users to other charging stations if the closest stations to the customer are fully occupied, or tell those customers when a charging slot will become available (considering that the average time a station is busy is over four hours, it is important to drive only to stations that are not in use); it allows the site host to remotely manage geographically dispersed charging stations without the need for "gas station attendants." Supp. Baxter Dec. ¶5. The remote server also can take into account driver profile information in making decisions about payment, demand response, load management, and charge scheduling—something a mere credit card validation can never do. *Id*.

In other words, the Asserted Claims offer network-based solutions to address problems specific to electric grids and electric vehicles (the problem of maintaining grid stability through demand response; the need to validate payment modalities; the ability of a consumer or a site host to control a charging session remotely) and, in doing so, improve the functioning of an electric vehicle charging infrastructure (*e.g.*, by allowing real-time communication between an electric vehicle charging station and a local grid while enhancing the ability of the electric vehicle charging station to contribute to grid stability through demand response and vehicle-to-grid functionalities).

SemaConnect cites to *Uniloc USA, Inc. v. AVG Techs. USA, Inc.*, No. 216CV00393-RWSLEAD, 2017 WL 1154927 *6 (E.D. Tex. Mar. 28, 2017), but that case held only that "using

'license management policy information' to provide an indication of whether a license is available to a user for an application program" is a business, rather than technological, benefit.  None of the cases support SemaConnect's contention that enabling real-time communication between an EV charging infrastructure and a computer network does not improve the functioning of the infrastructure.  And SemaConnect concedes that, under clear Federal Circuit precedent, an improvement in the functioning of a device is patent eligible.  Motion at 24 ("the Federal Circuit found that claims were 'directed to an improvement in the functioning of a computer,' rather than 'simply adding conventional components to well-known business practices'").  But it maintains that improving real-time communication between EV charging stations and a local electric grid is not an improvement in the functioning of EV charging stations.  Yet SemaConnect's own website touts "demand response ready" as one of the technological advantages of its products, and SemaConnect has repeatedly highlighted the demand response and "smart grid" functionalities of its product in its promotional announcements.  *See* Dkt. 2-7 at 2 ("demand response ready"); Dkt. 2-9 at 2 ("Smart Grid Integration – for easy energy metering and demand response").  Utilizing demand response as a technique to assist in maintaining grid stability is more than a simple "business concept" or method of "maximizing revenue," as SemaConnect attempts to portray (Motion at 24).  Haas Dec. ¶¶ 43; Supp. Baxter Dec. ¶ 12.  Each claim represents a technical solution to an important problem specific to the electric charging industry.  Haas Dec. ¶ 60; Supp. Baxter Dec. ¶7.

### 5.    The PTO's examination guidelines support patentability

Lastly, SemaConnect asserts that "[t]he Patent Office's 2015 patent examination guidelines [] prove that [the Asserted Claims do not contain] patentable subject matter," noting that the guidelines "identif[y] managing 'transactions between people' as abstract ideas."  Motion at 21.

This assertion misrepresents both the weight and the content of the Patent Office's subject-matter eligibility guidelines.

As an initial matter, regulatory guidelines from the Patent Office "are not binding on [the] court[s]." *Enzo Biochem, Inc. v. Gen-Probe Inc.*, 323 F.3d 956, 964 (Fed. Cir. 2002). Nor are the Asserted Claims directed to "managing transactions between people," but instead describe network-controlled EV charging stations that enable a variety of functionalities such as demand response, V2G, real-time communication with grid servers, and remote payment.

Furthermore, the Patent Office has issued six separate official guidelines on subject matter eligibility, four of which postdate the 2015 guidelines cited by SemaConnect. The guidelines published *after* the 2015 guidelines make it clear that merely showing that a claimed invention recites or performs an abstract idea is not sufficient to demonstrate that the claimed invention is directed to an abstract idea. Bloch Dec. ¶ 5, Ex E ("Examiners should consider the claim as a whole under [the first step of the *Alice* framework], and should not overgeneralize the claim or simplify it into its 'gist' or core principles, when identifying a concept as a judicial exception"). The subsequent Patent Office guidelines confirm that "the fact that a claim is directed to an improvement in computer-related technology can demonstrate that the claim does not recite a concept similar to previously identified abstract ideas." *Id.* ¶ 6, Ex. F. SemaConnect cherry-picked the 2015 guidelines while ignoring later and more pertinent guidance.

## B. The Asserted Claims are patent-eligible under step 2 of the *Alice* test

### 1. The Asserted Claims recite non-conventional and non-generic arrangements of networked EV charging stations

As shown above, the Asserted Claims are not directed to an abstract idea, but instead represent tangible technological advancements to electric vehicle charging stations. Because SemaConnect failed to satisfy *Alice* step 1 with respect to any of the Asserted Claims, there is no

need for the Court to move to step 2.  Nonetheless, the Asserted Claims are also patentable under *Alice* step 2 because they consist of individual elements that provide an inventive concept.  Even if every single individual element of each of the Asserted Claims was known, that is not enough to hold that the claimed inventions are ineligible for patent protection.  As the Federal Circuit explained, "[t]he inventive concept inquiry requires more than recognizing that each claim element, by itself, was known in the art[;] an inventive concept can be found in the non-conventional and non-generic arrangement of known, conventional pieces."  *Bascom*, 827 F.3d at 1350.  Here, the Asserted Claims recite various non-generic and non-conventional elements that each provide an inventive concept for the Asserted Claims.  The *arrangement* of those elements is non-conventional and non-generic—an independent ground to find that the Asserted Claims are patent-eligible.

For example, the Asserted Claims recite a coupling of a network to an electrical vehicle charging station to allow communications between users and the local electric grid when charging electric vehicles.  Claim 1 of the '715 patent (the only claim SemaConnect actually grapples with) recites an arrangement where a remote server connects, through a wide area network, to a controller that controls "a control device to turn the electric supply on and off to enable and disable charge transfer *for electric vehicles*" (emphasis added).  It also includes "a transceiver to communicate requests for charge transfer with a remote server and receive communications from the remote server via a data control unit that is connected to the remote server through a wide area network," and "a controller, coupled with the control device and the transceiver, to cause the control device to turn the electric supply on based on communication from the remote server."  This arrangement of elements requires a charging station with a transceiver that communicates charge requests to a remote server through a transceiver, determining actions for the control device

based on communication from the remote server, and causes the control device to perform those actions.  The patent also requires a coupling between the transceiver and the data control unit, the transceiver and the controller, and the data control unit and the remote server.  As discussed by Dr. Haas and Mr. Baxter, this arrangement was not generic or conventional at the priority date of the Asserted Claims, and SemaConnect has not provided any evidence to show otherwise.

Other claims are equally clear.  For example, for the claims of the '131 patent, the network may allow for "the application of charge transfer based on the communications received as part of the demand response system."  '131 patent, claim 1.  This arrangement was not conventional or generic at the priority date of the Asserted Claims.  Indeed, the electric vehicle industry was highly skeptical of the need for networked charging stations. Dkt. 7-3 at ¶¶ 5.[21] Despite the early skepticism, ChargePoint's inventions were showered with praise once they were exposed to the rest of the industry.  *Id*. ¶ 6.  *Time Magazine* called ChargePoint's technology one of the 50 best inventions of 2010.  Supp. Baxter Dec. ¶ 14, Ex.  2 ("The company is building a system of automated charging stations in public places that are connected to utilities, so the charge for your charge can be added to your home electricity bill").

The Federal Circuit has held that arrangements of elements less sophisticated than the arrangements recited in the Asserted Claims are inventive and patent-eligible.  For example, in *Bascom*, the Federal Circuit held that a patent with no tangible, non-data processing applications was nonetheless patent-eligible because it moved a function that was generally performed on user

---

[21] *See also* Supp. Baxter Dec. ¶¶15-16, Exs. 3 (Charles Morris, *ClipperCreek Adds ChargeGuard Access Control Option to Its HCS Series Charging Stations*, CHARGED (May 16, 2016): "The HCS with ChargeGuard is a robust and cost-effective solution for companies who desire access control but do not want to pay high upfront hardware costs or ongoing network fees") and 4 (Michael Kent, *Lean and Mean: The EV Charging Pioneers at ClipperCreek*, CHARGED (Jan. 28, 2014): "You walk around with a network in your pocket, why do you need to pay for another one? [] Subscription plans and networks add so much unnecessary cost to the marketplace").

devices to remote server devices.  *See Bascom*, 827 F.3d at 1350.[22]  In other words, the Federal Circuit held that moving a known piece of software (customizable filtering software) from a first device in a known network (a user device) to a second known device in the known network (a server) was a non-conventional and non-generic arrangement of known elements that rendered the claimed inventions patent-eligible.  *Id.*

Here, just one of the many aspects of the claimed inventions in the Asserted Claims— coupling of electric vehicle charging stations, the electric grid, and electric vehicle owners through a network—is more innovative than the entire network arrangement held to be patent-eligible in *Bascom*.  There is no evidence that the prior art disclosed EV charging stations with the recited network capabilities; servers configured to provide consumer profiles (including account information for payment), utility company power grid load data (updated in real time by the utility company), and electricity consumption data information to such networked charging stations; or networks connecting the servers, local electric grid, and electric vehicle owners.  Thus, claim 1 of the '715 patent and the Omitted Claims each recite an *un*known network with *unknown* and *inventive* components, facts not present in *Bascom* that alone provide sufficient basis for holding that they contain a patent eligible inventive concept.

Furthermore, like the claimed invention in *Bascom*, claim 1 of the '715 patent (to say nothing of the Omitted Claims) moves software functions from the local charging station to a networked server.  *See, e.g.*, '715 patent at 9:6-12.  Moreover, like the claimed invention in *Bascom*, the non-conventional and non-generic arrangement of claim elements recited in claim 1 and the Omitted Claims lead to technological advantages, for example, by allowing "an efficient communication network for managing peak load leveling using Demand Response and V2G."  *Id.*

---

[22] "The inventive concept described and claimed in the [] patent is the installation of a filtering tool at a specific location, remote from the end-users, with customizable filtering features specific to each end user."

at 2:4-11.  Even ignoring the additional limitations of the claim 1 of the '715 patent and the Omitted Claims, each of the Asserted Claims contain an arrangement far more innovative and comprehensive than the arrangement held to be patent eligible by the Federal Circuit in *Bascom*.

SemaConnect relies on *Parker v. Flook*, 437 U.S. 584, 586 (1978) to argue that the presence of structural features with non-conventional arrangements do not confer patent eligibility on the Asserted Claims.  Motion at 32.  *Flook* held no such thing.  Instead, in *Flook*, the Supreme Court held that the claims were ineligible because the claims only recited calculating a number.  *See*, *e.g.*, *Diamond v. Diehr*, 450 U.S. 175, 187 (1981) (contrasting patent eligibility against the Flook claims that sought to "to patent a mathematical formula").

SemaConnect's citation to *Elec. Power Grp., LLC v. Alstom, S.A.*, No. CV1206365JGBRZX, 2015 WL 12720309, at *5 (C.D. Cal. May 21, 2015) is also misplaced.  In that case, the Court found no non-conventional arrangement of elements.  *Id.*  Instead, it concluded that, beyond reciting "the abstract idea of monitoring and analyzing data from disparate sources," "the most significant additional limitations in the asserted claim are those that limit the claim to monitoring and analyzing data in the context of electric power grids."  *Id.*  In other words, the claims recited implementing an abstract idea in a particular field of use.  In contrast, the Asserted Claims in this case include important *structural* limitations, such as coupling of an electric vehicle charging infrastructure and computer networks, and recite important *inventive* solutions, such as implementing demand response through real-time communication between a server and an electric vehicle charging station (including a meter in the EV charging station).  The non-conventional arrangement of elements in the Asserted Claims is also unlike the conventional arrangement of elements in *Smart Sys. Innovations, LLC v. Chicago Transit Auth.*, 873 F.3d 1364, 1375 (Fed. Cir. 2017), another case that involved "no inventive concept" and addressed claims "recit[ing] the

29

abstract idea of collecting financial data using generic computer components." SemaConnect's reliance on *Groundswell Techs., Inc. v. Synapsense Corp.*, No. CV 15-06024-AB (JPRx), 2016 WL 6661177, at *8 is also misplaced, as that case did not involve any non-generic arrangement of elements. *Id.*

  **2.**  **The Asserted Claims provide technical solutions to technical problems**

  Each of the Asserted Claims satisfies step 2 of the *Alice* test because a claimed invention is patent eligible if it "entails an unconventional technological solution [] to a technological problem." *Amdocs*, 841, F.3d at 1301. Here, claim 1 of the '715 patent and the Omitted Claims each offer unconventional technological solutions to a particular set of technological problems. For example, they address the problem of grid instability at times of peak demand; allow site hosts to control access to widely dispersed charging station assets; and gives customers additional information about where and how to charge their vehicles. Haas Dec. ¶¶ 35-44; Supp. Baxter Dec. ¶¶ 6-7; '715 patent at 2:4-6 (reciting additional advantages). They speak to the issue of consumer convenience in using EV charging stations by allowing real-time communication between a network-configured charging station and a remote server. '715 patent at 2:32-38.[23] And they address how to incorporate demand-responsiveness and grid management into an EV charging infrastructure. Each of these technological solutions to specific technological problems provides an independent ground for this Court to hold that the Asserted Claims are patent-eligible.

  SemaConnect repeats its mantra that ChargePoint's inventions are reliant on the Internet or other networks. But the Federal Circuit has repeatedly held that computer networking-based solutions can and do qualify as technological solutions. *Bascom*, 827 F.3d at 1351; *Amdocs*, 841

---

[23] "An important part of any consumer experience is the ease of acquiring a product—to recharge an electric vehicle this entails finding an available recharging facility, controlling the facility, and paying for the electricity consumed. There is a need for a communication network which facilitates finding the recharging facility, controlling the facility, and paying for the electricity consumed."

F.3d at 1300-1301.  Further, multiple district courts have held that claims that address problems related to the functioning of electric power distribution systems, as well as problems related to enhancing user experience of electronic devices, are patent-eligible.  *See, e.g.*, *Smart Meter Techs., Inc. v. Duke Energy Corp.*, Civ. Action No. 16-208 2017 WL 2954916, at *5 (D. Del. July 11, 2017) (the claimed networked utility meter inventions are patent eligible because they address "several technological challenges related to power meters"); *Fitbit, Inc. v. AliphCom*, 233 F. Supp. 3d 799, 812 (N.D. Cal. 2017) ("one problem that confronted the process of pairing small, portable devices was that they were purposefully designed to eliminate keyboards and multiple buttons in order to satisfy other design criteria"; the claimed invention "overcame this problem in an inventive way because it took advantage of the inherent, technical capabilities of the portable monitoring device") (citations and internal quotations omitted).

SemaConnect attempts to distract the Court by characterizing solutions addressing grid stability through demand response as "business and not technical benefits" that simply "allow[] a business to exercise control over its charging station and maximize revenue."  Motion at 12, 24. This fundamentally misstates the purpose of demand-response systems and the role they play in the EV charging industry.  A demand-response system does not seek to grant businesses control over their charging stations or enable them to maximize their revenue; instead, it allows an electric power distribution system to "reduc[e] consumption of electricity during periods of high demand ... according to a preplanned load prioritization scheme" and/or "increase demand at times of high electricity production" by reducing the cost of electricity during periods of low demand.  '715 patent at 1:43-50.  In doing so, the demand response system can address grid stability at times of peak demand, a major technological problem for the EV charging field.  The claimed inventions address this important need through a network-based solution that utilizes an unconventional

coupling of EV charging stations, local electric grids, and electric vehicle owners by sending communications over a network.

The fact that a claimed invention leads to increased revenue does not render the claimed solution non-technical and ineligible.[24] *DDR Holdings*, 773 F.3d at 1248 ("claims address[ing] a business challenge (reciting website visitors)" are patent-eligible because they addressed a technical problem "specific to the Internet"). A claimed solution is patent-eligible if it addresses a problem specific to a technical area, rather than a general business problem. *Id.* Each of the Asserted Claims addresses a problem specific to the electric vehicle charging industry.

SemaConnect relies on *Network Apparel Grp., LP v. Airwave Networks Inc.*, No. 6:15-CV-00134, 2016 WL 4718428 (W.D. Tex. Mar. 30, 2016) to argue that the Asserted Claims address a functionality that existed before computer networks existed. But the claims at issue in *Network Apparel* were directed to "incentiviz[ing] an end user to acknowledge the receipt of a message," which the court found to be "a well-known, longstanding commercial business practice." *Id.* The Asserted Claims concern a functionality much more sophisticated than simple messaging; the problems related to real-time communication between electric grids and remote servers, such as maintaining grid stability through demand response, are far more sophisticated and context-specific. They required the new technological solutions that ChargePoint supplied.

### C.    The Asserted Claims do not implicate preemption concerns

SemaConnect contends that the Asserted Claims are patent ineligible because they "[p]reempt an [e]ntire [i]ndustry" or alternatively "preempt all competition in network-controlled

---

[24] SemaConnect admits (when talking to the PTO) that determining "legitimacy of [charging station] transactions" can "improve the functioning of electric vehicle charging stations," Bloch Dec. ¶ 3, Ex. B (response to office action), and that networked an EV charging infrastructure represents an important *technological* advance that has enabled widespread EV adoption. *Id*. ¶ 4, Ex. C (SemaConnect CEO Mahi Reddy explaining that SemaConnect charging stations have a "very advanced technology" because they communicate real-time information about a charging session "to a central database" and allow for expedited payment using a "payment gateway").

electric vehicle charging stations."  Motion at 25-26.  Those contentions misstate the preemption doctrine.  The relevant inquiry is not whether a claimed invention preempts an industry or a technology; indeed, all patents are exclusionary rights that preempt some technology, products, or services.  Instead, the preemption doctrine inquires whether a claimed invention preempts *all* uses of an abstract idea.  *Bascom*, 827 F.3d at 1352.  Here, the claims are not directed to an abstract idea, which by itself shows that the Asserted Claims do not implicate preemption concerns.

Moreover, even assuming that the Asserted Claims are directed to the abstract idea of turning a switch on or off, as SemaConnect contends, that alleged abstract idea is clearly not preempted.  There are countless ways of turning switches on and off remotely that are not claimed by the Asserted Patents, and multiple different networks that can be used to do so.  '715 patent claim 1 recites claims communications over a *wide area network*, as opposed to the many other types of potential communication links (RFID, WPAN, PLC, etc.) described in the '715 patent specification.  '715 patent at 2:22-3:20.  There are also plenty of other ways of implementing EV charging station technology that do not implicate ChargePoint's patents, including products made by competitors such as ClipperCreek and the prior art devices described in SemaConnect's motion and its noninfringement contentions.  Supp. Baxter Dec. ¶¶ 9-10; Motion at 11-16; Dkt. 42 at 7-9.  Thus, SemaConnect's contention about a preempted industry is—beside being wholly irrelevant to preemption concerns—a myth that is betrayed by an even cursory observation of the state of the electric vehicle charging station industry.

## IV.     CONCLUSION

ChargePoint respectfully requests that this Court deny SemaConnect's Motion because all the Asserted Claims are directed to patent eligible subject matter under 35 U.S.C. § 101.

Dated:  January 15, 2018

Respectfully Submitted,


 _/s/ David S. Bloch_

Charles Klein (Fed. Bar No. 14504)
Zachary Cohen (Fed. Bar No. 20159)
Winston & Strawn LLP
1700 K St., N.W.
Washington, DC 20006
(Tel.) (202) 282-5000
cklein@winston.com
zcohen@winston.com

David S. Bloch *(Pro Hac Vice)*
Michael Rueckheim *(Pro Hac Vice)*
James C. Lin *(Pro Hac Vice)*
Winston & Strawn LLP
275 Middlefield Road, Suite 205
Menlo Park, CA 94025-4004
(Tel.) (650) 858-6500
dbloch@winston.com
mrueckheim@winston.com
jalin@winston.com

*Counsel for Plaintiff*