| | |
|---|---|
| ChargePoint, Inc., | Civil Action No: 8:17-cv-03717-MJG |
| Plaintiff, | |
| v. | |
| SemaConnect, Inc., | |
| Defendant. | |

**DECLARATION OF DAVID S. BLOCH
IN OPPOSITION TO DEFENDANT'S MOTION TO DISMIS**

I, David S. Bloch, declare:

1.      I am an attorney at law duly licensed to practice before all the courts of the State of California and the District of Columbia.  I am a partner at Winston & Strawn LLP, counsel for ChargePoint, Inc., in this matter.  The following is true and correct of my own knowledge, and if called upon I could and would testify competently thereto.

2.      Exhibit A is a true and correct printout of U.S. Patent No. U.S. Patent No. 9,704,145.

3.      Exhibit B is a true and correct printout of Response to Non-Final Action, Appl. No. 13/710,717 (issued as U.S. Patent 9,704,145) (filed June 27, 2016).

4.      Exhibit C is a true and correct transcript of a speech by SemaConnect Chief Executive Officer Mahi Reddy.   The video of the speech is accessible at https://www.youtube.com/watch?v=QVNr-HjfyqM (uploaded Nov. 2, 2010) (last accessed Jan. 15, 2018).

5.      Exhibit D is a true and correct printout of U.S. PATENT & TDMK. OFFICE, RECENT SUBJECT MATTER ELIGIBILITY DECISIONS (issued Nov. 2, 2016).

6.     Exhibit E is a true and correct printout of U.S. PATENT & TDMK. OFFICE, RECENT SUBJECT MATTER ELIGIBILITY DECISIONS (*ENFISH, LLC V. MICROSOFT CORP.* AND *TLI COMMUNICATIONS LLC V. A.V. AUTOMOTIVE, LLC*) (issued May 19, 2016).

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.  Executed in Menlo Park, California, this fifteenth day of January, 2018.

By: _____

David S. Bloch

# Exhibit A



US009704145B2

(12) **United States Patent**
Reddy et al.

(10) Patent No.: **US 9,704,145 B2**
(45) Date of Patent: **Jul. 11, 2017**

(54) **SYSTEM AND METHOD FOR REMOTE PAYMENT FOR AN ELECTRIC VEHICLE CHARGING STATION**

(71) Applicant: **SemaConnect, Inc.**, Bowie, MD (US)

(72) Inventors: **Mahidhar Reddy**, Annapolis, MD (US); **Harsha Kollaramajalu**, Bangalore (IN); **Roman Stanchak**, Baltimore, MD (US)

(73) Assignee: **SemaConnect, Inc.**, Bowie, MD (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 98 days.

(21) Appl. No.: **13/710,717**

(22) Filed: **Dec. 11, 2012**

(65) **Prior Publication Data**

US 2014/0164196 A1    Jun. 12, 2014

(51) **Int. Cl.**
| | |
|---|---|
| G07F 19/00 | (2006.01) |
| G06Q 20/14 | (2012.01) |
| G06Q 20/18 | (2012.01) |
| G06Q 20/32 | (2012.01) |
| G06Q 20/40 | (2012.01) |
| G07F 15/00 | (2006.01) |
| H04L 29/00 | (2006.01) |

(52) **U.S. Cl.**
CPC ........... *G06Q 20/145* (2013.01); *G06Q 20/18* (2013.01); *G06Q 20/3276* (2013.01); *G06Q 20/4012* (2013.01); *G07F 15/005* (2013.01); *Y02T 90/12* (2013.01); *Y02T 90/128* (2013.01); *Y02T 90/169* (2013.01); *Y04S 30/14* (2013.01)

(58) **Field of Classification Search**
USPC ........................................................ 705/34
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | | |
|---|---|---|---|---|---|
| 8,421,592 | B1 * | 4/2013 | Gunasekara | .......... | H04W 12/06 320/104 |
| 8,452,661 | B2 * | 5/2013 | Karch | ................. | B60L 11/1848 320/109 |
| 8,566,237 | B2 * | 10/2013 | Forzley | ................. | G06Q 20/00 345/156 |
| 8,572,411 | B2 * | 10/2013 | Ginter | .................... | G06F 21/10 345/59 |

* cited by examiner

*Primary Examiner* — Garcia Ade
(74) *Attorney, Agent, or Firm* — Vector IP Law Group; Robert S. Babayi

(57) **ABSTRACT**

A system and method is provided for billing transactions associated with an electric vehicle charging station (EVCS). A server may receive a station identifier associated with the EVCS from a computing device. The station identifier may be retrieved by decoding a code at the computing device. The code may include a graphic bit pattern that is configured to be decoded based on an optically captured representation of the code. The server may determine whether the EVCS is legitimate based on the station identifier. The server may provide a signal to the EVCS to initiate charging of a vehicle plugged into the EVCS in response to a determination that the EVCS is legitimate.

**18 Claims, 4 Drawing Sheets**





**FIG. 1**



**FIG. 2**



**FIG. 3**



400

Receive station identifier from computing device — 410

Determine whether EVCS is legitimate based on station identifier — 412

Provide signal to EVCS to initiate charging of vehicle — 414

Receive transaction information from EVCS — 416

Generate and communicate billing information to computing device — 418

**FIG. 4**

# SYSTEM AND METHOD FOR REMOTE PAYMENT FOR AN ELECTRIC VEHICLE CHARGING STATION

## TECHNICAL FIELD

The present disclosure relates to the field of electric vehicle charging stations. More specifically, the present disclosure relates to payment associated with electric vehicle charging stations.

## BACKGROUND

An electric vehicle charging station supplies electric energy for charging/recharging of an electric vehicle plugged into the station. A user of the electric vehicle is charged a particular rate for utilizing the electric vehicle charging station for charging the electric vehicle. What is needed is a reliable way to remotely perform payment/billing transactions associated with electric vehicle charging stations.

These and other drawbacks exist.

## BRIEF SUMMARY

Various systems, computer program products, and methods for billing transactions associated with an electric vehicle charging station (EVCS) are described herein.

According to one aspect of the present disclosure, the method may include a plurality of operations. In some implementations, the operations may include receiving a station identifier associated with the EVCS from a computing device, wherein the station identifier is retrieved by decoding a code at the computing device, wherein the code includes a graphic bit pattern that is configured to be decoded based on an optically captured representation of the code. In some implementations, the operations may include determining whether the EVCS is legitimate based on the station identifier. In some implementations, the operations may include providing a signal to the EVCS to initiate charging of a vehicle plugged into the EVCS in response to a determination that the EVCS is legitimate.

## BRIEF DESCRIPTION OF THE DRAWINGS

Aspects of the present disclosure are illustrated by way of example and are not limited by the accompanying figures with like references indicating like elements.

FIG. 1 illustrates an exemplary electric vehicle charging system, according to various implementations of the invention.

FIG. 2 illustrates a data flow diagram illustrating process relationships in an electric vehicle charging system, according to various implementations of the invention.

FIG. 3 illustrates an exemplary screenshot depicting rate information displayed via a computer application interface, according to various implementations of the invention.

FIG. 4 illustrates a flowchart depicting example operations performed by a server in an electric vehicle charging system, according to various implementations of the invention.

## DETAILED DESCRIPTION

FIG. 1 is block diagram illustrating an electric vehicle charging system 100, according to various implementations of the invention. Electric vehicle charging system 100 may

include an electric vehicle charging station (EVCS) 120 (illustrated in FIG. 1 as a plurality of electric vehicle charging stations 120a . . . 120n) that may be used to charge/recharge electric vehicles plugged into the EVCS. A user of an electric vehicle may drive to a location where the electric vehicle charging station is made available (for example, at offices, schools, hotels, retail, other parking lots/garages, and/or other locations) to charge the electric vehicle. Each electric vehicle charging station may include a processor 122, memory 125, and display 124 (illustrated in FIG. 1 as processor 122a, 122b, . . . , 122n, respectively; memory 125a, 125b, . . . , 125n, respectively; and display 124a, 124b, . . . , 124n, respectively). In some implementations, processor 122 includes one or more processors configured to perform various functions of EVCS 120. In some implementations, memory 125 includes one or more tangible (i.e., non-transitory) computer readable media. Memory 125 may include one or more instructions that when executed by processor 122 configure processor 122 to perform various functions of EVCS 120.

Electric vehicle charging system 100 may include a computing device 140 associated with the user of the electric vehicle. In some implementations, computing device 140 may include a mobile computing/processing device such as a wireless phone, a personal digital assistant, a smart phone, a tablet computing device, and/or other portable computing device that may be utilized to interact with server 130. In some implementations, computing device 140 may include a camera (not illustrated in FIG. 1) that may be used to capture information displayed via a display (for example, display 124) associated with the EVCS 120. Computing device 140 may include a processor (not otherwise illustrated in FIG. 1), circuitry, and/or other hardware operable to execute computer-readable instructions.

In some implementations, computing device 140 may execute a computer application (not otherwise illustrated in FIG. 1) that is configured to decode information captured from EVCS 120 and communicate with server 130. In some implementations, computing device 140 may include a memory (not otherwise illustrated in FIG. 1) that includes one or more tangible (i.e., non-transitory) computer readable media. The memory may include one or more instructions that when executed by the computing device processor configures the processor to perform functions of computing device 140/computer application.

In some implementations, the computer application executed by computing device 140 may be utilized by the user to register with the server 130. During registration, computer application may prompt the user to enter his/her user id (for example, user name, or other identifier) and password into a user interface associated with the computer application. The computer application may communicate with the server 130 and transmit the user id and password to the server 130. The server 130 may create a charge account associated with the user and store the user id and password entered during registration at the server 130 (in memory 135, for example).

In some implementations, server 130 may perform various functions associated with payment/billing transactions for EVCS 120. In some implementations, server 130 may manage charge accounts associated with users of electric vehicles. In some implementations, server 130 may include a processor 132, a memory 135, and/or other components that facilitate the functions of server 130. In some implementations, processor 132 includes one or more processors configured to perform various functions of server 130. In some implementations, memory 135 includes one or more

tangible (i.e., non-transitory) computer readable media. Memory 135 may include one or more instructions that when executed by processor 132 configure processor 132 to perform functions of server 130. In some implementations, memory 135 may include one or more instructions stored on tangible computer readable media that when executed at a remote device, such as computing device 140, cause the computing device to facilitate interaction with the server, as described herein.

In some implementations, electric vehicle charging station 120 may be communicatively coupled to server 130 via network 115. In some implementations, computing device 140 may be communicatively coupled to server 130 via network 145. In some implementations, network 115 and network 145 may include a Local Area Network, a Wide Area Network, a cellular communications network, a Public Switched Telephone Network, a wireless communication network, and/or other network or combination of networks.

FIG. 2 depicts an exemplary data flow diagram illustrating process relationships in an electric vehicle charging system, according to various implementations of the invention. In some implementations, EVCS 120 may generate a code in operation 202. In some implementations, the code may include a graphic bit pattern that is configured to be decoded based on an optically captured representation of the code. In some implementations, the code may be encoded using an optical encoding that is configured to be decoded based on an optically captured representation of the code. For example, the graphical bit pattern/optical encoding may include a QR code, a bar code, and/or any other code that encodes information and is recognizable by devices such as a camera or other image capture/scanning device. In some implementations, for example, a camera of computing device 140 may be used to take a picture of the graphic bit pattern/optical encoding for decoding at computing device 140.

In some implementations, a user of an electric vehicle that needs to be charged/recharged may drive up to an EVCS 120 and plug the electric vehicle into the EVCS 120 for charging/recharging. In some implementations, in response to the electric vehicle being plugged into the EVCS 120, the EVCS 120 may generate the code in operation 202. In some implementations, the code may be unique for each EVCS 120. In other words, each EVCS 120a . . . 120n may generate a unique code that includes a station identifier identifying the corresponding EVCS.

In some implementations, the EVCS 120 may encode the station identifier identifying the EVCS 120 into the code. Each EVCS 120 may have a station identifier associated with it and the corresponding station identifier may be encoded into the code displayed at the associated EVCS 120. In some implementations, the generated code may be displayed at a display 124 associated with the EVCS 120.

In some implementations, computing device 140 may capture the code displayed via EVCS 120 and decode the captured code, in operation 206. In some implementations, computing device 140 may include a camera which may be used to scan (i.e., optically capture) the code. In some implementations, computing device 140 may decode the code to retrieve the station identifier, and/or other information encoded in the code.

In some implementations, the computer application executing on the computing device 140 may prompt the user to scan the code. Once scanned, the computer application may decode the code. The computer application may retrieve the encoded information (e.g., station identifier) from the code.

In some implementations, the code/graphic bit pattern/optical encoding displayed via EVCS 120 may have error correction built in, in the form of a hash or checksum, for example. Other forms of error correction may be used without departing from the scope of the invention. In some implementations, the computing device/computer application may verify that the scanned code is genuine based on the checksum, as would be apparent to one of ordinary skill in the art. In some implementations, the computing device 140/computer application may decode the code and communicate the decoded information to server 130, in response to checksum verification.

In some implementations, the user may login to the computer application prior to capturing and decoding the code from the EVCS 120. The user may enter his user id and password (i.e., user information) into a user interface associated with the computer application.

In some implementations, the computer application may display rates for charging/recharging the plugged electric vehicle using the EVCS 120 on a display screen (not otherwise illustrated in the FIGs) associated with the computing device 140. In some implementations, the rates may be communicated to by computing device 140 by server 130. In some implementations, server 130 may store various rates (e.g., peak rates, non-peak rates, etc.) in memory 135, for example. In some implementations, the computer application may receive the rates from server 130 upon login.

In some implementations, the computing device 140/computer application may communicate the decoded information (for example, station identifier, and/or other information) and/or the user information (for example, user id, password, and/or other user data) to server 130, in operation 208. In some implementations, computing device 140/computer application may communicate the decoded/user information in response to the user accepting the rates for charging/recharging.

FIG. 3 illustrates an exemplary screenshot depicting rate information displayed via a computer application interface, according to various implementations of the invention. FIG. 3 is for illustrative purposes only and should not be viewed as limiting. Various interface elements may be included, excluded, or otherwise configured differently as would be appreciated. As illustrated, FIG. 3 depicts rate information that can be displayed by, for example, computing device 140. Peak and non-peak rates for charging an electric vehicle may be displayed. User may accept the rates for charging the electric vehicle by selecting check-box 302. The user may then select the "GO" button 304. In response the user selection, the decoded/user information may be communicated to the server 130. In some implementations, the rate information acceptance may also be communicated to the server 130.

Referring back to FIG. 2, in some implementations, server 130 may receive the decoded station identifier. In some implementations, server 130 may determine whether the EVCS is legitimate based on the station identifier, in operation 210. In some implementations, server 130 may store a list of one or more EVCS's 120 and the associated station identifiers, in memory 135, for example. In some implementations, server 130 may compare the decoded station identifier with the stored station identifier(s) to determine whether there is a match. In response to a determination that there is a match, server 130 may determine that the EVCS associated with the decoded station identifier is legitimate. In response to a determination that there is no match, server 130 may determine that the EVCS associated with the decoded station identifier is not legitimate.

In some implementations, server **130** may receive the user information and verify the identity of the user based on the received user information, in operation **210**. In some implementations, server **130** may compare the user information with the user id and password entered during registration to determine whether there is a match. In response to a determination that there is a match, server **130** may determine that the user's identity has been verified and that the user is a legitimate user. In response to a determination that there is no match, server **130** may determine that the user's identity has not been verified and that the user is not a legitimate user.

In some implementations, in response to a determination that the EVCS **120** is legitimate and/or in response to a determination that the users identity is verified, server **130** may provide a signal to the EVCS **120** to initiate charging of the vehicle plugged into the EVCS, in operation **212**. In some implementations, the signal to initiate charging is communicated via network **115**. In some implementations, in response to the signal, the EVCS may begin supplying AC voltage to the plugged in electric vehicle.

In some implementations, EVCS **120** may indicate via display **124** that the charging/recharging of the electric vehicle has been completed. In response, the user may unplug the vehicle from the EVCS **120**.

In some implementations, EVCS **120** may generate transaction information upon the electric vehicle being unplugged from the EVCS **120**. In some implementations, the transaction information may include, but not be limited to, start time of charging, end time of charging, energy used, user data, and/or other information. In some implementations, EVCS **120** may communicate the transaction information to server **130**, in operation **214**.

In some implementations, server **130** may generate billing information based on the transaction information received from the EVCS **120**, in operation **216**. In some implementations, the billing information may include, but not be limited to, a payment amount to be paid by the user for using EVCS **120** to charge the vehicle. In some implementations, server **130** may determine the payment amount based on the accepted rate information. For example, if the vehicle is charged during non-peak hours, server **130** may apply the non-peak rate to determine the payment amount. Similarly, if the vehicle is charged during peak hours, server **130** may apply the peak rate to determine the payment amount. In some implementations, server **130** may determine the payment amount based on the rate information and the transaction information (for example, start time of charging, end time of charging, and/or energy used).

In some implementations, server **130** may retrieve the charge account associated with the user and update the charge account based on the transaction information and/or the billing information. In some implementations, the charge account may be updated to reflect the payment amount to be paid by the user. In some implementations, server **130** may communicate the billing information to computing device **140**, in operation **218**.

FIG. **4** is a flowchart **400** depicting example operations performed by the server **130**, according to various implementations of the invention. In some implementations, the described operations may be accomplished using one or more of the modules/components described herein. In some implementations, various operations may be performed in different sequences. In other implementations, additional operations may be performed along with some or all of the operations shown in FIG. **4**. In yet other implementations, one or more operations may be performed simultaneously. In

yet other implementations, one or more operations may not be performed. Accordingly, the operations described are exemplary in nature and, as such, should not be viewed as limiting.

In an operation **410**, process **400** may receive a station identifier associated with an EVCS **120** which is being used for charging a plugged in electric vehicle associated with a user. In some implementations, the station identifier is received from computing device **140** associated with the user. In some implementations, the station identifier may be retrieved by decoding a code at the computing device **140**. In some implementations, the code may include a graphic bit pattern that is configured to be decoded based on an optically captured representation of the code.

In an operation **412**, process **400** may determine whether the EVCS **120** is legitimate based on the received station identifier. In some implementations, in an operation **414**, process **400** may provide a signal to the EVCS **120** to initiate charging of the vehicle plugged in the EVCS in response to a determination that the EVCS **120** is legitimate.

In some implementations, process **400** may also receive user information from computing device **140**. In some implementations, process **400** may verify the identity of the user based on the user information. In some implementations, process **400** may provide a signal to the EVCS **120** to initiate charging of the vehicle plugged in the EVCS in response to a determination that the EVCS **120** is legitimate and in response to the verification of the user identity indicating that the user is legitimate.

In an operation **416**, process **400** may receive transaction information from the EVCS **120** upon the vehicle being unplugged from the EVCS **120**. In an operation **418**, process **400** may generate billing information based on the transaction information and may communicate the billing information to the computing device **140**.

Implementations of the invention may be made in hardware, firmware, software, or various combinations thereof. The invention may also be implemented as computer-readable instructions stored on a tangible computer-readable storage medium which may be read and executed by one or more processors. A computer-readable storage medium may include various mechanisms for storing information in a form readable by a computing device. For example, a tangible computer-readable storage medium may include optical storage media, flash memory devices, and/or other storage mediums. Further, firmware, software, routines, or instructions may be described in the above disclosure in terms of specific exemplary aspects and implementations of the invention and performing certain actions. However, it will be apparent that such descriptions are merely for convenience, and that such actions may in fact result from computing devices, processors, controllers, or other devices executing firmware, software, routines or instructions.

Other embodiments, uses and advantages of the invention will be apparent to those skilled in the art from consideration of the specification and practice of the invention disclosed herein. The specification should be considered exemplary only, and the scope of the invention is accordingly intended to be limited only by the following claims.

What is claimed is:

**1**. A method for billing transactions associated with an electric vehicle charging station (EVCS), the method comprising:

at a server communicatively coupled to a computing device associated with a user of an electric vehicle plugged into the EVCS:

receiving, from the computing device, a station identifier associated with the EVCS, wherein:

the station identifier is retrieved by decoding a code at the computing device,

the code includes a graphic bit pattern that encodes the station identifier,

the code is configured to be decoded based on an optically captured representation of the code, and

the code is displayed at a display associated with the EVCS and optically captured via an image capturing device associated with the computing device;

determining whether the EVCS is legitimate based on the received station identifier, wherein said determining comprises determining whether a match exists between the received station identifier and one or more previously stored station identifiers, and wherein the EVCS is determined to be legitimate in response to a determination that a match exists between the received station identifier and one or more previously stored station identifiers; and

in response to a determination that the EVCS is legitimate based on the received station identifier that is decoded from the optically captured code, triggering the EVCS to initiate charging of the electric vehicle plugged into the EVCS.

**2**. The method of claim **1**, further comprising:

at the server:

receiving user information associated with the computing device;

verifying an identity of the user based on the received user information; and

triggering the EVCS to initiate charging of the electric vehicle plugged into the EVCS based on the verification of the identity of the user and in response to the determination that the EVCS is legitimate.

**3**. The method of claim **1**, wherein the code comprises a QR code.

**4**. The method of claim **1**, further comprising:

at the server:

receiving transaction information from the EVCS upon the electric vehicle being unplugged from the EVCS;

generating billing information based on the transaction information; and

communicating the billing information to the computing device.

**5**. The method of claim **4**, wherein the billing information comprises a payment amount to be paid for using the EVCS to charge the electric vehicle.

**6**. The method of claim **5**, wherein said generating the billing information further comprising:

determining the payment amount based on rate information.

**7**. The method of claim **5**, wherein the transaction information comprises start time of charging the electric vehicle and end time of charging the electric vehicle, and wherein said generating the billing information further comprising:

determining the payment amount based on rate information and the transaction information.

**8**. A system for billing transactions associated with an electric vehicle charging station (EVCS), the system comprising:

a computing device associated with a user of an electric vehicle plugged into the EVCS; and

a server communicably coupled to the computing device, the server comprising a processor configured to:

receive, from the computing device, a station identifier associated with the EVCS, wherein:

the station identifier is retrieved by decoding a code at the computing device,

the code includes a graphic bit pattern that encodes the station identifier,

the code is configured to be decoded based on an optically captured representation of the code, and

the code is displayed at a display associated with the EVCS and optically captured via an image capturing device associated with the computing device;

determine whether the EVCS is legitimate based on the received station identifier, wherein the processor is further configured to determine whether a match exists between the received station identifier and one or more previously stored station identifiers, and wherein the EVCS is determined to be legitimate in response to a determination that a match exists between the received station identifier and one or more previously stored station identifiers; and

in response to a determination that the EVCS is legitimate based on the received station identifier that is decoded from the optically captured code, trigger the EVCS to initiate charging of the electric vehicle plugged into the EVCS.

**9**. The system of claim **8**, wherein the processor is further configured to:

receive user information associated with the computing device;

verify an identity of the user based on the received user information; and

trigger the EVCS to initiate charging of the electric vehicle plugged into the EVCS based on the verification of the identity of the user and in response to the determination that the EVCS is legitimate.

**10**. The system of claim **8**, wherein the code comprises a QR code.

**11**. The system of claim **8**, wherein the processor is further configured to:

receive transaction information from the EVCS upon the electric vehicle being unplugged

from the EVCS;

generate billing information based on the transaction information; and

communicate the billing information to the computing device.

**12**. The system of claim **11**, wherein the processor configured to generate billing information is further configured to:

determine a payment amount to be paid for using the EVCS to charge the electric vehicle based on rate information and the transaction information.

**13**. A tangible computer readable medium having one or more computer-readable instructions thereon which when executed by one or more processors of a server cause the one or more processors to:

receive, from a computing device associated with a user of an electric vehicle plugged into an electric vehicle charging station (EVCS), a station identifier associated with the EVCS, wherein:

the station identifier is retrieved by decoding a code at the computing device, the code includes a graphic bit pattern that encodes the station identifier,

the code is configured to be decoded based on an optically captured representation of the code, and

the code is displayed at a display associated with the EVCS and optically captured via an image capturing device associated with the computing device;

determine whether the EVCS is legitimate based on the station identifier based on the received station identifier that is decoded from the optically captured code, wherein the one or more processors are further configured to determine whether a match exists between the received station identifier and one or more previously stored station identifiers, and wherein the EVCS is determined to be legitimate in response to a determination that a match exists between the received station identifier and one or more previously stored station identifiers; and

in response to a determination that the EVCS is legitimate, trigger the EVCS to initiate charging of the electric vehicle plugged into the EVCS.

**14**. The tangible computer readable medium of claim **13**, wherein the instructions further cause the one or more processors to:

receive user information associated with the computing device;

verify an identity of the user based on the received user information; and

trigger the EVCS to initiate charging of the electric vehicle plugged into the EVCS based on the verification of the identity of the user and in response to the determination that the EVCS is legitimate.

**15**. The tangible computer readable medium of claim **13**, wherein the instructions further cause the one or more processors to:

receive transaction information from the EVCS upon the electric vehicle being unplugged from the EVCS;

generate billing information based on the transaction information; and

communicate the billing information to the computing device.

**16**. The tangible computer readable medium of claim **15**, wherein the instructions causing the processors to generate billing information further cause the one or more processors to:

determine a payment amount to be paid for using the EVCS to charge the electric vehicle based on rate information and the transaction information.

**17**. A tangible computer readable medium having one or more computer-readable instructions thereon which when executed by one or more processors of a computing device cause the one or more processors to:

capture a code displayed on a display associated with an electric vehicle charging station (EVCS), wherein:

the code includes a graphic bit pattern that encodes a station identifier that identifies the EVCS,

the code is optically captured via an image capturing device associated with the computing device, and

the computing device is associated with a user of an electric vehicle plugged into the EVCS;

decode from the optically captured code the station identifier; and

communicate the station identifier to a server, wherein the electric vehicle plugged into the EVCS is charged based on a verification of the station identifier.

**18**. An electric vehicle charging station (EVCS) comprising:

a processor configured to generate a code in response to an electric vehicle being plugged into the EVCS, wherein the code includes a graphic bit pattern that encodes a station identifier associated with the EVCS; and

a display configured to display the code, wherein:

the code is optically captured via an image capturing device associated with a computing device and decoded to obtain the station identifier encoded therein,

the computing device is associated with a user of the electric vehicle, and

the processor is further configured to initiate charging of the electric vehicle based on a verification of the station identifier.

* * * * *

# Exhibit B

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re Patent Application of:

Reddy et al.

Application No: 13/710,717

Confirmation No: 3142

Filed: 12-11-2012

For:     System and Method for Remote Payment for
         an Electric Vehicle Charging Station

Art Unit: 3687

Examiner: GARCIA OGER ADE

Atty. Docket No: 1119-0003001

Customer No.:
**124657**
PATENT & TRADEMARK OFFICE

## RESPONSE TO NON-FINAL OFFICE ACTION

Commissioner for Patents
P.O. Box 1450
Alexandria, VA  22313-1450

Dear Sir:

   In response to the Non-final Office Action dated **February 26, 2016**, for the above-identified application, Applicant hereby submits the following response.

   **Claims** are reflected in the listing of claims, which begins on page 2 of this paper.

   **Remarks/Arguments** begin on page 8 of this paper.

# CLAIMS

1. (Previously Presented) A method for billing transactions associated with an electric vehicle charging station (EVCS), the method comprising:

at a server communicably coupled to a computing device associated with a user of an electric vehicle plugged into the EVCS:

receiving, from the computing device, a station identifier associated with the EVCS, wherein:

the station identifier is retrieved by decoding a code at the computing device,

the code includes a graphic bit pattern that encodes the station identifier,

the code is configured to be decoded based on an optically captured representation of the code, and

the code is displayed at a display associated with the EVCS and optically captured via an image capturing device associated with the computing device;

determining whether the EVCS is legitimate based on the received station identifier, wherein said determining comprises determining whether a match exists between the received station identifier and one or more previously stored station identifiers, and wherein the EVCS is determined to be legitimate in response to a determination that a match exists between the received station identifier and one or more previously stored station identifiers; and

in response to a determination that the EVCS is legitimate based on the received station identifier that is decoded from the optically captured code, triggering the EVCS to initiate charging of the electric vehicle plugged into the EVCS.

2. (Previously Presented) The method of claim 1, further comprising:

at the server:

receiving user information associated with the computing device;

2

verifying an identity of the user based on the received user information; and

triggering the EVCS to initiate charging of the electric vehicle plugged into the EVCS based on the verification of the identity of the user and in response to the determination that the EVCS is legitimate.

3.  (Original) The method of claim 1, wherein the code comprises a QR code.

4.  (previously presented) The method of claim 1, further comprising:

at the server:

receiving transaction information from the EVCS upon the electric vehicle being unplugged from the EVCS;

generating billing information based on the transaction information; and

communicating the billing information to the computing device.

5.  (previously presented) The method of claim 4, wherein the billing information comprises a payment amount to be paid for using the EVCS to charge the electric vehicle.

6.  (original) The method of claim 5, wherein said generating the billing information further comprising:

determining the payment amount based on rate information.

7.  (previously presented) The method of claim 5, wherein the transaction information comprises start time of charging the electric vehicle and end time of charging the electric vehicle, and wherein said generating the billing information further comprising:

determining the payment amount based on rate information and the transaction information.

8.  (Previously Presented) A system for billing transactions associated with an electric vehicle charging station (EVCS), the system comprising:

a computing device associated with a user of an electric vehicle plugged into the EVCS; and

a server communicably coupled to the computing device, the server comprising a processor configured to:

receive, from the computing device, a station identifier associated with the EVCS, wherein:

the station identifier is retrieved by decoding a code at the computing device,

the code includes a graphic bit pattern that encodes the station identifier,

the code is configured to be decoded based on an optically captured representation of the code, and

the code is displayed at a display associated with the EVCS and optically captured via an image capturing device associated with the computing device;

determine whether the EVCS is legitimate based on the received station identifier, wherein the processor is further configured to determine whether a match exists between the received station identifier and one or more previously stored station identifiers, and wherein the EVCS is determined to be legitimate in response to a determination that a match exists between the received station identifier and one or more previously stored station identifiers; and

in response to a determination that the EVCS is legitimate based on the received station identifier that is decoded from the optically captured code, trigger the EVCS to initiate charging of the electric vehicle plugged into the EVCS.

9.  (Previously presented) The system of claim 8, wherein the processor is further configured to:

receive user information associated with the computing device;

verify an identity of the user based on the received user information; and

trigger the EVCS to initiate charging of the electric vehicle plugged into the EVCS based on the verification of the identity of the user and in response to the determination that the EVCS is legitimate.

4

10.     (Original) The system of claim 8, wherein the code comprises a QR code.

11.     (Previously presented) The system of claim 8, wherein the processor is further configured to:

       receive transaction information from the EVCS upon the electric vehicle being unplugged

         from the EVCS;

         generate billing information based on the transaction information; and

         communicate the billing information to the computing device.

12.     (Previously presented) The system of claim 11, wherein the processor configured to generate billing information is further configured to:

       determine a payment amount to be paid for using the EVCS to charge the electric vehicle based on rate information and the transaction information.

13.     (Previously Presented) A tangible computer readable medium having one or more computer-readable instructions thereon which when executed by one or more processors of a server cause the one or more processors to:

       receive, from a computing device associated with a user of an electric vehicle plugged into an electric vehicle charging station (EVCS), a station identifier associated with the EVCS, wherein:

         the station identifier is retrieved by decoding a code at the computing device, the code includes a graphic bit pattern that encodes the station identifier,

         the code is configured to be decoded based on an optically captured representation of the code, and

         the code is displayed at a display associated with the EVCS and optically captured via an image capturing device associated with the computing device;

       determine whether the EVCS is legitimate based on the station identifier based on the received station identifier that is decoded from the optically captured code, wherein the one or more processors are further configured to determine whether a match exists between the received station identifier and one or more previously stored station identifiers, and wherein the EVCS is determined to be legitimate in response to a

determination that a match exists between the received station identifier and one or more previously stored station identifiers; and

in response to a determination that the EVCS is legitimate, trigger the EVCS to initiate charging of the electric vehicle plugged into the EVCS.

14. (Previously presented) The tangible computer readable medium of claim 13, wherein the instructions further cause the one or more processors to:

receive user information associated with the computing device;

verify an identity of the user based on the received user information; and

trigger the EVCS to initiate charging of the electric vehicle plugged into the EVCS based on the verification of the identity of the user and in response to the determination that the EVCS is legitimate.

15. (Previously presented) The tangible computer readable medium of claim 13, wherein the instructions further cause the one or more processors to:

receive transaction information from the EVCS upon the electric vehicle being unplugged from the EVCS;

generate billing information based on the transaction information; and

communicate the billing information to the computing device.

16. (Previously presented) The tangible computer readable medium of claim 15, wherein the instructions causing the processors to generate billing information further cause the one or more processors to:

determine a payment amount to be paid for using the EVCS to charge the electric vehicle based on rate information and the transaction information.

17. (Previously Presented) A tangible computer readable medium having one or more computer-readable instructions thereon which when executed by one or more processors of a computing device cause the one or more processors to:

capture a code displayed on a display associated with an electric vehicle charging station (EVCS), wherein:

the code includes a graphic bit pattern that encodes a station identifier that identifies the EVCS,

the code is optically captured via an image capturing device associated with the computing device, and

the computing device is associated with a user of an electric vehicle plugged into the EVCS;

decode from the optically captured code the station identifier; and

communicate the station identifier to a server, wherein the electric vehicle plugged into the EVCS is charged based on a verification of the station identifier.

18.  (Cancelled)

19.  (Previously Presented) An electric vehicle charging station (EVCS) comprising:

a processor configured to generate a code in response to an electric vehicle being plugged into the EVCS, wherein the code includes a graphic bit pattern that encodes a station identifier associated with the EVCS; and

a display configured to display the code, wherein:

the code is optically captured via an image capturing device associated with a computing device and decoded to obtain the station identifier encoded therein,

the computing device is associated with a user of the electric vehicle, and

the processor is further configured to initiate charging of the electric vehicle based on a verification of the station identifier.

# REMARKS

The Applicant thanks the Examiner for the careful consideration of the present application. **Claims 1-17, and 19 remain pending.**

## Summary of the Office Action

In the Non-final Office Action mailed February 26, 2016 ("The Action"), the request for continued examination filed on 09/16/2015 was accepted and the finality of the previous office action has been withdrawn pursuant to 37 CFR 1.1114. The amendment and request for reconsideration filed on 09/16/2015 was considered. Claims 1-17 and 19 remain pending. Claims 1, 8, 13, 17, and 19 stand rejected under 35 U.S.C. 101 because the claimed invention is directed to a judicial exception (i.e., an abstract idea) without "significantly more". Claims 1-17, and 19 stand rejected under pre-AIA 35 U.S.C. 103(a) as being unpatentable over Ginter et al. (US 8,572,411) in view of Karch et al. (US 8,452,661).

## Response to Rejection under 35 USC § 101

Claims 1, 8, 13, 17, and 19 stand rejected under 35 U.S.C. § 101 because the claimed invention is directed to a judicial exception (i.e., an abstract idea).

According to the Action, the claims are directed to an idea of itself, such as "billing transactions with an electric vehicle charging station."   The Action finds that the present claims do not include "significantly more" because the generically-recited computer elements do not add a meaningful limitation to the abstract idea as the actions, functions, and/or steps performed by the generically-recited computer elements would be routine and conventional in any computer implementation.

This rejection is traversed because "the claims are not directed to an abstract idea within the meaning of Alice. Rather, they are directed to a specific improvement to the way computers operate" *Enfish, LLC v. Microsoft Corp (Enfish)*, which recently held that "Software can make non-abstract improvements to computer technology just as hardware improvements can, and sometimes the improvements can be accomplished through either route" *Id.* According to the pending claims, software and hardware are combined to improve computer technology as further described below where the improvements are defined by reference to physical objects and devices as well as logical structures and processes.

The claimed invention requires decoding a graphic bit pattern representing a code that is optically captured via an image capturing device. The claims further require the graphic bit pattern, which encodes the station identifier associated with the EVCS, to be displayed at a display. Legitimate billing transactions associated with the EVCS are verified based on the received station identifier that is decoded from the optically captured code. A processor is configured to initiate charging of the electric vehicle based on a verification of the station identifier.

The determination of whether patent claims fall within one of the patent-ineligible exceptions (i.e., law of nature, natural phenomenon, and abstract idea), as emphasized by the Supreme Court in *Alice Corp.* must be accomplished through a two-part analysis. The first step is to determine whether the claims at issue are directed to a patent-ineligible exception. If so, step two is to determine whether an element or combination of elements is sufficient to ensure that the claim amounts to significantly more than the abstract idea itself. The Alice court,

however, specified that improvements and enhancements to computerized technologies are fully patent-eligible.

Examiner's attention is directed to a memo dated May 16th 2016 to the Examining Corps, authored by Mr. Robert Bahr, Deputy Commissioner for Patent Examination Policy on the *Enfish* decision, providing "additional information and clarification on the inquiry for identifying abstract ideas" (the May 16th Memo). The May 16th Memo states that the Examiners "may determine that a claim directed to improvements in computer-related technology is not directed to an abstract idea under Step 2A of the subject matter eligibility examination guidelines (and is thus patent eligible), without the need to analyze the additional elements under Step 2B."

The claims improve the operation of electric vehicle charging stations (EVCS) based on a verification process that involves displaying and capturing graphic patterns by imaging devices. Legitimacy of the EVCS transactions are determined in response to a determination that a match exists between a received station identifier encoded by the graphic pattern and one or more previously stored station identifiers. Thus, the claims create a robust EVCS system that can bill for transactions based on displayed and captured encoded graphic patterns.

Accordingly, the claimed invention is more than an uninstantiated concept, plan or scheme, as well as a mental process (thinking) that "can be performed in the human mind, or by a human using a pen and paper." It is respectfully submitted that the verification process embodied in the invention involves displaying and capturing graphic patterns by imaging devices. Legitimacy of the EVCS transactions is determined in response to a determination that a match associated with the displayed graphical pattern, which can not be performed in

the human mind, or by a human using a pen and paper.    Fore this reason, the claims of the present application are not directed to an abstract idea.

Even assuming that the claims are directed to an abstract idea, the claims as a whole have elements sufficient to ensure that the claim amounts to significantly more than an abstract idea because the claims are unobvious in view of the prior art of record for the reasons set forth below.

### Rejection under 35 USC § 103

Applicant respectfully traverses rejection of claims 1-17, and 19 under pre-AIA 35 U.S.C. 103(a) as being unpatentable over Ginter et al. (US 8,572,411) in view of Karch et al. (US 8,452,661) because the combination fails to teach or suggest each and every claim requirement, including a station identifier retrieved by decoding an optically captured code via an image capturing device, wherein the code including a graphic  bit pattern displayed at a display that encodes the station identifier associated with the EVCS.

The Action cited Ginter's Abstract for disclosing a method for billing transactions associated with an electric vehicle charging station (EVCS).   The entire Ginter Abstract is reproduced below:

"*The present invention provides systems and methods for secure transaction management and electronic rights protection. Electronic appliances such as computers equipped in accordance with the present invention help to ensure that information is accessed and used only in authorized ways, and maintain the integrity, availability, and/or confidentiality of the information. Such electronic*

*appliances provide a distributed virtual distribution environment (VDE) that may enforce a secure chain of handling and control, for example, to control and/or meter or otherwise monitor use of electronically stored or disseminated information. Such a virtual distribution environment may be used to protect rights of various participants in electronic commerce and other electronic or electronic-facilitated transactions. Distributed and other operating systems, environments and architectures, such as, for example, those using tamper-resistant hardware-based processors, may establish security at each node. These techniques may be used to support an all-electronic information distribution, for example, utilizing the "electronic highway."*

As can be seen above, nothing in Ginter's abstract discloses an EVCS. Indeed, careful study of Ginter reveals no teaching about the disclosed system and method being applied to an EVCS. Thus, the Action is incorrect in characterizing Ginter as an EVCS billing system. There is simply no support in Ginter for a billing system applied to any EVCS.

Without specific citation, the Action summarily states that Ginter discloses "a server communicably coupled to a computing device associated with a user of an electric vehicle plugged into the EVCS." Not one Figure in Ginter shows an electric vehicle plugged into the EVCS, let alone "receiving, from the computing device, a station identifier associated with the EVCS."

As best understood, the Action construes under the BRI Standard, EVCS's station identifier to read on "encryption keys or unique identifiers…retrieved by decoding a code at the computing device." According to the Action, "the code includes a graphic bit pattern…"

However, nothing in Ginter discloses encryption keys as a graphic bit pattern. Indeed, it would defy logic to represent encryption keys in a graphic bit pattern "displayed at a display associated with the EVCS," as argued by the Action. The purpose of an encryption key is to encrypt data in a manner that is unknown and not visible to the outside world. Otherwise, data encryption would be meaningless if the such encryption could be displayed and seen. Furthermore, nothing in Ginter teaches or suggests the encryption keys being "optically captured via an image capturing device associated with the computing device," irrespective of the argument put forward in the Action that in Ginter "SPU 500 must typically decrypt code and other information obtained from external memory in encrypted form before processing (e.g., executing)]."

Applicant respectfully submits that Ginter does not disclose decoding <u>a code with a graphic bit, which is displayed and optically captured</u> via an image capturing device, as required by the claims of the present application. In fact, even though Ginter discloses a secure processing unit (SPU) which "may encrypt and cryptographically seal code" and "typically decrypt code…before processing", Ginter teaches away from encrypting data into a code with a graphical bit pattern which would be displayed. This is because according to Ginter, "the SPU **500**…may be used for securely storing such highly sensitive information" (Ginter, Col 69, Lines 38-41) and "Inasmuch as the encryption layer relies on secure processes and information (e.g., encryption algorithms and keys) present within SPU **500**, the encryption layer effectively "extends" the SPU security barrier **502** to protect information the SPU **500** stores in memory external to it." (Ginter, Col 70, Lines 11-16) If the encrypted code of such highly sensitive information were encoded with a graphical pattern and displayed on a display, the security of sensitive information would be put at risk.

Ginter makes no reference to encoding information with a graphical bit and furthermore it makes no reference to displaying any encrypted information. It is respectfully submitted that the construction of the claimed "identification code" that includes "a graphic bit pattern" for reading on Ginter's "encryption keys" violates the BRI standard because such construction is unreasonable. Encryption keys in Ginter are simply not associated with graphical patterns that are displayed and captured.

The claims require determination that the EVCS is legitimate based on the received station identifier that is decoded from the optically captured code, triggering the EVCS to initiate charging of the electric vehicle plugged into the EVCS." For meeting this requirement, the Action sates "transmit and receive signals." It is respectfully submitted that the construction of the claimed "station identifier that is decoded from the optically captured code" for reading on Ginter's "signals" violates the BRI standard because such construction is unreasonable. Nothing in the Action gives an indication of what is meant by "signals" and how they meet the express claim requirement for "received station identifier that is decoded from the <u>optically</u> captured code."

Based on the foregoing, Ginter fails to disclose the following claimed elements:

1. the code includes a graphic bit pattern that encodes the station identifier,

2. the code is configured to be decoded based on an optically captured representation of the code,

3. the code is displayed at a display associated with the EVCS and optically captured via an image capturing device associated with the computing device.

14

Without identifying any missing claimed element in Ginter, the Action cites Karch for disclosing "a system for safely recharging and charging electrically powered vehicles, including hybrid powered vehicles…" The Action concludes it would have been obvious … to incorporate the teaching of Karch to the teaching of Ginter in order to provide a "system for recharging and charging electrically powered vehicles, including hybrid powered vehicles, includes an electrical charging station for connecting the vehicles to a source of electrical power, an authorization device for permitting an operator of the vehicle to utilize a secure electronic content distributor (SECD) such as a credit card, a debit card, a hotel/motel electronic key card, a smart card, or other electronic credit authorization device to authorize payment for the amount of electrical power utilized to recharge or charge the vehicle."

Even assuming that Ginter can be combined with Karch, the combination still fails to disclose teach or suggest the above listed missing elements, namely, a code configured to be decoded based on an optically captured representation of a graphic bit pattern that encodes an EVCS station identifier, where the code is displayed at a display associated with the EVCS. It follows that nothing in the combination optically captures the code via an image capturing device associated with the computing device.

Karch describes charging a vehicle by locating the vehicle sufficiently proximate to a charging station having an optical reader unit to allow the vehicle to be connected thereto. (See, Karch at Col. 3: ln. 5-15). In Karch, the station reads optical images provided by a machine readable coded element associated with a vehicle. Nothing in Karch teaches or suggests the station itself displaying a graphical pattern to be read by a computing devices as required by the claims.

## CONCLUSION

In view of the above, it is respectfully submitted that all pending claims are now in allowable form. Early issuance of a Notice of Allowance is respectfully submitted. If the Examiner is of the opinion that the prosecution of this application would be advanced by a personal interview, the Examiner is invited to telephone undersigned counsel to arrange for such an interview.

Dated: June 27, 2016          Respectfully submitted,

By: / Robert S. Babayi /
Robert S. Babayi
Registration No.: 33,471
VECTOR IP LAW GROUP

(202) 446-1481 (Direct)
(703) 587-3803 (Mobile)
(202) 446-1485 (Fax)
Attorney/Agent For Applicant

# Exhibit C

# TRANSCRIPT OF SPEECH BY SEMACONNECT CEO MAHI REDDY

Hi! I'm here to talk about the charging station. This is essentially the gas station of the future. So when electric cars hit the road this is how you're going to be pumping electricity into the car. So the way this works is this is a very advanced technology and the way it works says so you pull your car up to this system and then you take this connector out now this connector is called a j1772 connector and it's been standardized by the Society of Automotive Engineers, and you can plug this into any electric car that's out there. So the thing is you then we'll plug it into this electric car and then we give you this little smart card which as you can see is this is something that will help you start the whole process. So you bring the smart card near the station it recognizes the smart card and it says authenticating now it says authenticated because it has communicated with a central database and authenticated the smart card so that means that it's recognized you and now it's turned on the power and it's essentially supplying power to your car. Ok, as it supplies electricity it also meters the amount of electricity that is going to your car and at the end of the transaction when you're disconnected from the car and plug it back in it's actually going to send all of that information back to the central database, so that is when you plugged in, how much energy used, and when you unplug. And so that is incredibly useful because you can if you had these this infrastructure in a bunch of places, let's say apartment building parking lots, you would have this in transit parking lots hotels, commercial office buildings, so you could literally go in and plug in anywhere or a grocery store parking lot and you could plug in anywhere and be able to track how much electricity you used. And not only that, all of this is then linked to a payment gateway which has your credit card information on file so you're it's able to bill you accurately for this energy that you used. And I think this is the

key enabler of electric cars because without the fueling infrastructure you're not going to buy an electric car, but when you have these things in all of these parking lots then you can get an electric car and you will be able to travel around be able to conveniently charge it up wherever you need to and you know switch to a completely electric lifestyle.  Thank you.

# Exhibit D

UNITED STATES PATENT AND TRADEMARK OFFICE

Commissioner for Patents
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450
www.uspto.gov

# MEMORANDUM

**DATE:**     November 2, 2016

**TO:**     Patent Examining Corps

**FROM:**     Robert W. Bahr
Deputy Commissioner
for Patent Examination Policy

**SUBJECT:**     Recent Subject Matter Eligibility Decisions

The U.S. Court of Appeals for the Federal Circuit (Federal Circuit) has issued a number of subject matter eligibility decisions since the May 2016 Update to the USPTO's subject matter eligibility (SME) guidance. These decisions do not change the basic subject matter eligibility framework explained in the SME guidance and training examples, but provide additional information about finding eligibility for software claims. Accordingly, the USPTO will be updating its SME guidance in view of these decisions and feedback from patent stakeholders.

This memorandum provides a discussion of two of the recent decisions identifying eligible subject matter, namely *McRO, Inc. dba Planet Blue v. Bandai Namco Games America Inc.*, 120 USPQ2d 1091 (Fed. Cir. 2016) and *BASCOM Global Internet Services v. AT&T Mobility LLC*, 827 F.3d 1341 (Fed. Cir. 2016). Yesterday, the Federal Circuit issued another precedential decision finding eligibility (*Amdocs (Israel) Ltd. v. Openet Telecom, Inc.*, No. 2015-1180 (Fed. Cir. Nov. 1, 2016)), which will be discussed further in the forthcoming update to the SME guidance, along with *McRO, BASCOM,* and other recent decisions concerning patent eligibility.[1] These decisions have also been added to the chart of court decisions available on the USPTO's SME Webpage.

---

[1] Other decisions since the May 2016 Update to the USPTO's SME guidance finding eligibility (*Rapid Litigation Management Ltd. v. CellzDirect, Inc.*, 827 F.3d 1042 (Fed Cir. 2016), and *Enfish, LLC, v. Microsoft Corp.*, 822 F.3d 1327 (Fed Cir. 2016)) have been discussed in prior memoranda, which are available on the USPTO's SME Webpage. In addition, there also have been a number of precedential decisions since the May 2016 Update to the USPTO's SME guidance finding ineligibility. *See Synopsys v. Mentor Graphics Corp.*, 2016 WL 6068920 (Fed. Cir. 2016), *FairWarning IP, LLC v. Iatric Systems*, 120 USPQ2d 1293 (Fed. Cir. 2016), *Intellectual Ventures I LLC v. Symantec Corp.*, 120 USPQ2d 1353 (Fed. Cir. 2016), *Affinity Labs of TX, LLC v. DirecTV, LLC*, 120 USPQ2d 1201 (Fed. Cir. 2016), *Affinity Labs of TX, LLC, v. Amazon.com Inc.*, 120 USPQ2d 1210 (Fed. Cir. 2016), *Electric Power Group, LLC v. Alstom S.A.*, 830 F.3d 1350 (Fed. Cir. 2016), and *In re TLI Communications LLC Patent Litigation*, 823 F.3d 607 (Fed. Cir. 2016).

**McRO:**  In *McRO*, the Federal Circuit held the claimed methods of automatic lip synchronization and facial expression animation using computer-implemented rules **patent eligible** under 35 U.S.C. § 101, because they were not directed to an abstract idea (Step 2A of the USPTO's SME guidance).  The basis for the *McRO* court's decision was that the claims were directed to an improvement in computer-related technology (allowing computers to produce "accurate and realistic lip synchronization and facial expressions in animated characters" that previously could only be produced by human animators), and thus did not recite a concept similar to previously identified abstract ideas.

As part of its analysis, the *McRO* court examined the specification, which described the claimed invention as improving computer animation through the use of specific rules, rather than human artists, to set morph weights (relating to facial expressions as an animated character speaks) and transition parameters between phonemes (relating to sounds made when speaking).  As explained in the specification, human artists did not use the claimed rules, and instead relied on subjective determinations to set the morph weights and manipulate the animated face to match pronounced phonemes.  The *McRO* court thus relied on the specification's explanation of how the claimed rules enabled the automation of specific animation tasks that previously could not be automated when determining that the claims were directed to improvements in computer animation instead of an abstract idea.  The *McRO* court indicated that it was the incorporation of the particular claimed rules in computer animation that "improved [the] existing technological process", unlike cases such as *Alice* where a computer was merely used as a tool to perform an existing process.

The *McRO* court cautioned that courts "must be careful to avoid oversimplifying the claims" by looking at them generally and failing to account for the specific requirements of the claims.  The *McRO* court also noted that the claims at issue described a specific way (use of particular rules to set morph weights and transitions through phonemes) to solve the problem of producing accurate and realistic lip synchronization and facial expressions in animated characters, rather than merely claiming the idea of a solution or outcome, and thus were not directed to an abstract idea.

Notable Points from *McRO*:  Examiners should consider the claim as a whole under Step 2A of the USPTO's SME guidance, and should not overgeneralize the claim or simplify it into its "gist" or core principles, when identifying a concept as a judicial exception. See also the discussion of identifying an abstract idea in the May 4, 2016 Memorandum (in Section II.A) and the discussion of claims directed to improvements in computer-related technology in the May 19, 2016 Memorandum about *Enfish*, which is available on the USPTO's SME Webpage.

An "improvement in computer-related technology" is not limited to improvements in the operation of a computer or a computer network *per se*, but may also be claimed as a set of "rules" (basically mathematical relationships) that improve computer-related technology by allowing computer performance of a function not previously performable by a computer.

An indication that a claim is directed to an improvement in computer-related technology may include—

> (1) a teaching in the specification about how the claimed invention improves a computer or other technology (*e.g.*, the *McRO* court relied on the specification's explanation of how the claimed rules enabled the automation of specific animation tasks that previously

could not be automated when determining that the claims were directed to improvements in computer animation instead of an abstract idea). In contrast, the court in *Affinity Labs of TX v. DirecTV* relied on the specification's failure to provide details regarding the manner in which the invention accomplished the alleged improvement when holding the claimed methods of delivering broadcast content to cellphones directed to an abstract idea.

(2) a particular solution to a problem or a particular way to achieve a desired outcome defined by the claimed invention, as opposed to merely claiming the idea of a solution or outcome (*e.g.*, *McRO*'s claims defined a specific way, namely use of particular rules to set morph weights and transitions through phonemes, to solve the problem of producing accurate and realistic lip synchronization and facial expressions in animated characters, and thus were not directed to an abstract idea). In contrast, *Electric Power Group*'s claimed method was directed to an abstract idea because it merely presented the results of collecting and analyzing information, without even identifying a particular tool for the presentation.

**BASCOM:** In *BASCOM*, the Federal Circuit vacated a judgment of ineligibility because the district court failed to properly perform the second step of the *Mayo/Alice* framework (Step 2B of the USPTO's SME guidance) when analyzing a claimed system for filtering content retrieved from an Internet computer network. The *BASCOM* court agreed that the additional elements were generic computer, network, and Internet components that did not amount to significantly more when considered individually, but explained that the district court erred by failing to recognize that when combined, an inventive concept may be found in the non-conventional and non-generic arrangement of the additional elements, *i.e.*, the installation of a filtering tool at a specific location, remote from the end-users, with customizable filtering features specific to each end user (note that the term "inventive concept" is often used by the courts to describe additional element(s) that amount to significantly more than a judicial exception).

Notable Point from *BASCOM*: In Step 2B of the USPTO's SME guidance, examiners should consider the additional elements in **combination**, as well as individually, when determining whether a claim as a whole amounts to significantly more, as this may be found in the non-conventional and non-generic arrangement of known, conventional elements. See also the discussion of evaluating combinations of additional elements in the May 4, 2016 Memorandum (in Section II.B), and the July 2015 Update (in Section I).

**Preemption:** Several recent decisions discuss the role of preemption in the eligibility analysis, and the Office will be addressing preemption in more detail in its forthcoming update to its SME guidance. Specifically, some recent decisions discuss the absence of preemption as confirming the analysis that the claimed invention is not directed to a judicial exception (*CellzDirect*) or includes an inventive step (*BASCOM*). The *McRO* court discusses the absence of preemption in determining that the claimed invention was not "directed to" a judicial exception. Other decisions, however, do not consider the absence of preemption as conferring patent eligibility (*e.g.*, *Synopsys, FairWarning, Intellectual Ventures v. Symantec, Sequenom*, and *OIP*).

3

Examiners should continue to use the *Mayo/Alice* framework (incorporated as Steps 2A and Step 2B of the USPTO's SME guidance and further discussed in this memorandum) to resolve questions of preemption. If applicant argues that a claim does not preempt all applications of the exception, an examiner should reconsider in Step 2A of the eligibility analysis whether the claim is directed to an improvement in computer-related technology or a specific way of achieving a desired outcome or end result (as discussed in the *McRO* section of this memorandum and the USPTO's prior SME guidance). If an examiner still determines that the claim is directed to a judicial exception, the examiner should then reconsider in Step 2B of the eligibility analysis whether the additional elements **in combination** (as well as individually) are more than the non-conventional and non-generic arrangement of known, conventional elements.

**Non-precedential decisions**: Finally, given the large and ever-increasing number of precedential decisions, examiners should avoid relying upon or citing non-precedential decisions (*e.g.*, *SmartGene*, *Cyberfone*) unless the facts of the application under examination uniquely match the facts at issue in the non-precedential decision. The updated chart of court decisions available on the USPTO's <u>SME Webpage</u> indicates whether a decision is precedential or non-precedential.

# Exhibit E

Commissioner for Patents
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450
www.uspto.gov

**MEMORANDUM**

**DATE:**      May 19, 2016

**TO:**        Patent Examining Corps

**FROM:**      Robert W. Bahr
               Deputy Commissioner
                for Patent Examination Policy

**SUBJECT:**   Recent Subject Matter Eligibility Decisions (*Enfish, LLC v. Microsoft Corp.* and
               *TLI Communications LLC v. A.V. Automotive, LLC*)

On May 12, 2016, the U.S. Court of Appeals for the Federal Circuit (Federal Circuit) in *Enfish, LLC v. Microsoft Corp.* held that the claimed database software designed as a "self-referential" table is patent eligible under 35 U.S.C. § 101 because it is not directed to an abstract idea. While the decision does not change the subject matter eligibility framework, it provides additional information and clarification on the inquiry for identifying abstract ideas (Step 2A of the subject matter eligibility examination guidelines).

In reaching its conclusion, the Federal Circuit highlighted several important points regarding the subject matter eligibility analysis, in particular regarding whether a claim is directed to an abstract idea (Step 2A). First, the court noted that when determining whether a claim is directed to an abstract idea, it is appropriate to compare the claim to claims already found to be directed to an abstract idea in a previous court decision. Second, the court emphasized that the "directed to" inquiry applies a filter to claims, when interpreted in view of the specification, based on whether their character as a whole is directed to a patent ineligible concept. Third, the Federal Circuit cautioned against describing a claim at a high level of abstraction untethered from the language of the claim when determining the focus of the claimed invention. Fourth, the court stated that an invention's ability to run on a general purpose computer does not automatically doom the claim. The subject matter eligibility examination instructions, as set out in the 2014 Interim Eligibility Guidance, July 2015 Update, and May 4, 2016 memorandum to examiners, are consistent with these points.

The Federal Circuit in *Enfish* stated that certain claims directed to improvements in computer-related technology, including claims directed to software, are not necessarily abstract (Step 2A). The court specifically noted that some improvements in computer-related technology, such as chip architecture or an LED display, when appropriately claimed, are undoubtedly not abstract. Explaining that software can make non-abstract improvements to computer technology just as hardware can, the court noted that claims directed to software, as opposed to hardware, also are

not inherently abstract. Therefore, an examiner may determine that a claim directed to improvements in computer-related technology is **not** directed to an abstract idea under Step 2A of the subject matter eligibility examination guidelines (and is thus patent eligible), without the need to analyze the additional elements under Step 2B. In particular, a claim directed to an improvement to computer-related technology (*e.g.*, computer functionality) is likely not similar to claims that have previously been identified as abstract by the courts.

The claims of the patents at issue in this case describe the steps of configuring a computer memory in accordance with a self-referential table, in both method claims and system claims that invoke 35 U.S.C. § 112(f). The court asked whether the focus of the claims is on the specific asserted improvement in computer capabilities (*i.e.*, the self-referential table for a computer database), or instead on a process that qualifies as an "abstract idea" for which computers are invoked merely as a tool. To make the determination of whether these claims are directed to an improvement in existing computer technology, the court looked to the teachings of the specification. Specifically, the court identified the specification's teachings that the claimed invention achieves other benefits over conventional databases, such as increased flexibility, faster search times, and smaller memory requirements. It was noted that the improvement does not need to be defined by reference to "physical" components. Instead, the improvement here is defined by logical structures and processes, rather than particular physical features. The Federal Circuit stated that the Enfish claims were not ones in which general-purpose computer components are added after the fact to a fundamental economic practice or mathematical equation, but were directed to a specific implementation of a solution to a problem in the software arts, and concluded that the Enfish claims were thus **not** directed to an abstract idea (under Step 2A).

Closely following *Enfish*, the Federal Circuit decided *TLI Communications LLC v. A.V. Automotive, LLC* on May 17, 2016, which provides a contrast between non-abstract claims directed to an improvement to computer functionality and abstract claims that are directed, for example, to generalized steps to be performed on a computer using conventional computer activity. Specifically, the court stated that the TLI claims describe steps of recording, administration and archiving of digital images, and found them to be directed to the abstract idea of classifying and storing digital images in an organized manner (Step 2A). The court then found that the additional elements of performing these functions using a telephone unit and a server did not add significantly more to the abstract idea because they were well-understood, routine, conventional activities (Step 2B).

In summary, when performing an analysis of whether a claim is directed to an abstract idea (Step 2A), examiners are to continue to determine if the claim recites (*i.e.*, sets forth or describes) a concept that is similar to concepts previously found abstract by the courts. The fact that a claim is directed to an improvement in computer-related technology can demonstrate that the claim does not recite a concept similar to previously identified abstract ideas.