**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Northern Division)**

| | | |
|---|---|---|
| CHARGEPOINT, INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | Civil Action No. 8:17-cv-03717-MJG |
| SEMACONNECT, INC., | § | |
| | § | |
| Defendant. | § | |
| | § | |
| | § | |

**<u>DEFENDANT SEMACONNECT'S REPLY IN SUPPORT OF ITS MOTION TO
DISMISS FOR FAILURE TO STATE A CLAIM</u>**

# TABLE OF CONTENTS

**Page**

TABLE OF EXHIBITS ........................................................................................................ V

I.      INTRODUCTION ............................................................................................... 1

II.     CHARGEPOINT MISCHARACTERIZES THE LAW ...................................... 2

    A.      "Clear and Convincing" Standard Does Not Apply to Questions of Law .............. 2

    B.      ChargePoint Confuses *Alice* Step-One for *Alice* Step-Two .................................... 4

    C.      Novelty Is a Factor to be Considered in the *Alice* Analysis ................................... 5

III.    ALL ASSERTED CLAIMS ARE PATENT INELIGIBLE UNDER §101 ........................ 6

IV.     THE ASSERTED CLAIMS ARE ALL DIRECTED TO AN ABSTRACT IDEA ........... 8

    A.      ChargePoint Relies on Non-Existent Limitations to Save Its Claims...................... 8

    B.      ChargePoint's Alleged "Tangible Application" Is a Field of Use Limitation........................................................................................................... 9

    C.      The Asserted Claims Do Not Improve a Charging Station Itself .......................... 12

    D.      Asserted Claims Are Patent Ineligible Under All Post-*Alice* PTO Guidelines ........................................................................................................... 14

V.      ASSERTED CLAIMS ONLY RECITE CONVENTIONAL COMPONENTS ............... 14

    A.      ChargePoint Failed to Identify Any Inventive Concept ........................................ 14

    B.      Asserted Claims Do Not Provide Technical Solutions to Technical Problems ........................................................................................................... 17

VI.     THE COURT SHOULD NOT CONSIDER CHARGEPOINT'S DECLARATIONS ...................................................................................................... 20

VII.    CONCLUSION ................................................................................................... 20

# TABLE OF AUTHORITIES

**Page**

## Cases

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l*,
  134 S. Ct. 2347 (2014) ........................................................................ 1, 4, 5, 9, 17

*Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*,
  367 F.3d 212 (4th Cir. 2004) ................................................................... 20

*Amdocs (Israel) Ltd. v. Openet Telecom, Inc.*,
  841 F.3d 1288 (Fed. Cir. 2016)................................................................. 4, 5

*B.H. Papsan v. Allain*,
  478 U.S. 265 (1986)................................................................................. 20

*Bascom Global Internet Services, Inc. v. AT&T Mobility LLC*,
  827 F.3d 1341 (Fed. Cir. 2016)................................................................. 4, 16

*buySAFE, Inc. v. Google, Inc.*,
  765 F.3d 1350 (Fed. Cir. 2014)............................................................. 4, 14, 16

*Canrig Drilling Tech, Ltd. v. Trinidad Drilling L.P.*,
  No. H-15-0656, 2015 WL 5458576 (S.D. Tex. Sept. 17, 2015)............................ 10

*Chamberlain Group, Inc. v. Linear LLC*,
  114 F. Supp. 3d 614 (N.D. Ill. 2015) ....................................................... 11

*Content Extraction and Transmission, LLC v. Wells Fargo Bank, Nat'l Ass'n*,
  776 F.3d 1343 (Fed. Cir. 2014).................................................................. 6

*ContourMed Inc. v. Am. Breast Care L.P.*,
  No. H-15-2769, 2016 WL 1059531 (S.D. Tex. Mar. 17, 2016) ............................. 11

*Credit Acceptance Corp. v. Westlake Servs.*,
  859 F.3d 1044 (Fed. Cir. 2017)............................................................... 13, 14

*CyberSource Corp. v. Retail Decisions, Inc.*,
  654 F.3d 1366 (Fed. Cir. 2011).................................................................. 2

*Diamond v. Diehr*,
  450 U.S. 175 (1981)................................................................................. 5

*Elec. Power Grp., LLC v. Alstom*,
  830 F.3d 1350 (Fed. Cir. 2016).......................................................... 11, 13, 17

*Enfish, Inc. v. Microsoft Corp.*,
    56 F. Supp. 3d 1167 (C.D. Cal. 2014) ................................................................. 5

*Fitbit, Inc. v. AliphCom*,
    233 F. Supp. 3d 799 (N.D. Cal. 2017) ........................................................... 18, 19

*Groundswell Techs., Inc. v. Synapsense Corp.*,
    No. 15-CV-06024-AB (JPRx), 2016 WL 6661177, at *8 (C.D. Cal. Apr. 28, 2016) ............ 17

*Intellectual Ventures I LLC v. Capital One Financial Corp.*,
    850 F.3d 1332 (Fed. Cir. 2017)............................................................................ 15

*Intellectual Ventures I LLC v. Erie Indemnity Co.*,
    850 F.3d 1315 (Fed. Cir. 2017)............................................................................ 15

*Intellectual Ventures I, LLC v. Canon Inc.*,
    143 F. Supp. 3d 143 (D. Del. 2015)................................................................. 10, 11

*Inventor Holdings, LLC v. Bed Bath & Beyond, Inc.*,
    876 F.3d 1372 (Fed. Cir. 2017)............................................................................. 3

*Mayo Collaborative Services v. Prometheus Labs., Inc.*,
    566 U.S. 66 (2012)................................................................................................ 5

*McRO, Inc. v. Bandai Namco Games Am. Inc.*,
    837 F.3d 1299 (Fed. Cir. 2016)............................................................................. 4

*Microsoft Corp. v. i4i Ltd. Partnership*,
    564 U.S. 91 (2011)........................................................................................... 3, 4

*Network Apparel Grp., LP v. Airwave Networks Inc.*,
    No. 15-CV-00134, 2016 WL 4718428 (W.D. Tex. Mar. 30, 2016) ........................ 20

*Open Parking LLC v. ParkMe, Inc.*,
    No. 15-CV-976, 2016 WL 3547957 (W.D. Pa. June 30, 2016)................................ 11

*Parker v. Flook*,
    437 U.S. 584, 586 (1987)...................................................................................... 17

*RecogniCorp, LLC v. Nintendo Co., Ltd.*,
    855 F.3d 1322 (Fed. Cir. 2017)............................................................................ 15

*Smart Meter Techs., Inc. v. Duke Energy Corp.*,
    No. 16-CV-208-SLR, 2017 WL 2954916 (D. Del. July 11, 2017)........................... 18

*Smart Sys. Innovations, LLC v. Chicago Transit Authority*,
    873 F.3d 1364 (Fed. Cir. 2017)................................................................. 11, 13, 17

*Two-Way Media Ltd. v. Comcast Cable Comm'cns, LLC*,
  874 F.3d 1329 (Fed. Cir. 2017)............................................................................. 8, 12, 16, 18

*Ultramercial, Inc. v. Hulu, LLC*,
  772 F.3d 709 (Fed. Cir. 2014)................................................................................. 3, 5

*Uniloc USA, Inc. v. AVG Techs. USA, Inc.*,
  No. 16-CV-00393-RWS, 2017 WL 1154927 (E.D. Tex. Mar. 28, 2017) ............................... 13

*Vehicle Intelligence & Safety LLC v. Mercedes-Benz USA, LLC*,
  635 F. App'x 914 (Fed. Cir. 2015) ...................................................................... 9, 11

*Veracode, Inc. v. Appthority, Inc.*,
  137 F. Supp. 3d 17 (D. Mass. 2015) ........................................................................... 5

*Wireless Media Innovations LLC v. Maher Terminals LLC*,
  100 F. Supp. 3d 405 (D.N.J. 2015)
  *aff'd* 636 F. App'x 1014 (Fed. Cir. 2016).................................................................. 3

**Statutory Authorities**

35 U.S.C. 112(d) ........................................................................................................... 7

## TABLE OF EXHIBITS

| Exhibit No. | Description |
|-------------|-------------|
| Exhibit 1 | Robert W. Bahr, "Formulating a Subject Matter Eligibility Rejection and Evaluating the Applicant's Response to a Subject Matter Eligibility Rejection" (May 4, 2016) |

## I.    INTRODUCTION

ChargePoint's Opposition does not contest that (1) turning a switch "on" and "off" using a remote computer is a patent ineligible abstract idea, and (2) the Asserted Patents attempt to monopolize the industry for network-connected electric-vehicle charging stations.   Instead, ChargePoint's Opposition rests on two common threads: mischaracterizing the Asserted Claims and ignoring *Alice* and its progeny.

*First*, repeatedly throughout its Opposition, ChargePoint points to limitations and alleged benefits that are not in the Asserted Claims.  (*See* Dkt. 43 ("Opp.") at 13, 15-16, 22-23, 28, 30-31.)  For example, none of the Asserted Claims recite customizing the charging based on a customer profile; vehicle-to-grid charge transfer; or managing charging station availability—all features that ChargePoint asserts save its claims from patent ineligibility but are not found in any Asserted Claim.  When ChargePoint filed its patent applications, ChargePoint could have drafted narrower claims to include these features.  Instead ChargePoint sought broader claims that are directed to an abstract idea and preempt an entire industry.  ChargePoint has to live with the claims that issued.

*Second*, ChargePoint argues that the Asserted Claims are patent eligible merely because they "have a tangible application" and recite "structural" limitations.  But this is not the law. (*See id.* at 19, 29.)  The Supreme Court *rejected* ChargePoint's premise that tangibility dictates patentability.  *See Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2358 (2014) ("The fact that a computer necessarily exists in the physical, rather than purely conceptual, realm is besides the point.") (internal citation and quotation marks omitted).  Here, the claimed structures are nothing more than generic components that could be used with practically any electric device.  For example, the word "vehicle" in claim 1 of the '715 patent can be replaced with the words microwave, dishwasher, dryer, coffee maker, or hot water heater, and the claims would

still provide the alleged benefits of the claimed invention:

> An apparatus, comprising a control device to turn electric supply on and off to enable and disable charge transfer for electric *[coffee maker/dishwasher/dryer/hot water heater]*; a transceiver to communicate requests for charge transfer with a remote server and receive communications from the remote server via a data control unit that is connected to the remote server through a wide area network; and a controller, coupled with the control device and the transceiver, to cause the control device to turn the electric supply on based on communication from the remote server.

('715 patent, claim 1 (replacing "vehicle" with other fields of use).)  By replacing this single word in the claim, ChargePoint's alleged invention can be easily used in many different industries,  demonstrating the degree of abstractness in these claims.  That is they are not tied to the specific problem they are sought to solve.  None of the claims purport to improve the structures found in a charging station or the network used to communicate with the remote server.  Instead all of the claims are directed to the abstract idea of turning a switch "on" and "off" using a remote server.  Merely applying this abstract idea to electric vehicle charging stations using known, generic structures does not make it patentable.    Accordingly, SemaConnect respectfully requests that this Court grant its Motion to Dismiss.

## II.    CHARGEPOINT MISCHARACTERIZES THE LAW

### A.    "Clear and Convincing" Standard Does Not Apply to Questions of Law

ChargePoint asserts that "SemaConnect has the burden to prove by clear and convincing evidence" that the Asserted Claims are patent ineligible.  (Opp. at 9.)  However, this standard only applies to the resolution of *factual* disputes, not the resolution of pure issues of law, such as the question of patent eligibility under §101.  *See, e.g.*, *CyberSource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366, 1369 (Fed. Cir. 2011) ("Issues of patent-eligible subject matter are questions of law.").  This is especially true here.  ChargePoint has already taken the position that "no terms . . . require construction" (Dkt. 7-1 at 15-17, 19), and has admitted that "non-networked electric

vehicle charging stations had existed for many years" (Dkt. 2-3 ¶ 5).  Accordingly, there are no underlying factual disputes that this Court needs to weigh under the "clear and convincing" evidence standard.  However, even if this Court were to apply the clear and convincing standard to this case, SemaConnect has more than met that burden of proof in showing that ChargePoint's Asserted Claims are patent ineligible.

ChargePoint's conclusion that this issue needs to be weighed under the "clear and convincing" standard incorrectly assumes that patent eligibility carries a presumption of validity. While patents issued by the Patent Office generally carry a presumption of validity, this does not mean that there also exists a presumption of patent eligibility that applies to Section 101 determinations.  In fact, numerous (likely even most) courts throughout this country have found that this presumption does not apply to §101 determinations.  *See, e.g, Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 721 (Fed. Cir. 2014) (Mayer, J., concurring) (recognizing that "while a presumption of validity attaches in many contexts, no equivalent presumption of eligibility applies in the section 101 calculus") (internal citations omitted); *Wireless Media Innovations LLC v. Maher Terminals LLC*, 100 F. Supp. 3d 405, 411 (D.N.J. 2015) ("[T]he Court adopts Judge Mayer's approach and will not afford Plaintiff's Patents the presumption of subject matter eligibility."), *aff'd* 636 F. App'x 1014 (Fed. Cir. 2016).

Even if the Court finds that a presumption of validity applies—which it does not—that presumption loses force here.  All the Asserted Patents issued before the Supreme Court's seminal *Alice* decision, where "*Alice* was a significant change in the law."  *Inventor Holdings, LLC v. Bed Bath & Beyond, Inc.*, 876 F.3d 1372, 1379 (Fed. Cir. 2017).  Accordingly, the presumption of validity "lose[s] significant force" because "the PTO did not have all material facts before it" when it allowed the Asserted Patents.  *Microsoft Corp. v. i4i Ltd. Partnership*,

564 U.S. 91, 111 (2011).

### B.    ChargePoint Confuses *Alice* Step-One for *Alice* Step-Two

Under its analysis for *Alice* Step-One, ChargePoint incorrectly alleges that SemaConnect must show that "the elements of each Asserted Claim, *both alone and as ordered combinations*, are directed to an abstract idea."  (Opp. at 12 (emphasis added).)  This interpretation of the law ignores the entire body of precedent on the application of *Alice* Step-One.  *See, e.g., Ultramercial*, 772 F.3d at 715 (*Alice* Step-One requires the Court to look at "the concept embodied by the majority of the limitations" and determine whether it describes an abstract idea); *buySAFE, Inc. v. Google, Inc.*, 765 F.3d 1350, 1355 (Fed. Cir. 2014) (rejecting patentee's argument that narrowing limitations in the claims make the idea non-abstract for §101 purposes).  Instead, ChargePoint mistakenly relies on the statement in *Alice* Step-Two, which considers "all claim elements," in its analysis of *Alice* Step-One.  *Alice*, 134 S.Ct., at 2355 n.3.[1]

ChargePoint incorrectly relies on *Amdocs* and *Bascom*.  (Opp. at 10.)  In both of these cases, when the court discusses analyzing the claim elements "individually" or "as an ordered combination," it does so in the context of *Alice* Step-Two, not as part of *Alice* Step-One.  *See Amdocs (Israel) Ltd. v. Openet Telecom, Inc.*, 841, F.3d 1288, 1300 (Fed. Cir. 2016); *see also Bascom Global Internet Services, Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1349 (Fed. Cir. 2016).  Under *Alice* Step-One, there is no requirement that the abstract idea be formulated with absolute lexical precision or that the abstract idea be a robotic repeated recitation of each claim limitation.  Instead, *Alice* Step-One looks to "the purpose of the claimed invention," which is

---

[1]  The Federal Circuit's decision in *McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299 (Fed. Cir. 2016) and the Patent Office guidelines are not contrary. In *McRO*, the Federal Circuit agreed that, while the entire claim needs to be considered, the abstract idea identified in *Alice* Step-One needs to identify the claim's "character as a whole." *Id.* at 1312. The guidelines cited by ChargePoint merely reiterate the Federal Circuit's discussion in *McRO* and do not require including all claim limitations in *Alice* Step-One.

precisely what SemaConnect did in its analysis under *Alice* Step-One.  *See Veracode, Inc. v. Appthority, Inc.*, 137 F. Supp. 3d 17, 47 (D. Mass. 2015) (citing *Enfish, Inc. v. Microsoft Corp.*, 56 F. Supp. 3d 1167, 1170–71 (C.D. Cal. 2014)).

### C.    Novelty Is a Factor to be Considered in the *Alice* Analysis

ChargePoint incorrectly accuses SemaConnect of conflating novelty and obviousness with patent eligibility.  (Opp. at 9.)  But, as the Supreme Court observed, "in evaluating the significance of additional steps" under *Alice* Step-Two, "the §101 patent-eligibility inquiry and, say, the § 102 novelty inquiry might sometimes overlap."  *Mayo Collaborative Services v. Prometheus Labs., Inc.*, 566 U.S. 66, 90 (2012); *see also Ultramercial*, 772 F.3d at 715 ("novelty in implementation of the idea is a factor to be considered only in the second step of the *Alice* analysis").[2]  For example, "well-understood, routine, conventional activities previously known in the industry" cannot confer patent eligibility.  *Alice*, 134 S. Ct. at 2359 (internal quotation marks omitted).  Here, SemaConnect described a number of prior art references (ChargePoint does not dispute that these references predate and are prior art to the Asserted Patents) in order to give the Court context and describe the state of the art in the electric vehicle charging station industry, thereby demonstrating what constitutes "well-understood, routine, conventional activities previously known in the industry."  (*See* Dkt. 41 ("Mot.") at 13-16.)[3]  SemaConnect's

---

[2]  ChargePoint cites two cases for the contrary premises.  First, ChargePoint cites to the ***dissent*** in *Amdocs (Israel) Ltd. v. Openet Telecom, Inc.*, but does not acknowledge that the quote is from a ***dissenting*** opinion.   841 F.3d 1288, 1311 (Fed. Cir. 2016) (Reyna, J., ***dissenting***).  Nonetheless, the cited quote from *Amdocs* is taken out of context, since the actual discussion does not purport that an analysis of the prior art cannot play any role in patent eligibility.  Second, ChargePoint cites *Diamond v. Diehr*, 450 U.S. 175 (1981), but that decision predates *Mayo* by more than 30 years.  To the extent the quoted dicta from *Diehr* is inconsistent with *Mayo*, the more recent *Mayo* decision takes precedence.

[3]  ChargePoint's assertion that SemaConnect "fail[ed] to introduce even a triable issue of fact with respect to novelty or obviousness" (Opp. at 10) lacks merit.  For example, the only difference ChargePoint's expert was able to identify between claim 1 of the '715 patent and the

description of the prior art was correct and does not conflate the §101 analysis with the invalidity analysis under §§102 and 103.

## III. ALL ASSERTED CLAIMS ARE PATENT INELIGIBLE UNDER §101

SemaConnect presented claim 1 of the '715 patent as representative to simplify the Court's analysis, and because none of the differences between the claims affect patent eligibility. This was a proper way to analyze the claims when they are "substantially similar and linked to the same abstract idea." *See Content Extraction and Transmission, LLC v. Wells Fargo Bank, Nat'l Ass'n*, 776 F.3d 1343, 1348 (Fed. Cir. 2014). While ChargePoint disputes this and believes that SemaConnect must analyze each claim individually, this does not change the underlying truth: none of the differences between claim 1 of the '715 patent and the other Asserted Claims affect SemaConnect's analysis of patent eligibility.

ChargePoint claims that "the notion that the seven other Omitted Claims merely cover 'using a network (*e.g.*, the Internet) to remotely turn an electrical outlet 'on' and 'off,' is *risible*." (Opp. at 18 (internal citation omitted and emphasis added).) Yet that is exactly what all the Asserted Claims cover, as further evidenced by ChargePoint's infringement allegations. (Mot. at 6-11.) Claim 1 of the '715 patent requires a "control device to turn electric supply on and off"— turning the electric supply on and off requires turning an outlet "on" and "off." Claim 31 of the '570 patent requires "a control device . . . for switching said receptacle on and off"—switching the receptacle "on" and "off" is the same as turning an outlet "on" and "off." Claim 1 of the '131 patent requires "modify[ing] the application of charge transfer"—turning the charge

---

disclosure of the Williams reference is that claim 1 requires "communicat[ing] requests for charge transfer," whereas Williams transmits a request "for payment verification." (Dkt. 43-2 ¶ 64.) That is a red herring, since (according to ChargePoint and as recited in claim 2 of the '967 patent) "enabl[ing] charge transfer includes validating a payment source for the charge transfer." (Opp. at 9.) Accordingly, ChargePoint's alleged distinction between claim 1 of the '715 patent and Williams has no substance.

transfer "on" and "off" constitutes "modify[ing]" it.   Claim 1 of the '967 patent requires "indicat[ing] to the network-controlled charge transfer device to enable charge transfer"— enabling charge transfer cannot be interpreted as anything other than turning the charging station "on."   Therefore, every asserted independent claim is directed to the same abstract idea— remotely turning an outlet "on" and "off."

The asserted dependent claims fare no better and are similarly directed to the same abstract idea.   Even though none of the dependent claims explicitly claim activation or deactivation, by virtue of the fact that they depend from independent claims directed to this abstract idea, they too are directed to this abstract idea.   *See* 35 U.S.C. 112(d) ("A claim in dependent form shall be construed to incorporate by reference all limitations of the claim to which it refers.").   The additional limitations in the dependent claims do not make these claims any less abstract.   Claim 2 of the '715 patent only adds "an electrical coupler," but (as revealed by claim 3 and ChargePoint's infringement allegations) that is nothing more than just "an outlet."   Claim 32 of the '570 patent only adds that the "wide area network is the Internet"— adding an abstract idea to the Internet does not make it any less abstract.   Claim 8 of the '131 patent only adds that "the communications received as part of the demand response system include power grid load data," but this limitation, according to ChargePoint, is met by taking demand into consideration when deciding how much to charge customers—a business consideration.   Claim 2 of the '967 patent only adds "validating a payment source for the charge transfer"—a factor in deciding whether to turn an outlet "on" and "off."   The dependent claims at issue here merely add generic limitations to the independent claims, but do not change the underlying fact that all Asserted Claims are directed to the same abstract idea.   (Mot. at 13-16.)

None of the claim limitations that ChargePoint identified change the fact that all Asserted

Claims are directed to a patent ineligible subject matter.  (*See* Opp. at 18-19.)  ChargePoint alleges that certain limitations constitute "non-conventional and non-generic arrangements of hardware."  (*Id.* at 12.)  But SemaConnect already explained how the "hardware" identified in ChargePoint's Opposition—"a local area network transceiver," "a controller," and "a server"— are nothing more than generic computer hardware that is not even specific to electric-vehicle charging stations.  (Mot. at 30.)  Other than listing certain limitations and making an unsupported assertion that they are "non-conventional and non-generic arrangements of hardware," ChargePoint presents no evidence or explanation for why these limitations render the Asserted Claims not abstract.

## IV.    THE ASSERTED CLAIMS ARE ALL DIRECTED TO AN ABSTRACT IDEA

### A.    ChargePoint Relies on Non-Existent Limitations to Save Its Claims

In an effort to show that the claims contain patent eligible subject matter, ChargePoint throughout its Opposition points to *non-existent* limitations.   But in order to determine patentability, this Court need only look at the limitations actually present in the Asserted Claims—additional limitations not set forth in the claim cannot save a claim under §101.  *See Two-Way Media Ltd. v. Comcast Cable Comm'cns, LLC*, 874 F.3d 1329, 1338 (Fed. Cir. 2017) ("The main problem that Two-Way Media cannot overcome is that the *claim*—as opposed to something purportedly described in the specification—is missing an inventive concept.  While the specification may describe a purported innovative 'scalable architecture,' claim 1 of the '187 patent does not.") (emphasis in original).  For example, ChargePoint alleges that claim 1 of the '715 patent is not directed to an abstract idea because it contains "consumer profiles," "utility company power grid load data," "electricity consumption data," a "Smartlet[TM]," and "grid stability in times of peak electricity demand."  (Opp. at 15-16.)  But ***none*** of these features are recited in the claims.  ChargePoint alleges that the Asserted Claims are not directed to abstract

ideas because they "address[] problems associated with grid stability in times of peak electricity demand by utilizing network-controlled electric vehicle charging stations that communicate with power grids and charge electric vehicles according to a demand-response system." (*Id.* at 13.) Again, ***none*** of the Asserted Claims recite or otherwise reference the alleged problem ("grid stability in times of peak electricity demand") or the alleged solution ("communicat[ion] with power grids"). ChargePoint could have added these limitations to the claims to make them narrower, but instead chose to broadly claim an abstract idea. ChargePoint cannot now rewrite its claims and import additional concepts to save them from being invalidated.

### B.     ChargePoint's Alleged "Tangible Application" Is a Field of Use Limitation

ChargePoint cites to the "machine-or-transformation test" to claim that the Asserted Claims "have a tangible application," and are therefore not abstract. (*Id.* at 19.) "But, post-*Mayo/Alice*, this is no longer sufficient to render a claim patent-eligible." *Vehicle Intelligence & Safety LLC v. Mercedes-Benz USA, LLC*, 635 F. App'x 914, 919 (Fed. Cir. 2015). As the Supreme Court observed in *Alice*: "The fact that a computer necessarily exists in the physical, rather than purely conceptual, realm is besides the point." *Alice*, 134 S. Ct. at 2358 (internal quotations and citations omitted). The fact that the Asserted Claims may "have a tangible application" (Opp. at 19) cannot save an otherwise abstract claim.

ChargePoint claims that the tangible application of its Asserted Patents is the ability to "modify charge transfer between EV charging stations and electric vehicles." *Id.*) However, when analyzed with respect to the actual claim limitations, it is clear that the Asserted Claims are not "tied to a particular machine," as ChargePoint contends, but instead recite only a field of use—for an electric vehicle. Such field of use limitations do not render an abstract idea patentable. *Alice*, 134 S. Ct. at 2358 ("Nor is limiting the use of an abstract idea to a particular technological environment [enough for patent eligibility].") (internal quotation marks omitted).

This is illustrated by a simple test:  one can swap out the claim elements related to electric vehicles for other well-known appliances and the claims would still provide the alleged benefits of the claimed invention—the Asserted Claims are equally applicable to a network-connected laundromat (using a remote server to switch driers "on" and "off"), a network-connected soda fountain (using a remote server to switch the flow of soda "on" and "off"), and a network-connected dishwasher (using a remote server to switch the supply of water "on" and "off").  As shown below, only a single word—"**_vehicle_**"—in claim 1 of the '715 patent[4] needs to be modified to extend the claim to other fields of use, completely unrelated to the Asserted Patents:

> An apparatus, comprising a control device to turn electric supply on and off to enable and disable charge transfer for electric **_[coffee maker/dishwasher/dryer/hot water heater]_**; a transceiver to communicate requests for charge transfer with a remote server and receive communications from the remote server via a data control unit that is connected to the remote server through a wide area network; and a controller, coupled with the control device and the transceiver, to cause the control device to turn the electric supply on based on communication from the remote server.

('715 patent, claim 1 (replacing "vehicle" with other fields of use).)  ChargePoint's decision to limit the claims to vehicles—a field of use—is not a tangible application to confer patentability.

The non-binding district court cases cited by ChargePoint are all distinguishable on this very basis.  (Opp. at 19-21.)  The claims in _Canrig Drilling Tech, Ltd. v. Trinidad Drilling L.P._ were found patent eligible because they "address[ed] specific challenges in directional drilling through a concrete process for controlling the rotation of the long drill strings to and between predetermined angles."  No. H-15-0656, 2015 WL 5458576, at *4 (S.D. Tex. Sept. 17, 2015).  The claims in _Intellectual Ventures I, LLC v. Canon Inc._ "describe[d] steps including

---

[4]   The same reasoning also applies to the other Asserted Claims.  For example, the laundromat could modify its pricing based on "a demand response system" (as recited in the asserted claims of the '131 and '967 patent) and could include "a current measuring device" (as recited in the asserted claims of the '570 patent) that measures how much current is provided to the dryer.

determining the parameters (which meet a certain mathematical formula) and applying parameters to operate a scanner." 143 F. Supp. 3d 143, 173 (D. Del. 2015). The claims in *ContourMed Inc. v. Am. Breast Care L.P.* required "imaging of the breast to the ultimate end of creating a breast prosthetic, using alignment markers placed on the breast and captured in the image to aid in the computer modeling." No. H-15-2769, 2016 WL 1059531, at *3 (S.D. Tex. Mar. 17, 2016).[5] In each of these cases, the patent at issue claimed a technological improvement that is specific to the subject matter of that patent. None of these claimed improvements made sense in other, completely unrelated contexts. This is in contrast to the Asserted Claims, whose alleged improvements apply equally to an electric-vehicle charging station as to a laundromat.

The controlling Federal Circuit precedent cited by SemaConnect is directly on point. Specifically, in *Smart Sys. Innovations, LLC v. Chicago Transit Auth.,*[6] the patentee made the same argument as ChargePoint makes here: that the Federal Circuit "should not find the Asserted Claims directed to an abstract idea because they apply to a particular, concrete field— namely, mass transit." 873 F.3d at 1373. The Federal Circuit disagreed and concluded that the Asserted Claims were directed to an abstract idea because "merely limiting the field of use of the abstract idea to a particular . . . environment does not render the claims any less abstract." *Id.*

---

[5] ChargePoint also cites *Chamberlain Group, Inc. v. Linear LLC*, 114 F. Supp. 3d 614 (N.D. Ill. 2015). But this case was decided without the benefit of the Federal Circuit's guidance in, *e.g.*, *Smart Sys. Innovations, LLC v. Chicago Transit Authority*, 873 F.3d 1364 (Fed. Cir. 2017) and *Elec. Power Grp., LLC v. Alstom*, 830 F.3d 1350 (Fed. Cir. 2016). SemaConnect respectfully submits that more recent, controlling Federal Circuit precedent, such as *Smart Sys.*, *Elec. Power*, and *Vehicle Intelligence* should take precedent over a single, non-binding decision.

[6] ChargePoint purports to distinguish various cases cited by SemaConnect **solely** on the basis that they allegedly "lacked any tangible applications." (Opp. at 21.) But lacking a tangible application was not the deciding factor in these cases. For example, the claim in *Open Parking* required displaying "parking data" that "indicat[es] an occupancy condition of an available parking lot." *Open Parking LLC v. ParkMe, Inc.*, No. 2:15-CV-976, 2016 WL 3547957, at *2 (W.D. Pa. June 30, 2016). Even if the claim required thereafter moving a vehicle to occupy an available spot (what ChargePoint would call a "tangible application[]"), the substantive scope of the claim would remain the same, and the patent at issue would still be patent ineligible.

Similarly, the alleged "tangible application" of the Asserted Claims is merely a field of use limitation that cannot confer patent eligibility.

### C.       The Asserted Claims Do Not Improve a Charging Station Itself

ChargePoint also contends that the Asserted Claims are patent eligible because they allegedly "improve the functioning of EV charging stations." (Opp. at 22.) None of the alleged improvements are actually found in the claims—ChargePoint again resorts to non-existent limitations. The alleged improvements identified by ChargePoint include "[d]emand response and V2G functionalities [that allegedly] assist in maintaining the stability of electric grids . . . ." (*Id*.) But none of the Asserted Claims recite "V2G functionalities" or "maintaining the stability of electric grids," and therefore, these alleged improvements should not be considered. *See Two-Way Media Ltd.*, 874 F.3d at 1338-39. ChargePoint cites to the Asserted Patents' specification, and not their claims, for this assertion. (Opp. at 22.) Only the asserted claims of the '131 and '967 patents refer to a "demand response system," but this limitation is defined at such a high level of generality that it merely constitutes a patent ineligible, fundamental economic concept (supply and demand) and is at most a well-known technique in the industry that cannot confer patent eligibility. (*See also* Part V.A (explaining how the claimed "demand response system" cannot confer patent eligibility).)

ChargePoint contends that the Asserted Claims provide "an array of technical options not available in prior art systems." (Opp. at 23.) According to ChargePoint, these include taking into account driver profile information, reserving and managing charging station availability, and managing geographically dispersed charging stations. (*Id.*) Again, none of these alleged "technical options" is found in the Asserted Claims. ChargePoint does not even cite to any intrinsic support for this assertion, relying instead on the "Supplemental Declaration of David Baxter," which appears to just repeat the statements in ChargePoint's Opposition. (*See* Dkt. 43-1

¶ 5.)  Even if the Court considers these alleged "technical options," the Asserted Claims still do not improve the functioning of an electric charging station itself.  These options are merely additional, patent ineligible, abstract ideas that a customer or service provider would find desirable in various technical environments.  (*See supra* Part IV.B (explaining how the alleged "improve[ments]" are not specific to electric-vehicle charging stations, but equally applicable in other context).)[7]  As such, they do not qualify as improving the functioning of the charging station in a manner that renders the Asserted Claims patent eligible.  *See Smart Sys.*, 873 F.3d at 1372 (finding that "improv[ing] prior systems of fare collection by speeding up the process at [a] turnstile" does not negate that the claims are directed at an abstract idea).  Just as ChargePoint cannot monopolize the abstract idea of turning a switch "on" and "off" using a remote server, so too should it be precluded from monopolizing these alleged (but unclaimed) "technical options."

ChargePoint's assertion that "[n]one of the cases support SemaConnect's contention that enabling real-time communication between an EV charging infrastructure[8] and a computer network does not improve the functioning of the infrastructure" is misleading at best.  (Opp. at 24.)  In *Elec. Power*, the Federal Circuit addressed claims directed at "detecting events on an interconnected electric power grid in real time" and found that they were patent ineligible because "the focus of the claims is not . . . an improvement in computers as tools, but on certain independently abstract ideas that use computers as tools."  830 F.3d at 1351, 1354.  In *Credit Acceptance Corp. v. Westlake Servs.*, the Federal Circuit expressly held that "communication

---

[7]   ChargePoint attempts to distinguish *Uniloc USA, Inc. v. AVG Techs. USA, Inc.*, No. 2:16-cv-00393-RWS, 2017 WL 1154927, at *6 (E.D. Tex. Mar. 28, 2017) based on the general subject matter of the claims asserted in that case (controlling access to an application program). ChargePoint fails, however, to dispute the underlying point made by that court:  that claiming "a business, rather than a technological, benefit" does not render a claim patent eligible.  (Opp. at 23-24.)  This observation holds true whether the claim is controlling access to an application program (as in *Uniloc*) or an electric supply (as here).

[8]   "EV charging infrastructure" in this statement refers to an EV charging station.

between previously unconnected systems . . . does not amount to an improvement in computer technology."  859 F.3d 1044, 1055 (Fed. Cir. 2017).  The same is true for the numerous other cases cited in SemaConnect's Motion where the Federal Circuit has found that adding network connectivity does not constitute a technological improvement to render the claims patent eligible.  (Mot. at 21-24.)

> ### D.  Asserted Claims Are Patent Ineligible Under All Post-*Alice* PTO Guidelines

ChargePoint accuses SemaConnect of "cherry-pick[ing] the 2015 guidelines while ignoring later and more pertinent guidance."  (Opp. at 25.)  This is false.  The 2015 PTO Examination Guidelines are the most comprehensive guidelines used by patent examiners.  The two newer guidelines cited by ChargePoint, as well as the interim May 4, 2016 guidelines, only provide *updates* to the 2015 PTO Examination Guidelines regarding more recent Federal Circuit decisions or are "intended to assist examiners in applying" the 2015 guidelines.  (*See* Exhibit 1.)  These later guidelines "do not change the basic subject matter eligibility framework explained in the [prior] guidelines and training examples."  (Dkt. 43-3 at 35.)

## V.  ASSERTED CLAIMS ONLY RECITE CONVENTIONAL COMPONENTS

> ### A.  ChargePoint Failed to Identify Any Inventive Concept

None of the features identified by ChargePoint constitute an inventive concept sufficient to confer patent eligibility.  ChargePoint points to the concept of "coupling [] a network to an electric vehicle charging station to allow communications between users and the local electric grid when charging electric vehicles" found in claim 1 of the '715 patent.  (Opp. at 26.)  But connecting an electric vehicle charging station to a network is not inventive.  *See buySAFE*, 765 F.3d at 1355 ("[t]hat a computer receives and sends the information over a network—with no further specification—is not even arguably inventive").  Even if connecting a device to a network could be "inventive," the prior art demonstrates that connecting a network to an electric

vehicle charging station was well-known in the industry and not inventive.  (*See* Mot. at 11-16.)

ChargePoint points to the concept of "allow[ing] for 'the application of charge transfer based on the communications received as part of the demand response system'" found in claim 1 of the '131 patent.  (Opp. at 27.)[9]  This is the extent of ChargePoint's discussion of "the demand response system" and no other features of this system are set forth in the claims.  There is no explanation of how this system is implemented, such as how grid load is determined, how prices are calculated, and what effect those prices have on electricity consumption.  This failure to include any implementation details is the tell-tale sign of a patent ineligible abstract idea.  *See Intellectual Ventures I LLC v. Capital One Financial Corp.*, 850 F.3d 1332, 1342 (Fed. Cir. 2017) (finding the patent invalid because "the claim language here provides only a result-oriented solution, with insufficient detail for how a computer accomplishes it"); *Intellectual Ventures I LLC v. Erie Indemnity Co.*, 850 F.3d 1315, 1331-32 (Fed. Cir. 2017) ("Without an explanation of the 'mechanism' for 'how the result is accomplished,' this purported feature of the invention cannot supply an inventive concept.").  Indeed, at this level of abstraction, the concept of a "demand response system" is nothing more than an instruction to implement the claimed invention in a capitalist economy governed by supply and demand.  Combining two abstract ideas (turning a switch "on" and "off" and supply-and-demand) in this manner is not an inventive concept and cannot confer patent eligibility.  *See RecogniCorp, LLC v. Nintendo Co., Ltd.*, 855 F.3d 1322, 1327 (Fed. Cir. 2017) ("Adding one abstract idea (math) to another abstract idea (encoding and decoding) does not render the claim non-abstract.").  Even if the claimed "demand response system" is deemed to not be abstract, it is still a well-known technique used by utility companies long before the filing of the Asserted Patents.  (*See* '570 patent, 1:37-54.)

---

[9]   This argument does not apply to the asserted claims of the '715 and '570 patents, which do not require a "demand response system."

ChargePoint also alleges that the Asserted Claims recite "an *un*known network with *unknown* and *inventive* components" that includes the capabilities of "provid[ing] consumer profiles (including account information for payment), utility company power grid load data (updated in real time by the utility company), and electricity consumption data information." (Opp. at 28 (emphasis in original).)   Again, none of those limitations are found in the claims, and therefore, these alleged "capabilities" are irrelevant.  *See Two-Way Media*, 874 F.3d at 1338-39.  Moreover, the Asserted Patents cannot possibly claim "an *un*known network," since claim 32 of the '570 patent specifies that the claimed "network" is the "Internet."  There is no dispute that in 2008, ChargePoint did not invent the Internet.

ChargePoint attempts to compare the Asserted Claims to the claims found patent eligible in *Bascom*, but this comparison fails.  (Opp. at 27.)   In *Bascom*, the claims required "a remote ISP server" that processed "network access requests for . . . individual controlled access network accounts."  827 F.3d at 1345.  The Federal Circuit found that this "this particular arrangement of elements is a ***technical*** improvement over prior art ways of filtering such content," because it "take[s] advantage of the ability of at least some ISPs to identify individual accounts that communicate with the ISP server."  *Id.* at 1350.  Here, in contrast, the Asserted Claims are directed to connecting a generic charging station to a generic server.  This arrangement does not "exploit[]" any technical characteristic of the remote server other than the intrinsic ability of a network to transmit data.  (*See also* Part IV.B (demonstrating that the claims are equally applicable to other electric appliances).)   Using a network for its intended purpose (communicating information) is not an inventive concept to confer patent eligibility.  *See buySAFE*, 765 F.3d at 1355.

Finally, ChargePoint attempts to distinguish the Asserted Claims from the claims found

patent ineligible in *Elec. Power* on the grounds that the Asserted Claims include "*structural* limitations." (Opp. at 29.) This argument misses the point—what matters is that the claims at issue in *Elec. Power* recited "an interconnected electric power grid" and other limitations related to monitoring such a grid, yet the Federal Circuit dismissed those limitations as merely limiting the claims to a particular technological environment. 830 F.3d at 1354. Whether or not a claim is limited to a particular technological environment by "*structural*" or other types of limitations is irrelevant;[10] what matters is that these limitations are merely field-of-use limitations that cannot confer patent eligibility. *See Alice*, 134 S. Ct. at 2358-59. Similarly, ChargePoint dismisses SemaConnect's citations to *Parker v. Flook*, 437 U.S. 584 (1987), *Groundswell Techs., Inc. v. Synapsense Corp.*, No. CV 15-06024-AB (JPRx), 2016 WL 6661177, at *8 (C.D. Cal. Apr. 28, 2016), and *Smart Sys.* by selectively quoting the ultimate holding of each decision (Opp. at 29-30), but fails to explain why the limitations identified by SemaConnect—"the catalytic chemical conversion of hydrocarbons," "bankcard reader," and "generic sensors and telemetry equipment," respectively—did not confer patent eligibility in those cases, yet supposedly similar limitations in the Asserted Patents constitute an inventive concept.

## B. Asserted Claims Do Not Provide Technical Solutions to Technical Problems

ChargePoint alleges that the Asserted Patents "address the problem of grid instability at times of peak demand; allow site hosts to control access to widely dispersed charging stations; and gives customers additional information about where and how to charge their vehicles." (Opp. at 30.) Once again, none of these alleged problems and solutions are found in the Asserted Claims; instead, those claims merely recite connecting a single, generic charging station to a

---

[10] Moreover, ChargePoint's alleged distinction between the Asserted Claims and the claims at issue in *Elec. Power* does not apply to claims 1-2 of the '967 patent, which are method claims whose only "*structural* limitation[]" in the body of the claims is a "network-controlled charge transfer device."

remote server without any reference to "grid instability at times of peak demand," "widely dispersed charging stations," or "giving customers additional information about where and how to charge their vehicles."   These unclaimed features cannot set forth technical solutions to technical problems to confer patent eligibility.   *See Two-Way*, 874 F.3d at 1338-39.   In addition, none of these alleged "problems" are "technical" in nature.   Managing multiple stations and directing customers are related to organization problems, not technical problems, that predate the Internet—companies managed many gas stations and customers sought information regarding the closest gas station long before the priority date of the Asserted Patents.

ChargePoint alleges that "multiple district courts have held that claims that address problems related to the functioning of electric power distribution systems, as well as problems related to enhancing user experience of electronic devices, are patent-eligible."  (Opp. at 31.) However, neither of the two non-binding district court cases that ChargePoint cites support its position.   The claims in *Smart Meter Techs., Inc. v. Duke Energy Corp.* required "measuring current fluctuations in the power line," "calculating power consumption," and transmitting "IP-based power consumption information . . . over an external power line network."  No. 16-cv-208-SLR, 2017 WL 2954916, at *2 (D. Del. July 11, 2017).   Accordingly, the claims at issue in *Smart Meter*, unlike the claims at issue here, were directed to measuring current in a power line and then transmitting that measurement over that same power line. These claims, therefore, spelled out both the technical nature of the information being measured and the specific method used to transmit that information.  In contrast, the claims at issue here lack any such specifics.

ChargePoint's   other   cited   case,   *Fitbit,   Inc.   v.   AliphCom*,   actually   supports SemaConnect's argument.   233 F. Supp. 3d 799 (N.D. Cal. 2017).   There, the court found that "the claims' relation to wearable activity tracker technology, in and of itself, does not make them

patent-eligible," nor does generic client-server architecture. *Id*. at 812. This is comparable to the Asserted Patents' recitation of generic charging station technology and communicating with a server—neither constitutes an inventive concept. The *Fitbit* court did conclude, however, that the claims at issue were patent eligible because they "took advantage of the inherent, technical capabilities of the portable monitoring device—its ability to detect motion with a motion sensor—to provide a manner of validating the device that was different from traditional forms of input (i.e., buttons and keyboards)" and because they claimed a non-traditional client-server-client architecture. *Id*. at 812-13. No such additional limitations are found in the Asserted Patents—the Asserted Patents do not take advantage of any technical characteristic specific to the client-server architecture at issue and instead are directed to a generic network connection. Under the *Fitbit* court's reasoning, such limitations are insufficient to confer patent eligibility.

ChargePoint also disputes whether "addressing grid stability through demand response" is a business or a technical benefit. (Opp. at 31.) Its argument, however, is a strawman: first, the claims do not require "addressing grid stability" and thus capture the business benefit of "maximiz[ing] revenue"; and second, the claimed "demand response system" relies on supply-and-demand (a fundamental economic principal) to optimize resource allocation (a business goal). Accordingly, the claimed "demand response system" is not a technical solution (since it is an economic/business solution); nor does it address a technical problem (since the claims are sufficiently broad to read onto using demand response to maximize revenue). (*See* Part V.A.)[11]

---

[11]   ChargePoint mischaracterizes certain statements by SemaConnect to support its proposition that the Asserted Claims are directed to a technical advancement. (Opp. at 24, 32.) The statements from SemaConnect's website identify "demand response" as a feature of certain products, but do not describe it as a "technological advantage[]." (*Compare* Opp. at 24 *with* Dkt. 2-7, 2-9.) SemaConnect's statement to the PTO regarding improving the operation of a charging station was directed at a specific process "that involves displaying and capturing graphic patterns by imaging devices" and not the broader concept of determining the "[l]egitimacy of the EVCS

Finally, ChargePoint's attempt at distinguishing *Network Apparel* misses the point. (Opp. at 32.)   SemaConnect did not allege that the claims at issue here are comparable to the claims in *Network Apparel*; instead, *Network Apparel* stands for the premise that if a patent addresses a problem that existed in the "brick and mortar" context, then it is likely directed to a patent ineligible abstract idea.   *See Network Apparel Grp., LP v. Airwave Networks Inc.*, No. 6:15-CV-00134, 2016 WL 4718428, at *6 (W.D. Tex. Mar. 30, 2016).   Here, the Asserted Claims existed in the brick-and-mortar context—as SemaConnect demonstrated in its Motion, the claims can be applied to a traditional gas station.  (Mot. at 27-29.)  That, alone, demonstrates that the Asserted Claims are directed to a patent ineligible abstract idea.

## VI.  THE COURT SHOULD NOT CONSIDER CHARGEPOINT'S DECLARATIONS

ChargePoint attached two declarations in support of its Opposition to SemaConnect's motion to dismiss under Rule 12(b)(6).  (Dkt. 43-1, 43-2.)   These declarations cannot be considered on a rule 12(b)(6) motion to dismiss.   *See Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004) ("as a general rule extrinsic evidence should not be considered at the 12(b)(6) stage").  Nor do any of the exceptions to this rule apply.  For example, these declarations are not "integral or explicitly relied on in the complaint."  *See id.* Nor are they "items in the public record" to which the Court could take judicial notice.  *See B.H. Papsan v. Allain*, 478 U.S. 265, 268 n.1 (1986).  Thus, Court should disregard these declarations when deciding SemaConnect's Motion.

## VII.  CONCLUSION

For the above reasons, SemaConnect respectfully requests that its Motion be granted.

---

transactions."  (*Compare* Opp. at 32 *with* Dkt. 43-3 at 24.)   Finally, SemaConnect's CEO described SemaConnect's **entire** charging station as "very advanced technology," and not just the basic idea of network connectivity.  (*Compare* Opp. at 32 *with* Dkt. 43-3 at 32.)

DATED:  January 18, 2018                    Respectfully submitted,

                                            */s/ Alan L. Whitehurst*
                                            _____

                                            Alan L. Whitehurst
                                            DC Bar No. 484873 (admitted *pro hac vice*)
                                            alanwhitehurst@quinnemanuel.com
                                            Marissa R. Ducca
                                            DC Bar No. 979328 (admitted *pro hac vice*)
                                            marissaducca@quinnemanuel.com
                                            Deepa Acharya
                                            DC Bar No. 267654 (admitted *pro hac vice*)
                                            deepaacharya@quinnemanuel.com
                                            Scott E. Lerner
                                            D. Md. Bar No. 13327
                                            scottlerner@quinnemanuel.com
                                            QUINN EMANUEL URQUHART &
                                            SULLIVAN, LLP
                                            1300 I Street NW, Suite 900
                                            Washington, DC 20005
                                            Tel: (202) 538-8000
                                            Fax: (202) 538-8100

                                            Sean S. Pak
                                            CA Bar No. 219032 (admitted *pro hac vice*)
                                            QUINN EMANUEL URQUHART &
                                            SULLIVAN, LLP
                                            50 California Street, 22nd Floor
                                            San Francisco, CA 94111
                                            Tel: (415) 875-6600
                                            Fax: (415) 875-6700

                                            *Attorneys for Defendant SemaConnect, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document on January 18, 2018.

*/s/ Alan L. Whitehurst*
Alan L. Whitehurst